Ryan Rodriguez et al v. West Publishing Corporation et al                    Doc. 45

*No FEE*

1    ROBERT C. CHOJNACKI, CSB: 169936
     LAW OFFICES OF ROBERT C. CHOJNACKI
2    525 Laurel Avenue
     Menlo Park, CA 94025
3    Telephone:(510) 282-4110
     Attorney for Unnamed Classmembers and Objectors
4    David Oriol, Jason Tingle and Oliver Guiterrez

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 0 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

SCANNED

DOCKETED ON CM

OCT 17 2007

BY _____ 184

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       CENTRAL DISTRICT OF CALIFORNIA

8

9    RYAN RODRIGUEZ, REENA B.          )  Case No.:  CV-05-3222 R(MCx)
     FRAILICH, LOREDANA NESCI,         )  Honorable Manuel J. Real
10   JENNIFER BRAZEAL, and LISA GINTZ, )
     on behalf of themselves and all others )  **UNNAMED CLASSMEMBERS AND**
11   similarly situated,               )  **OBJECTORS DAVID ORIOL, JASON**
                                       )  **TINGLE AND OLIVER GUITERREZ'S**
12           Plaintiffs,               )  **NOTICE OF APPEAL TO THE UNITED**
13                                     )  **STATES COURT OF APPEALS FOR**
                                       )  **THE NINTH CIRCUIT**
14   v.                               )
                                       )  Bill _____
15   WEST PUBLISHING CORPORATION, a    )  Fees Pd _____
     Minnesota Corporation d/b/a BAR/BRI, )  Frms Gvn _____
16   and KAPLAN, Inc., a Delaware      )       CAD _____
     Corporation,                      )       TDO _____
17                                     )  Ntc/Dkt Mld _____
18           Defendants.               )  Fr Frms Gvn _____

19

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
20   FIRST CLASS MAIL, POSTAGE PREPAID, TO ALL COUNSEL
     (OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
     RECORD IN THIS ACTION ON THIS DATE.
21
     DATED: _____
22
     _____
     DEPUTY CLERK
23

24

25

26

27

28

                        NOTICE OF APPEAL                    (452)

Dockets.Justia.co

1       Notice is hereby given that unnamed classmembers and objectors, David Oriol,

2   Jason Tingle and Oliver Guiterrez hereby appeal to the United States Court of Appeals

3   for the Ninth Circuit from the United States District Court, Central District of California's

4   opinion and order filed on September 10, 2007, and entered on September 11, 2007. A

5   copy of the Opinion and Order is attached hereto as Exhibit A.

6       To the extent necessary to preserve their rights to appeal, David Oriol, Jason

7   Tingle and Oliver Guiterrez also notice their appeal of all prior interlocutory orders and

8   judgments.

9

10   Dated: October 9, 2007          LAW OFFICES OF ROBERT C. CHOJNACKI

11

12                                   By _____

13                                        ROBERT C. CHOJNACKI
                                         Attorney for Unnamed Classmembers and Objectors
14                                       David Oriol, Jason Tingle and Oliver Guiterrez

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEAL

ORIGINAL

JS6

ENTERED
CLERK, U.S DISTRICT COURT

SEP 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED
CLERK, U.S DISTRICT COURT

SEP 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RODRIGUEZ, REENA B. FRAILICH, LOREDANA NESCI, JENNIFER BRAZEAL, and LISA GINTZ, on behalf of themselves and all others similarly situated, | CASE NO. CV05-3222 R (MCx) |
| Plaintiffs, | |
| vs. | OPINION AND ORDER |
| WEST PUBLISHING CORPORATION, a Minnesota Corporation d/b/a BAR/BRI, and KAPLAN, Inc., a Delaware Corporation, | |
| Defendants. | |
| AND CONSOLIDATED ACTION | |

## I.    Introduction

This is a federal antitrust class action brought by Plaintiffs Ryan Rodriguez ("Rodriguez"),

Reena B. Frailich ("Frailich"), Jennifer Brazeal ("Brazeal"), Loredana Nesci ("Nesci"), and Lisa Gintz

("Gintz") (represented by Class Counsel McGuireWoods LLP) and Plaintiffs Kari Brewer ("Brewer")

and Lorraine Rimson ("Rimson") (represented by Class Counsel Finkelstein Thompson LLP and

Zwerling, Schachter & Zwerling, LLP, respectively) against Defendants West Publishing Corporation

(doing business as BAR/BRI) ("West") (represented by Liner Yankelevitz Sunshine & Regenstreif, LLP

and Shearman & Sterling, LLP) and Kaplan, Inc. ("Kaplan") (represented by Jones Day and Munger,

432

Exh. A.

1   Tolles & Olsen, LLP). Plaintiffs sue on behalf of themselves and more than 300,000 class members

2   nationwide who took a full-service bar review course from BAR/BRI between August 1, 1997 and July

3   31, 2006 ("the Class" or "Class Members"). The operative complaint alleges that: (1) BAR/BRI (now

4   owned by Defendant West) illegally acquired the assets of its direct competitor West Bar in violation of

5   Section 7 of the Clayton Act; (2) Defendant West unlawfully conspired with Defendant Kaplan to

6   restrain trade in the full-service bar review course market in violation of Section 1 of the Sherman Act;

7   and (3) Defendant West wrongfully monopolized the full-service bar review course market in violation

8   of Section 2 of the Sherman Act.

9   **II.     Procedural History**

10          After an extensive pre-filing factual investigation, Plaintiffs Rodriguez and Frailich ("Initial

11  Plaintiffs") filed the first complaint against Defendants in this Action in April 2005 alleging claims for

12  violation of federal antitrust laws ("Initial Complaint") The Initial Plaintiffs later filed a First Amended

13  Complaint ("FAC"), in which Plaintiffs Brazeal, Nesci, and Gintz joined. Plaintiffs Brewer and Rimson

14  filed a related action against Defendants in this Court entitled, *Brewer v  West Publishing Corp* , Case

15  No. CV-05-06211. The Court consolidated the two actions after motion practice on October 17, 2005.

16          The FAC, the operative complaint in this action, alleges claims for violation of Sections 1 and 2

17  of the Sherman Act, and Section 7 of the Clayton Act. The FAC seeks monetary damages and

18  injunctive relief. Defendants answered the FAC in July 2006, raising numerous defenses, including

19  statute of limitations, laches, proximate cause, standing, and *bona fide* business competition.

20          The action entered the discovery phase in August 2005. Plaintiffs took substantial factual and

21  expert discovery relating to liability, damages, and class certification issues. Plaintiffs reviewed and

22  analyzed over 400,000 pages of documents produced by Defendants and third parties, conducted one

23  deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), and deposed fourteen fact witnesses.

24  Defendants deposed the seven Plaintiffs, as well as three non-party witnesses. The parties also

25  conducted extensive expert discovery, including eight depositions of five different expert witnesses.

26  Plaintiffs and Defendants had a series of discovery disputes. These discovery disputes resulted in a

27  number of motions to compel before this Court and Special Discovery Master John Francis Carroll.

28          On March 13, 2006, Plaintiffs filed their Motion for Class Certification. Defendants raised many

1  challenges, including the relevant market definition, antitrust impact, and the existence of a formulaic

2  approach to damages. On May 15, 2006, after comprehensive briefing, including the submission of

3  detailed expert declarations and exhibits as well as extended oral argument, the Court certified a

4  national class defined as: "All persons who purchased a bar review course from BAR/BRI in the United

5  States from 1997 to the present." The Court appointed the seven named plaintiffs as class

6  representatives ("Class Representatives").

7        On June 29, 2006, after reviewing submissions from Plaintiffs and Defendants concerning the

8  proposed plan of notice to the Class, the Court issued an Order Re: Class Notice ("Class Notice Order")

9  which approved the proposed form of notice, and provided for dissemination by: (a) first-class mail; (b)

10  in national publications; and (c) over the internet. In accordance with the Class Notice Order, the Class

11  Action Notice ("Notice") was disseminated in July 2006. The Notice provided Class Members the

12  opportunity to request exclusion from the Class.

13        Defendants filed a petition with the Court of Appeals for the Ninth Circuit for leave to file an

14  appeal regarding the Class Certification Order. Plaintiffs filed an extensive opposition. The Ninth

15  Circuit denied Defendants' petition on August 11, 2006.

16        On July 17, 2006, Kaplan filed a motion for summary judgment seeking to dismiss Count II of

17  the FAC (the only count against Kaplan). Plaintiffs opposed the Motion and subsequently sought leave

18  to file two supplemental opposition briefs to the Motion, which the Court granted. The Court denied

19  Kaplan's Motion for Summary Judgment on September 18, 2006. Trial was set for February 13, 2007.

20        After completion of discovery, and with the February trial date approaching, the counsel for

21  Plaintiffs and Defendants, together with Rodriguez, Nesci, and Gintz, engaged in a formal mediation in

22  New York City on November 29, 2006. The Honorable Daniel Weinstein (Ret.) of JAMS, who has

23  substantial experience in resolving antitrust and class action cases, served as mediator. Plaintiffs were

24  represented by Class Counsel and Defendants were represented by their litigation counsel and their in-

25  house counsel. The record reflects that at all times the negotiations were at arm's-length and hard

26  fought. The parties were unable to reach a resolution on November 29, 2006.

27        Negotiations continued for the next several weeks with the assistance of the mediator. During

28  this time, the parties continued to prosecute discovery disputes and prepare for trial. After several

1  weeks of negotiations, an agreement was reached on all settlement terms. The Settlement Agreement

2  was executed on February 2, 2007. Plaintiffs Rodriguez, Nesci, and Gintz ("the Objecting Plaintiffs")

3  refused to authorize the execution of the Settlement Agreement on their behalf.

4        On March 19, 2007, over the objections of the Objecting Plaintiffs, the Court entered an Order

5  Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Directing

6  Dissemination of Notice to Class ("Preliminary Approval Order") that, among other things: (a) found

7  that the Settlement Agreement was negotiated in good faith, under the supervision of a well-respected

8  mediator, was the result of extensive arm's length negotiations, was concluded after Class Counsel

9  conducted broad discovery, and was sufficiently fair, reasonable, and adequate to warrant sending

10  notice of the Settlement to Class Members and holding a full hearing on the Settlement; (b) modified

11  the definition of the previously certified class to: "All Persons who purchased a bar review course from

12  BAR/BRI in the United States from August 1, 1997 through and including July 31, 2006"; (c) found

13  that the proposed forms and methods of notice met the requirements of the Federal Rules of Civil

14  Procedure, the United States Constitution, the Rules of the Court and all other applicable law; (d)

15  appointed a claims administrator; (e) established procedures for Class Members to object to the

16  Settlement; and (f) established the date for the Final Approval Hearing.

17        On June 18, 2007 and July 9, 2007, the Court conducted hearings on the fairness,

18  reasonableness, and adequacy of the Settlement. Twelve groups of Objectors were represented at the

19  first Final Approval Hearing (through counsel). Two of the three Objecting Plaintiffs - Nesci and

20  Rodriguez - were also present. At the Final Approval Hearing on July 9, 2007, after hearing argument

21  from the parties, Objectors and/or their counsel, and Objecting Plaintiffs Nesci and Rodriguez, the

22  Court: (1) granted Plaintiffs' Motion for an Order Granting Approval of the Class Action Settlement;

23  (2) denied Plaintiffs' Motion for Incentive Awards to Class Representatives; and (3) granted Class

24  Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses. This Opinion and Order

25  follows.

26  **III.**    **The Incentive Agreement and the Requests for Incentive Awards**

27        As part of their Retainer Agreement, the five Class Representatives represented by Class

28  Counsel Van Etten Suzumoto & Becket LLP (the predecessor to Class Counsel McGuireWoods LLP)

1    entered into an "Incentive Agreement" with their counsel.[1] Each of the five Class Representatives

2    represented by McGuireWoods signed the Incentive Agreement prior to entering the lawsuit. Under the

3    section entitled "Incentive/Compensation to Clients" the contingency fee-type contract obligates Class

4    Counsel to seek payment for each of the Class Representatives in an amount that adjusts based on the

5    end settlement or litigated victory amount. If the settlement or litigated victory was greater than or equal

6    to $500,000, Class Counsel would seek a $10,000 award per Class Representative. For $1.5 million or

7    more, Class Counsel would seek a $25,000 award. For $5 million or more, Class Counsel would seek

8    $50,000 and for $10 million or more, Class Counsel would seek $75,000. The five Class

9    Representatives who signed the Incentive Agreement all aver that they were never promised that they

10   would receive an incentive award and that any award was contingent on court approval. Such a promise

11   is not necessary to securing an award that is quickly becoming the grist of the class action money mill.

12           The Class was never advised of the Incentive Agreement. The Court was made aware of the

13   Incentive Agreement only after the Preliminary Approval Hearing, when the incentive payment requests

14   were made. Apparently, however, Defendants obtained a copy of the Incentive Agreement in April

15   2006.

16           The case settled for $49,000,000. Thus, per the Incentive Agreement, McGuireWoods is

17   contractually obligated to seek $75,000 for each Class Representative as an incentive payment.

18

---

19   [1] The section entitled "Incentive/Compensation to Clients" states in full: "In consideration for the
     services Clients will be providing, and as an incentive to Clients for their participation as Class
20   representatives here and to compensate them for all the burdens accruing therefrom, VSB agrees to seek
     payment for each Client in the following amounts: 1. The sum of $10,000 if the West case ends by
21   settlement or litigated victory with the payment to the Class a sum greater than or equal to five hundred
     thousand dollars ($500,000) in cash or anything of comparable value; 2. In supplement to the sum
22   identified in paragraph 1 directly above, an additional $15,000 (for a sum total of $25,000) will be paid
     to each client if the West case ends by settlement or litigated victory with the payment to the Class a sum
23   greater than or equal to one million five hundred thousand dollars ($1,500,000) in cash or anything of
     comparable value; 3. In supplement to the sum identified in paragraph 2 directly above, an additional
24   $25,000 (for a sum total of $50,000) will be paid to each client if the West case ends by settlement or
     litigated victory with the payment to the Class a sum greater than or equal to five million dollars
25   ($5,000,000) in cash or anything of comparable value; and 4. In supplement to the sum identified in
     paragraph 3 directly above, an additional $25,000 (for a sum total of $75,000) will be paid to each client
26   if the West case ends by settlement or litigated victory with the payment to the Class a sum greater than
     or equal to ten million ($10,000,000) in cash or anything of comparable value. 5. Such payments listed
27   above shall be subject to the following conditions: a. Clients have reasonably provided the assistance
     sought in paragraphs 1-3 under section "Services to be Rendered by Clients;" and b. any required Court
28   approval is first obtained; which VSB agrees to seek, as need be, at the pertinent time." (June 11, 2007
     Kanazawa Decl. Ex. 1 at 2-3.)

1  However, in the Settlement Agreement entered into on February 2, 2007, Defendants would only agree

2  not to oppose requests for incentive awards less than or equal to $25,000 for each Class Representative.

3  After the Settlement was reached, McGuireWoods communicated with the five Class Representatives it

4  represents about the incentive awards. Two of the five (Plaintiffs Brazeal and Frailich) agreed that

5  McGuireWoods would seek only $25,000 on their behalf. The three Objecting Plaintiffs refused to

6  agree to the lower amount and, as a result, McGuireWoods seeks $75,000 each for Plaintiffs Rodriguez,

7  Nesci, and Gintz pursuant to the terms of the Incentive Agreement. Class Counsel seeks these awards

8  on behalf of the Class Representatives despite the minimal assistance the Class Representatives

9  contributed to the prosecution of the litigation and the conflict of interests the contingency fee-type

10  agreement created between the Class Representatives and the Class Members.

11        The two other named plaintiffs, Plaintiffs Brewer and Rimson, who were represented by Class

12  Counsel Finkelstein Thompson LLP and Zwerling, Schachter & Zwerling, LLP, respectively, made no

13  ex-ante incentive award agreement with their clients. Plaintiffs Brewer and Rimson had no agreement

14  regarding any amount that would be requested as an incentive award on their behalf. Their counsel

15  maintain that they independently determined that $25,000 was an appropriate incentive award amount

16  for each of their Class Representatives.

17  **IV.    Jurisdiction**

18        This Court has jurisdiction over Class Members' claims because Plaintiffs have alleged

19  violations of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 18. 28 U.S.C. 1331.

20        This Court can also exercise personal jurisdiction over all absentee Class Members because

21  Class Members received proper notice of the action. The Notice informed potential Class Members of

22  the pendency of this Action and provided them with the opportunity to exclude themselves from the

23  Class. The Notice also informed Class Members of their opportunity to object to the Settlement and to

24  be heard at the Final Approval Hearing. As discussed further below, such notice satisfies the due

25  process requirements of the Fifth Amendment. *Brown v. Ticor Title Inc.,* 982 F2d 386, 392 (9th Cir.

26  1992).

27

28

## V.    Settlement Terms

### A.    The Settlement Fund

Consistent with the terms of the Settlement Agreement, Defendants paid forty-nine million dollars ($49,000,000) into an interest-bearing account for the benefit of the Class, which amount, plus interest ("Gross Settlement Fund"), has or will be used to pay for the costs of notice, settlement administration, taxes and attorneys' fees and expenses pursuant to the orders of this Court. After such payments from the Gross Settlement Fund, the balance will be distributed to the Class ("Net Settlement Fund") pursuant to the Plan of Allocation.

### B.    Plan of Allocation

Under the terms of the Plan of Allocation, the Net Settlement Fund will be distributed *pro rata* based on the amount each Class Member who submits a timely and valid Claim Form ("Authorized Claimant") paid BAR/BRI for the bar review course in relation to the amounts paid by all other Authorized Claimants. For example, if the amount paid for a bar review course by an Authorized Claimant equals 1/100,000 of the aggregate of such amounts paid by all other Authorized Claimants, then the Authorized Claimant will receive 1/100,000 of the Net Settlement Fund. The maximum amount of payment that any Authorized Claimant shall be entitled to receive from the Net Settlement Fund, however, shall not exceed thirty-percent (30%) of the amount the Authorized Claimant paid for the bar review course ("Maximum Payment").

Class Members also have the option of donating their portion of the Net Settlement Fund to the National Legal Aid and Defender Association ("NLADA"), for the purpose of providing training opportunities for young lawyers nationwide. NLADA, founded in 1911, is the oldest and largest national, nonprofit membership organization devoted to advocating equal access to justice for all.

Defendants are not entitled to a reversion of any money remaining in the Net Settlement Fund after distribution of the Maximum Payments to all Authorized Claimants. If any funds remain in the Net Settlement Fund after distributing the Maximum Payments to all Authorized Claimants, Class Counsel will make an application to the Court for a *cy pres* distribution of the residual amount of the Net Settlement Fund.

1    **C.    Provisions to Promote Competition in the Bar Review Market**

2         For purposes of Settlement, BAR/BRI and Kaplan agreed to terminate the marketing agreement

3    that Plaintiffs allege is unlawful and has allowed BAR/BRI to maintain a monopoly and Defendants to

4    divide the market. Further, for a period of five years following the Effective Date, BAR/BRI will

5    include the following statement on the forms it uses to enroll law students into its review courses:

6         NOTE: By signing this Enrollment Form and making an initial payment to BAR/BRI,

7         you are not committing yourself to taking the BAR/BRI Bar Review course or making

8         full payment to BAR/BRI for such course.

9         Finally, in the Settlement Agreement, BAR/BRI expressly states "that it is committed to

10    accurate advertising as required by the Lanham Act, the Federal Trade Commission Act and similar

11    laws, regulations and rules."

12    **D.    Release**

13         The Settlement Order provides that all Class Members (including any of their past, present or

14    future officers, directors, agents, employees, legal representatives, trustees, parents, associates,

15    affiliates, licensees, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors,

16    successors, and assigns), with the exception of those who exercised their right to opt out (identified in

17    Exhibit A to the Settlement Order), whether or not he, she, or it objects to the Settlement and whether

18    or not he, she, or it makes a claim upon or participates in the Settlement Fund, whether directly,

19    representatively, derivatively or in any other capacity, ever had, now has or hereafter can, shall or may

20    have concerning or relating to any conduct alleged in the FAC in this Action, and including without

21    limitation all claims that have been asserted or could have been asserted in any litigation against the

22    Released Parties or any of them for any conduct alleged in the FAC in this Action (collectively with all

23    claims referenced in the next paragraph, the "Released Claims"), are permanently enjoined from filing,

24    commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving

25    any benefits or other relief from, any other lawsuit, arbitration, or other proceeding against any or all

26    Released Parties, or order in any jurisdiction entered against any or all Released Parties that is based

27    upon, arises out of, or relates to any Released Claims.

28         Notwithstanding the foregoing, the Released Claims shall not include claims asserted against the



8

1   named defendants as of February 2, 2007, in the putative class actions, entitled *Park v. Thomson Corp.,*

2   *et al.,* Case No. 05 Civ. 2931 (WHP) and *Arendas v. Thomson Corp., et al.,* Case

3   6:06-cv-1113-Orl-28JGG, currently pending in the United States District Court, Southern District of

4   New York ("New York Actions").

5   **VI.    Notice and Dissemination Was Adequate**

6          Notice to the Class of the Settlement satisfied all applicable requirements, including due

7   process. Proper notice should provide: (a) the material terms of the proposed settlement; (b) disclosure

8   of any special benefit to the class representatives; (c) disclosure of the attorneys' fees provisions; (d) the

9   time and place of the final approval hearing and the method for objecting to the settlement; (e) an

10  explanation regarding the procedures for allocating and distributing the settlement funds; and (f) the

11  address and phone number of class counsel and the procedures for making inquiries. *See, e.g., Marshall*

12  *v. Holiday Magic,* 550 F.2d 1173, 1177-78 (9th Cir.1977); *In re Aetna Inc. Secs. Litig.,* MDL No. 1219,

13  2001 WL 20928 at * 5, 2001 U.S. Dist. LEXIS 68, at *16 (E.D. Pa. Jan. 4, 2001) (holding that the

14  notice must be "reasonably calculated under all the circumstances, to apprise interested parties of the

15  pendency of the action and afford them an opportunity to present their objections." (quoting *Mullane v*

16  *Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950) (citation omitted)). The Notice here met

17  all of these requirements and, thus, was adequate.

18          The Notice dissemination also satisfied all applicable requirements, including due process. The

19  Notice was mailed by first class mail to each Class Member identified from Defendants' records. The

20  Notice was also made available on a variety of internet sites – including that of the Claims

21  Administrator and Class Counsel. In addition, the Summary Notice describing the principal terms of the

22  Settlement Agreement and providing information on how a more detailed description of the Settlement

23  Agreement could be obtained was published in *The National Law Journal* (twice), *Lawyers Weekly*

24  *USA* (three times) and *USA Today* (once). The Summary Notice was sent by first-class mail to the

25  largest 200 law firms in the United States, as listed in *American Lawyer.* These publications and the

26  mailing to the 200 largest law firms specifically targeted the Class. Thus, the Notice dissemination was

27  adequate. *See, e.g., Silber v Mobon,* 18 F. 33 1449, 1452-54 (9th Cir. 1994) (approving notice sent by

28  first class mail as the "best notice practicable"); *Zimmer Paper Prods., Inc. v. Berger & Montague,*

1   *P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and

2   publication in the press fully satisfy the Notice requirement of both Fed. R. Civ. 23 and the due process

3   clause.") (citations omitted); *Montgomery v. Beneficial Consumer Disc. Co.*, No. 04- 2114, 2005 WL

4   497776, at *6, 2005 U.S. Dist. LEXIS 3249, at *19 (E.D. Pa. Mar. 2, 2005) (individual mailing

5   accompanied by publication in *USA Today* was best practicable notice under the circumstances; "[d]ue

6   process does not require actual notice, but rather a good faith effort to provide actual notice") (quoting

7   Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:53 (4th ed. 2002) ("*Newberg*").

8   **VII.   The Settlement Is Fair**

9       **A.   The Settlement Agreement Enjoys a Presumption of Fairness**

10         In the Ninth Circuit, a court affords a presumption of fairness to a settlement, if: (1) the

11   negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the

12   settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.

13   *Newberg* at § 11.41; *Young v. Polo Retail*, 2006 WL 3 050861, at *5, 2006 U.S. Dist. LEXIS 81077, at

14   *12-13 (N.D. Cal. Oct. 25, 2006). As described above, the Settlement was reached only after extensive

15   discovery had been conducted. Settlement negotiations occurred at arm's length for three months with

16   the assistance of a mediator and the Settlement Agreement was not reached until the eve of trial. Both

17   Class Counsel and Defendants' counsel are experienced in class actions, including antitrust class

18   actions. Moreover, only a small fraction of the Class objected to the Settlement. Thus, the Settlement

19   Agreement enjoys a presumption of fairness.

20       **B.   The Settlement Agreement is Fair, Adequate, and Reasonable**

21         "It is the settlement taken as a whole, rather than the individual component parts, that must be

22   examined for overall fairness." *Hanlon v Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). A court

23   may not delete, modify, or rewrite particular provisions of the settlement; rather, "[t]he settlement must

24   stand or fall in its entirety." *Id.* The Ninth Circuit has articulated eight factors to evaluate a settlement's

25   fairness, adequacy, and reasonableness:

26       (1)   The strength of plaintiffs' case;

27       (2)   The risk, expense, complexity, and likely duration of further litigation;

28       (3)   The risk of maintaining class action status throughout the trial;

1    (4)    The amount offered in settlement;

2    (5)    The extent of discovery completed, and the stage of the proceedings;

3    (6)    The experience and views of counsel;

4    (7)    The presence of a governmental participant;[2] and

5    (8)    The reaction of the class members to the proposed settlement.

6    *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *Hanlon,* 150 F.3d at 1026. All the applicable

7    factors favor a finding of fairness, adequacy, and reasonableness in this case. The Court also finds that

8    the conflict of interest between the Class Representatives and the Class Members does not disturb the

9    Court's finding that the Settlement is fair, adequate, and reasonable.

10              (1)    **The Strength of Plaintiffs' Case**

11         Although Plaintiffs prevailed on Kaplan's Motion for Summary Judgment and believe they

12    would prevail on any motion for summary judgment filed by BAR/BRI, defeating these motions does

13    not mean that Plaintiffs established Defendants' *prima facie* liability; whether they would obtain a

14    favorable, unanimous jury verdict as required by Federal Rule of Civil Procedure 48 is far from

15    guaranteed. *See, e.g., In re Airline Ticket Com'n Antitrust Litig.*, 953 F.Supp. 280, 283 (D. Minn. 1997)

16    (approving a settlement although it did not provide a full recovery of the potential losses and noting that

17    objectors failed to appreciate that on summary judgment, the court only decided that defendants did not

18    prevail as a matter of law, not that plaintiffs had a winning case). Claims for violation of federal

19    antitrust laws are notoriously difficult to prove. *See Palmer v. BRG,* 498 U.S. 46, 48 (1990). The

20    Court's ruling on Kaplan's Motion for Summary Judgment was simply a recognition that there were

21    material facts still in dispute. Accordingly, this factor weighs in favor of approving the Settlement.

22              (2)    **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

23         The risk, expense, complexity and duration of continued litigation also favored settlement.

24    These factors consider "the probable costs, in both time and money, of continued litigation." *In re*

25    *Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002). In most cases, "unless the

26    settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive

27

28    ――――――――――――――――――
      [2] There was no governmental presence with respect to the claims set forth in the action.

11

1 litigation with uncertain results." *Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*, 221 F.R.D. 523,

2 526 (C.D. Cal. 2004) (quoting *Newberg* at § 11:50 at 155). Indeed, settlement is encouraged in class

3 actions where possible. *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) ("It hardly

4 seems necessary to point out that there is an overriding public interest in settling and quieting litigation.

5 This is particularly true in class action suits which are now an ever increasing burden to so many federal

6 courts and which frequently present serious problems of management and expense."). Further, this

7 action is complex and, if not settled, is likely be enormously expensive and very lengthy. Antitrust class

8 actions "are notoriously complex, protracted, and bitterly fought" and "arguably the most complex

9 actions to prosecute." *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510

10 (E.D.N.Y. 2003) (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).

11 Additionally, the litigation would most likely take several years to finally resolve, considering the

12 length of trial and appeals. Accordingly, avoiding a trial and inevitable appeals in this complex,

13 antitrust suit strongly weigh in support of approval of the Settlement, rather than prolonged and

14 uncertain litigation. *See DIRECTV*, 221 F.R.D. at 527 ("Avoiding such a trial and the subsequent

15 appeals in this complex case strongly militates in favor of settlement rather than further protracted and

16 uncertain litigation"). Accordingly, this factor weighs in favor of approving the Settlement.

17        (3)    **The Risk of Maintaining Class Action Status Throughout the Trial**

18        As for the risk of maintaining class action status throughout the trial, this Court certified a

19 nationwide Class. Although Plaintiffs believe it is unlikely, there is no guarantee that Defendants would

20 not move for and obtain decertification of the Class before or during trial. *See In re Nasdaq Market-*

21 *Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). As noted by one court, if

22 "insurmountable management problems were to develop at any point, class certification can be revisited

23 at any time under Fed. R. Civ. P. 23(c)(1)." *Id.* Further, even if the Class remained certified throughout

24 the trial and Plaintiffs prevailed, Defendants would surely challenge class certification on appeal. If at

25 any point the Class were decertified or certification were reversed on appeal, the Class would recover

26 nothing. Thus, this factor also weighs in favor of approving the Settlement.

27        (4)    **The Amount Offered in the Settlement**

28        The relief offered in the Settlement also supports a finding that the Settlement is fair, adequate,

1  and reasonable. The Settlement includes a Settlement Fund of $49 million, as well as valuable non-

2  monetary relief. The $49 million represents approximately thirty-percent (30%) of Plaintiffs' damages,

3  estimated by their expert to be in the range of $158 million to $168 million, and seven times

4  Defendants' expert's estimate of damages. "[S]ettlement is about compromise, a yielding of the highest

5  hopes in exchange for certainty and resolution." *In re Warfarin*, 212 F.R.D. at 257-58 (finding

6  settlement amount representing 33% of maximum possible recovery was well within a reasonable range

7  when compared with recovery percentages in other class action settlements). Accordingly, this factor

8  weighs in favor of approving the Settlement.

**(5)    The Extent of Discovery Completed and the Stage of the Proceedings**

10       The extent of protracted and contentious discovery supervised by Special Master John Francis

11  Carroll completed and the stage of the proceedings when the parties reached the Settlement also

12  supports final approval of the Settlement. *See DIRECTV*, 221 F.R.D. at 528 ("A settlement following

13  sufficient discovery and genuine arms-length negotiation is presumed fair"). What is required is that

14  "sufficient discovery has been taken or investigation completed to enable counsel and the court to act

15  intelligently." *Newberg* at § 11:41. Here, Class Counsel conducted extensive discovery regarding each

16  of the relevant issues in the case, deposing more than a dozen witnesses and reviewing more than

17  400,000 pages of produced documents. When the parties reached the Settlement Agreement, they had

18  already engaged in numerous discovery disputes and Kaplan's Motion for Summary Judgment had

19  already been decided by the Court. Thus, this factor weighs in favor of approving the Settlement.

**(6)    The Experience and Views of Counsel**

21       In assessing the adequacy of the terms of a settlement, the trial court is entitled to, and should,

22  rely upon the judgment of experienced counsel for the parties. *See DIRECTV*, 221 F.R.D. at 528

23  ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with

24  the facts of the underlying litigation") (internal quotations and citations omitted); *see also Cotton v.

25  Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). The basis for such reliance is that "[p]arties represented

26  by competent counsel are better positioned than courts to produce a settlement that fairly reflects each

27  party's expected outcome in the litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.

28  1995). Indeed, when evaluating a proposed settlement, the trial judge, absent fraud, collusion, or the

13

1  like, should be hesitant to substitute its own judgment for that of counsel. *See Flinn v. FMC Corp.*, 528

2  F.2d 1169, 1173 (4th Cir. 1975); *Hanrahan v. Britt*, 174 F.R.D. 356, 366-368 (E.D. Pa. 1997) (finding

3  that a presumption of correctness applies to a class action settlement reached in arm's length

4  negotiations between experienced, capable counsel after meaningful discovery, citing the *Manual for*

5  *Complex Litigation* § 30.41 (2nd ed. 1985)). Here, Class Counsel have considerable experience in

6  litigating antitrust matters, class actions, and other complex litigation. Class Counsel concluded that

7  the Settlement terms are fair, adequate, and reasonable and in the best interests of the Class as a whole,

8  and recommended that it be granted final approval. This factor weighs in favor of approving the

9  Settlement.

10        **(8)    The Reaction of the Class Members to the Proposed Settlement**

11        Finally, the fact that the Settlement Agreement enjoys overwhelming support from the Class

12  supports a finding that the Settlement Agreement is fair, adequate, and reasonable. *DIRECTV*, 221

13  F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class

14  action settlement raises a strong presumption that the terms of a proposed class settlement action are

15  favorable to the class members."). The Notice was delivered by first class U.S. mail to approximately

16  376,000 Class Members. As of August 2007, more than 52,000 claims were filed. In contrast, only 54

17  Class Members submitted Objections; less than a thousandth of a percent of the Class. The relatively

18  low number of objectors supports a finding that the Settlement is adequate. *See, e.g., Boyd v. Cechtle*

19  *Corp*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the

20  class was persuasive that the settlement was adequate). Regardless, in any class action of significant

21  size, the absence of any objections would be "extremely unusual." *See In re Anthracite Coal Antitrust*

22  *Litig.*, 79 F.R.D. 707, 712-13 (M.D. Pa. 1978). Accordingly, this factor weighs in favor of approving

23  the Settlement.

24    **C.    Objections to the Settlement Agreement Are Overruled**

25        **(1)    The Adequacy of the Settlement Does Not Depend on the Individual Desires**

26                **of the Objecting Plaintiffs**

27        The Court rejects the arguments by four Objectors or groups of Objectors that the Settlement

28  should not be approved because the Objecting Plaintiffs object to the terms of the Settlement. To the

1  contrary, "agreement of the named plaintiffs is not essential to approval of a settlement which the trial

2  court finds to be fair and reasonable." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982); *see*

3  *also Lazy Oil Co. v. Witco Co.*, 95 F. Supp. 2d 290, 333-34 (W.D. Pa. 1997) (approving a settlement

4  and noting same). Multiple courts have approved class action settlements notwithstanding the

5  objections of the class representatives. *See, e.g., Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615,

6  631 (9th Cir. 1982); *Parker*, 667 F.2d at 1204 (affirming the approval of a settlement of an

7  employment discrimination class action over the objections of 10 of the 11 named plaintiffs); *Maywalt*

8  *v. Parker & Parsley Petroleum*, 864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd* 67 F.3d 1072 (2d. Cir. 1995)

9  (granting final approval of a securities fraud class action over some 2,700 objections, including certain

10  of the class representatives); *Boyd*, 485 F. Supp. at 624 (approving a consent decree in an employment

11  discrimination class action despite the fact that "[a]pproximately sixteen percent of the class, including

12  three of the four named plaintiffs, have filed some opposition to the settlement"); *Olden v. LaFarge*

13  *Corp.*, 2007 U.S. Dist. LEXIS 5954, at *40-41 (E.D. Mich. Jan. 29, 2007) (approving settlement

14  without the support of any of the class representatives). Plainly, "[t]o empower the Class

15  Representatives with what would amount to an automatic veto over the Proposed Settlement does not

16  appear to serve the best interests of Rule 23 and would merely encourage strategic behavior 'designed

17  to maximize the value of the veto rather than the settlement value of the claims.'" *Maywalt*, 864 F.

18  Supp. at 1430, quoting *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991).

19         **(2)**    **The Bifurcation Motion Is Improper, Lacks Merit and Is Denied**

20        Bifurcating the Section 7 claim from the Sherman Act claims, as requested by the Objecting

21  Plaintiffs, would create further obstacles and be a waste of time and resources. The moving party has

22  the "burden of proving that the bifurcation will promote judicial economy and avoid inconvenience or

23  prejudice to the parties." *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D.

24  Cal. 1992); *see also Ebay, Inc. v. Bidder's Edge, Inc.*, 2000-2 Trade Cases P 73,039, 56 U.S.P.Q.2d

25  1856, at *4 (C.D. Cal. July 25, 2000); *Burton v. Mountain W. Farm Bureau Mut. Ins. Co.*, 214 F.R.D.

26  598 (D. Mont. 2003). That burden cannot be met, as bifurcation belies judicial economy here. The only

27  difference between the Section 7 and Sherman Act claims is the damages. Bifurcation would result in a

28  duplication of time and effort that squanders judicial resources determining unimportant differences.

15

   (3)  **Courts Do Not Evaluate Settlements in Light of the Treble Damages that**

       **Might Be Available After a Successful Trial**

  The Court rejects the Objecting Plaintiffs' argument that the monetary portion of the Settlement is inadequate because the Section 7 claim is worth $360 million. Objecting Plaintiffs arrive at this figure by trebling Plaintiffs' expert's estimated damages of $146 million since 2001 and then multiplying that figure by their estimated chances of winning at trial. This analysis is flawed because it presupposes that Plaintiffs will succeed at trial. Evaluating the Settlement in light of the treble damages available at the end of a successful trial is purely speculative. Courts do not consider such damages when calculating a reasonable range of recovery. *See, e.g., Detroit v. Grinnel Corp.*, 495 F.2d 448, 458 (2d Cir. 1974) ("[T]he vast majority of courts which have approved settlements in this type of case . . . have given their approval to settlements which are traditionally based on an estimate of single damages only."); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24; 2005 U.S. Dist. LEXIS 27011, at *69-70 (D.N.J. Sept. 13, 2005) ("In order to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement to the estimated single damages."); *In re Warfarin*, 212 F.R.D. 231, 257 (D. Del. 2002) (citing *In re Lorazaepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002)).

   (4)  **The Lack of Provisions Prohibiting Future Misconduct or Dissolution Do**

       **Not Render the Settlement Inadequate**

  The Court rejects the argument by certain Objectors that the non-monetary relief is either illusory or insufficient because it does not prohibit Defendants from engaging in anticompetitive or unlawful conduct in the future. Courts are reluctant to sustain such objections, finding that the "best assurance against future antitrust violations by defendants is the persistent threat of litigation by any class member." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 337 (N.D. Ga. 1993) (approving a settlement as fair, reasonable, and adequate despite the absence of injunctive relief prohibiting the defendant from engaging in future misconduct). Furthermore, this objection was promoted by a competitor in one of Defendant West's operating areas.

The Settlement requires Defendants to terminate the agreement Plaintiffs allege is unlawful. BAR/BRI is also required to provide a clear statement to initial enrollees that they are not contractually obligated to pay the full amount for a BAR/BRI course should they choose not to take such a course upon graduation from law school. Since many law students enter into a contract with BAR/BRI in their first year of law school, Plaintiffs have argued that the obligation to pay the full amount for the course serves as a powerful hold on these students, thereby locking-up a substantial portion of the market for a three-year period. Thus, this provision removes a significant barrier to entry into the market by competitors, who would otherwise face the potentially overwhelming obstacle of trying to compete in a market with few available customers for several years after entry. Furthermore, BAR/BRI has stated that it is committed to accurate advertising as required by the Lanham Act, the Federal Trade Commission Act, and similar laws.

Other Objectors criticize the Settlement because it does not provide for the break-up of BAR/BRI. According to the Objecting Plaintiffs, "a significant number of class members are directly interested in the future" of the bar review industry and believe that BAR/BRI would be broken up if Plaintiffs instead went to trial and prevailed on the Section 7 claim. First, the overwhelming majority of Class Members are in favor of the Settlement and have not filed any objection arguing that the Settlement should be rejected because there are no provisions for dissolution. Second, there is no guarantee that Plaintiffs would prevail at trial and obtain an order breaking-up BAR/BRI. Even if Plaintiffs did prevail at trial, any verdict in their favor, including divestiture, would be subject to appeal, thereby delaying any recovery to the Class. Regardless, neither Class Counsel nor the Court can force competitors to enter the market.

(5)    **The Possibility of a Cap and a *Cy Pres* Award Are Proper**

The Court rejects the argument of certain Objectors that the possibility of a cap on individual recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members

17

1   who make a valid claim, the Maximum Payment prevents a small group from receiving a multi-million

2   dollar windfall. This 30% Maximum Payment coincides with Plaintiffs' expert's estimate that the

3   average overcharge resulting from Defendants' alleged conduct was approximately 30% nationwide.

4   The Maximum Payment does not create any benefit for Defendants, as they will not receive any money

5   back if the Maximum Payment and *cy pres* award are implicated. In that event, this Court will

6   determine the recipient of any *cy pres* award of the undistributed funds.

7
       ### (6)    The Sealed Record Does Not Impact Approval of the Settlement
8

9         The Court rejects the argument by certain Objectors that final approval of the Settlement should

10  be delayed and/or denied on the ground that the Class was purportedly denied access to the pleadings

11  filed under seal pursuant to a protective order entered by the Court on January 13, 2006 ("Protective

12  Order"). These Objections are moot, untimely, and more importantly, ignore the crucial role served by

13  the Court in the class action settlement approval process. These Objections disregard the fact that, in its

14  role as guardian for the Class, this Court has had access to all of the pleadings filed by the parties,

15  including those under seal pursuant to the Protective Order. The Court's access to and review of these

16  documents throughout the pendency of this Action precludes any contention that this Court is

17  incapable of assessing the fairness, adequacy, and reasonableness of the Settlement. To the contrary,

18  this Court is intimately familiar with facts and legal theories in this matter. *See Newberg* at § 11.25,

19  quoting *Manual for Complex Litigation* (Third) § 30.41 (1995).

20
          The Objections based upon the inaccessibility of documents are untimely. Class Members
21
    received notice of the Settlement in early April 2007, and could have acted earlier to obtain access to
22
    the materials. Instead, they waited five weeks, until the Objections were due, to request a continuance
23
    of the Final Approval Hearing to permit a review the sealed documents, or in the alternative, a rejection
24
    of the Settlement.
25
       ### (7)    Class Counsel Has Fulfilled Its Fiduciary Obligation to the Class as a
26
             Whole and Is Adequate Under Fed. R. Civ. P. 23
27

28
          The Court rejects the argument by one Objector that Class Counsel are inadequate due to a

"rift" within McGuireWoods (one of three Class Counsel), allegedly because "one of the partners, Eliot Disner, has filed a brief objecting to the proposed settlement...." This is inaccurate. The brief in question, although apparently drafted by Disner or at his direction, was filed by the Objecting Plaintiffs without the authorization of Class Counsel. Moreover, Disner initially agreed to the Settlement and supported it at the Preliminary Approval Hearing on March 19, 2007. Class Counsel maintains that the viability of the theories espoused in the unauthorized filing by the Objecting Plaintiffs were thoroughly considered by Class Counsel prior to entering the Settlement, with the ultimate decision by Class Counsel as a whole (including Disner) that the Settlement was fair, adequate, and reasonable.

Between the Preliminary Approval Hearing and the Final Approval Hearing, Disner left McGuireWoods on May 22, 2007. Then, prior to the Final Approval Hearing, Disner filed an Ex Parte Application to Permit Lead Counsel to Speak Freely and, later, an Objection to the Settlement Agreement with the Court. The Court denied the Application and overruled the Objection because Disner was never appointed Class Counsel; McGuireWoods was appointed Class Counsel. Disner was not in a position to object to the Settlement Agreement, as he was only one of at least half a dozen McGuireWoods attorneys who helped negotiate the Settlement Agreement and only one of hundreds of McGuireWoods partners firm-wide. There is no compelling reason for the Court to grant Disner a Settlement Agreement veto. Therefore, the Court finds that Disner's subsequent reversal of position and departure from McGuireWoods is immaterial to the Court's consideration of the fairness, reasonability, and adequacy of the Settlement.

Class Counsel has fulfilled its fiduciary duty to the Class as a whole. The primary responsibility of class counsel is to represent the entire class as it believes appropriate. *See* Advisory Committee Note, Fed. R. Civ. P. 23(g) ("Paragraph (1) . . . articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members."); *see also Newberg* at § 11.65 ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint."); *Greenfield v Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before the court."). Class

counsel must make their own determinations about the appropriate course of action, taking full account of their fiduciary obligation to the class as a whole. *See Olden*, 472 F. Supp. 2d at 939; *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986); *Lazy Oil Co.*, 166 F.3d at 590. The Court finds that Class Counsel fulfilled its fiduciary obligation to the Class as a whole and is adequate under Rule 23.

All other objections are overruled on relevance and other grounds.

## VIII. The Court, in Its Discretion, Declines To Award Incentive Payments to the Class Representatives

### A. The Factors Courts Consider in Deciding Whether to Award an Incentive Payment and the Purposes for Which Courts Award Incentive Payments

The decision whether to award an incentive payment to a class representative, and the size of that award, is entirely within the trial court's discretion. *See, e g , In re Mego Fin. Corp. Sec Litig*, 213 F.3d 454, 458, 462 (9th Cir. 2000). "The criteria courts may consider in determining whether to make an incentive award include: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (S.D. Cal. 1995) (approving an award of $50,000 (half of the amount requested) to a named plaintiff who actively participated in a litigation that lasted many years, provided "key testimony" at trial, and did not receive great personal benefit from the common fund). Case law from other circuits is in accord. *See, e.g., Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991) ("Courts in [the Sixth Circuit] review the following factors when considering a request for class representative incentive awards: (1) the action taken by the Class Representatives to protect the interests of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial

risk; and (3) the amount of time and effort spent by the Class Representatives in pursuing the litigation."); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."). Courts generally evaluate class representative incentive awards individually. *See, e.g., Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1220-22, 1234-38 (S.D. Fla. 2006) (granting a reduced incentive award to a named plaintiff who entered into an improper fee sharing agreement with his attorney after finding that the conflict of interest created by it warranted partial forfeiture of the otherwise warranted award); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *18, 2005 U.S. Dist. LEXIS 13555, at *57 (C.D. Cal. 2005) (awarding different amounts to different named plaintiffs).

The purposes for which courts award incentive payments are threefold. First, incentive awards compensate class representatives for work done by them on behalf of the class under a quantum meruit theory. *See Enter. Energy Corp.*, 137 F.R.D. at 251; *see also, Financial Arrangements in Class Actions and the Code of Professional Responsibility*, 20 FORDHAM URB. L.J. 831, 834-835 (1993) ("*Financial Arrangements in Class Actions*"). This is the same reason attorneys' fees, expert fees, and other costs of litigation are generally deducted from the common fund - to prevent a windfall to the class. Second, incentive awards are used to compensate class representatives for risks undertaken by them in bringing the class action. *See, e.g., In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992). These risks include retaliation resulting in personal or financial harm, discrimination, trouble finding employment, and significant financial risk. *See, e.g., Cook*, 142 F.3d at 1016 (workplace retaliation); *Allapattah Servs.*, 454 F. Supp. 2d at 1220-21 (financial retaliation); *Women's Comm for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977) (discrimination); *Glass v. UBS Fin. Servs., Inc.*, Slip Copy, 2007 WL 221862, at *16, 2007 U.S. Dist. LEXIS 8476, at *52 (N.D. Cal. Jan. 26, 2007) (trouble finding employment); *Enter. Energy Corp.*, 137 F.R.D. at 251 (significant financial risk). Third, some courts award incentive awards to class representatives in recognition of their willingness to act as a private attorney general. *See, e.g., In re Continental/Midlantic S'holders Litig.*, 1987 WL 16678, at *7, 1987 U.S. Dist. LEXIS 8070, at *12-13

(E.D. Pa. Aug. 29, 1987).

**B.    The Court Considered the Relevant Factors and the Purposes for Which Courts Award Incentive Payments in Deciding Not to Award Incentive Payments**

(1)    The Risk to the Class Representative in Commencing Suit

None of the Class Representatives faced substantial risks in bringing this suit. All seven of their retainer agreements provided that Class Counsel would front all fees and costs in bringing the litigation, and seek reimbursement for those fees and costs as part of any settlement or judgment. *Cf. Enter. Energy Corp.*, 137 F.R.D. at 251 (finding there was a significant financial risk where class members were contractually obligated to pay all expenses incurred in the pursuit of the litigation if they were not otherwise paid, amounting to hundreds of thousands of dollars). There is no indication the Class Representatives were threatened with financial or personal harm in retaliation for their having brought this suit, and there was no risk of being discriminated against. Plaintiffs' argument that the Class Representatives here faced some risk to their careers, citing *Glass v. UBS Financial Services, Inc.*, is unavailing. 2007 WL 221862, at *16. In *Glass*, the class representatives were securities brokers still currently employed in the securities industry and had "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America." *Id.* at *16. There is no indication that Class Representatives face inordinate or significant risks to their professional reputations as lawyers as a result of suing a publishing company and test provider for whom they have never worked and for whom it is not likely that they would consider working. Furthermore, this Court finds it hard to believe that any potential legal employer would consider it a negative for an attorney to be litigious. Thus, this factor weighs against awarding incentive payments.

(2)    The Notoriety and Personal Difficulties Encountered by the Class Representatives

Although the Class Representatives likely received some notoriety in bringing this lawsuit, they received a significant amount of positive press also. This Court is aware of no personal difficulties of consequence encountered by the Class Representatives. Accordingly, this factor weighs against

1   awarding incentive payments.

2       (3)    **The Amount of Time and Effort Spent by the Class Representatives**

3

4       The incentive award amounts requested by Plaintiffs are unreasonable: (1) in light of the time

5   and effort spent by the Class Representatives in furtherance of this litigation; (2) after analyzing the

6   value of the work done; and (3) when compared to the recovery of the unnamed Class members

7   pursuant to the Settlement Agreement. In their Motion for Incentive Awards to Class Plaintiffs, the

8   three Objecting Plaintiffs requested $75,000 each; the four Settling Plaintiffs requested $25,000 each.

9   At the first Final Approval Hearing on June 18, 2007, the Court ordered Class Counsel to provide

10  documentation for each of the Class Representatives indicating his/her time spent working on the

11  litigation, and the value of such time, using a lodestar-type calculation. In response, each of the Class

12  Representatives filed declarations with the Court and Class Counsel filed briefs arguing in support of

13  the requested amounts. As part of the Settlement Agreement, Defendants agreed not to oppose the

14  Class Representatives incentive award requests up to $25,000 and, thus, filed nothing in response to

15  Plaintiffs' papers.

16      The time and effort spent by the Class Representatives does not justify the huge incentive

17  awards requested. The Class Representatives' declarations contain extensive entries for interpersonal

18  communications, including emails and telephone calls, meetings with reporters and photographers, and

19  several hours spent reviewing news articles about the case. Three of the Class Representatives "billed"

20  their time in .10 hour increments. A substantial portion of these billings were amassed between January

21  1, 2007 and June 23, 2007. Even assuming all of the hours claimed are justified, the amount of time

22  and effort spent by the Class Representatives does not justify an incentive award in the tens of

23  thousands of dollars. Just because the Class Representatives in this case happen to be attorneys does

24  not mean that the time they spent working as Class Representatives in furtherance of this litigation

25  should be charged to the rest of the Class at $250 an hour. *See Newberg* at § 15:22 (4th ed. 2002)

26  (collecting case law indicating that attorneys who wish to represent the class in a class action should

27  not also act or be paid as class counsel); *Gilbert v. Master Washer & Stamping Co.*, 87 Cal. App. 4th

28  212, 221 (2001); *Bruno v. Bell*, 91 Cal. App. 3d 776, 788 (1979).

1      Class Counsel cites *Glass, Bradburn, and In re Insurance Brokerage Antitrust Litigation* as

2  recent opinions that support the amounts requested here. In fact, these cases are easily distinguishable

3  and reveal just how unreasonable the amounts requested in this case really are. *Glass*, 2007 WL

4  221862, at *17; *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.)*, Slip Copy,

5  2007 WL 1468847, at *19, 2007 U.S. Dist. LEXIS 35899, at *57-58 (E.D. Pa. May 14, 2007); *In re*

6  *Ins. Brokerage Antitrust Litig.*, Slip Copy, 2007 WL 1652303, at *10-11, 2007 U.S. Dist. LEXIS

7  40729, at *68-69 (D.N.J. June 5, 2007). In *Bradburn,* the court approved a $75,000 award to a small

8  business that served as a named class representative from a total settlement of $39,750,000. The

9  *Bradburn* representatives worked closely with their class counsel for over four years, undergoing nine

10  depositions and providing testimony at the class certification hearing while preparing to attend and give

11  testimony at the trial. 2007 WL 1468847, at *17-19. Significantly, there were no objections to the

12  award. *Id.* at *19. In the instant matter, three of the Class representatives are requesting individual

13  awards of $75,000 -- an amount that was awarded based on the collective efforts of several

14  representatives of a small business in *Bradburn. Id.* Further, the representatives in *Bradburn* were

15  involved in litigation spanning four years, more than double the time involved in this case. *Id.* Finally,

16  while there were no objections to the award requested by the class representative in *Bradburn*, the

17  Court has received several objections by Class Members to the amounts requested by the Class

18  Representatives in this matter. *Id.*

19      *Glass* is likewise distinguishable. 2007 WL 221862, at *16-17. In that case, the court approved

20  $25,000 from a settlement of $45 million to each of the four named plaintiffs out of a class of 13,000

21  members. *Id.* In approving the awards, the court relied on the class counsel's declaration that the

22  named plaintiffs provided a great deal of informal discovery and insight into the policies and practices

23  of the defendant, and took into account the risk they faced suing a major employer in their industry. *Id.*

24  at 16-17. Here, the Class Representatives provided no such insights and faced no such risk, yet three of

25  them seek three times the amount requested by the class representatives in *Glass*. While in *Glass* there

26  was only one objection to the incentive awards amounts requested, here, a number of Objectors

27  vehemently oppose the incentive award payments, some even filing briefs addressing the issue. *Id.*

28  Finally, in *Glass*, the court noted that the settlement provided for a maximum of $100,000 in incentive

1    awards, subject to court approval. *Id.* at 16. Here, Defendants agreed only not to oppose incentive

2    award requests for $25,000 for each of the Class Representatives.

3        In *In re Insurance Brokerage Antitrust Litigation*, the court awarded an incentive payment of,

4    only $10,000 to each of fifteen named plaintiffs in an antitrust class action that resulted in a $121

5    million settlement fund. Slip Copy, 2007 WL 1652303, at *1, 10-11. The duration of the litigation in

6    that case was approximately the same as in this case, just under two years. *Id.* at *1. Also, the court

7    noted that there was only one objection to the amount requested and that the objection "lacked any

8    supporting case law or a thorough explanation as to why [the amount requested] should be considered

9    excessive." *Id.* at *11. Here, the Class Representatives seek bigger awards for the same type of

10    litigation, lasting about the same amount of time, that resulted in a smaller settlement fund. Also, in

11    this case, there are a number of outspoken Objectors who make valid and well-reasoned arguments

12    regarding the value of the work done by the Class Representatives and the impropriety of the Incentive

13    Agreement which five of them signed.

14

15        Most problematic, however, is the value to the litigation of the time and effort spent by the

16    Class Representatives. Although they are all attorneys, the Class Representatives were not Class

17    Counsel and it was unnecessary for them to have done work duplicative of that of the attorneys

18    representing the Class. The Class Representatives' declarations reflect that they spent much of their

19    time on this case researching case law and extensively reviewing documents produced in discovery,

20    pleadings, and deposition transcripts. The Class is already paying for those services, and Class Counsel

21    is being compensated for those services, through the Court's grant of Class Counsel's Motion for

22    Attorneys' Fees and Reimbursement of Costs. Again, none of the Class Representatives are current or

23    former employees of any of the Defendants in this case, so they could not provide extensive "informal

24    discovery" or "insight" into the practices of Defendants, as did the class representatives in *Glass*. 2007

25    WL 221862, at *17. Indeed, the fact that most of the Class Representatives contracted in advance the

26    amount of the incentive award that Class Counsel would request on their behalf, based solely on the

27    amount of recovery, leads the Court to believe that there is no correlation whatsoever between the

28    amount of work done, or the value of the work done, and the amount requested.

1  Finally, it is estimated that each Class Member who files an appropriate claim against the

2  Settlement Fund will receive about $125. The Settling Plaintiffs are requesting an amount

3  approximately 200 times that amount; the amount the Objecting Plaintiffs seek is approximately 600

4  times the amount each Class Member is expected to receive. Such a large discrepancy is inherently

5  suspicious and weighs against a finding that incentive awards are warranted. *See Staton v. Boeing Co.*,

6  327 F.3d 938, 975 (9th Cir. 2003) (finding a "serious concern[]" as to fairness, adequacy and

7  reasonableness" that the named plaintiffs would receive, on average, sixteen times greater damages

8  than each of the unnamed class members). Therefore, this factor weighs against awarding incentive

9  payments.

10      **(4)     The Duration of the Litigation**

11

12  Fourth, the duration of this litigation was relatively quick, given that antitrust litigation often

13  spans many years, the Complaint in this case was filed only two years before the Settlement Agreement

14  was reached, and the Class Representatives were not actively involved in trial preparations. *See*

15  *Bradburn*, Slip Copy, 2007 WL 1468847, at *57-58 (awarding a $75,000 incentive payment to a small

16  business that served as a class representative in class action antitrust lawsuit and worked closely with

17  their class counsel for over four years, undergoing nine depositions and providing testimony at the

18  class certification hearing while preparing to attend and give testimony at the trial). Thus, this factor

19  weighs against awarding incentive payments.

20      **(5)     The Personal Benefit Enjoyed by the Class Representative**

21

22  This factor weighs neither for or against an award of incentive payments.

23

24  After carefully considering the factors courts consider in deciding whether to award incentive

25  payments, and the purposes for which courts award incentive payments, the Court declines to award

any of the Class Representatives incentive payments in this case.

26

27  **B.     The Incentive Agreement is Inappropriate and Contrary to Public Policy**

28

Additionally, the Court declines to award incentive payments to the five Class Representatives

26

1  who signed the Incentive Agreement[3] because that agreement is inappropriate and contrary to public

2  policy. This appears to be the first case in which a class representative entered into a contingency fee-

3  type contract with class counsel from the outset whereby class counsel agreed to request a particular

4  incentive award on behalf of the class representative based on the amount of the ultimate recovery.

5  However, some commentators have opined that such agreements might be acceptable. *See* Clinton A.

6  Krislov, *Scrutiny of the Bounty. Incentive Awards for Plaintiffs in Class Litigation*, 78 ILL. B.J. 286,

7  290 (1990). ("While the plaintiff's attorney cannot promise the plaintiff an award in advance, there

8  would seem to be no reason to question the attorney's commitment in the initial engagement agreement

9  to request an incentive award if the primary claim is successful."). The Court strongly disagrees. These

10  contracts: (1) lead to an improper request of the court; (2) create the appearance of impropriety; (3) fail

11  to correlate the amount requested to any reasonable forecast of costs or risk incurred; (4) run afoul of

12  the California Rules of Professional Conduct; and (5) encourage "figurehead" lawsuits or "bounty

13  hunting" by potential class action plaintiffs.

14

15  **(1)    The Incentive Agreement Leads to an Improper Request of the Court**

16      The Incentive Agreement leads to an improper request of the Court, as it completely ignores the

17  factors courts should (and do) take into account when deciding whether to award incentive payments.

18  *See, e.g., Van Vraken*, 901 F. Supp. at 299-300. Under Federal Rule of Civil Procedure 11, claims,

19  defenses, and other legal conclusions presented to the court must be warranted by existing law or by a

20  nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment

21  of new law. Fed. R. Civ. P. 11. It is disingenuous, improper, and a violation of the Federal Rules, for

22  class counsel to request and argue for an arbitrary, contractually-obligated incentive award that is not

23  reflective of the factors courts consider in granting such requests.

24

25

26      [3] The Court recognizes that, of the five Class Representatives who signed the Incentive
27  Agreements, only the three Objecting Plaintiffs are requesting the $75,000 award pursuant to the terms
   of the Incentive Agreement. The two Settling Plaintiffs who signed the Incentive Agreements, Plaintiffs
28  Frailich and Brazeal seek $25,000, the same amount as the other two Settling Plaintiffs and the amount
   that Defendants agreed not to oppose in the Settlement Agreement.

### (2)    The Incentive Agreement Creates the Appearance of Impropriety

The Incentive Agreement itself creates at least the appearance of impropriety and can cloud the proceedings. Under the terms of the agreement, Class Counsel will request an incentive award on behalf of the Class Representatives based on the amount ultimately recovered, not on the amount of work to be done, the amount of time spent, the value of work done, or the risks undertaken in bringing the lawsuit. The contract essentially aligns the financial interests of the Class Representatives and Class Counsel in seeking the highest amount of monetary recovery possible in the shortest amount of time or for the least amount of work. Such an agreement runs afoul of the rule forbidding class counsel and class representatives from being the same person or otherwise having identical interests. *See, e.g., In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257, 260 (N.D. Cal. 1996) ("[A]n attorney may not serve as both class representative and class counsel."); *Turoff v. May Co.*, 531 F.2d 1357, 1360 (6th Cir. 1976) ("[T]he roles of class representative and of class attorney cannot be played by the same person."); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90-92 (7th Cir. 1977) ("Courts have also expressed fear as to the danger of champerty because of the close relationship between the putative class representative and counsel.").

Contracts such as these act to undermine class action settlement agreements. Even if it is not actually the case, courts (the ones charged with the responsibility of determining fairness, adequacy and reasonableness under Federal Rule 23) "fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Susman*, 561 F.2d at 91. Likewise, class members, who are generally not involved in settlement negotiations, justifiably fear collusion, especially when other remedies, such as injunctive relief, are minimal or nonexistent. Although the Court finds there was no collusion in this case, many of the Objectors understandably expressed these concerns in briefs and at the Final Approval Hearings. Further, when the defense counsel agrees not to oppose incentive award requests in line with the terms of the contract between the class counsel and the class representatives, it appears as if the class representatives were "bought off" by defense counsel. This is especially true where, as here, defense counsel uncovered the terms of the Incentive Agreement through discovery before settlement

1    negotiations even began. In this case, at least five different groups of Objectors argued that the $75,000

2    award requests for the Objecting Plaintiffs represent an attempt to "buy them off."

3            **(3)    The Incentive Agreement Fails to Correlate the Amount Requested to a**

4                 **Reasonable Forecast of Costs or Risk Incurred**

5

6          The Incentive Agreement is also improper because it fails to correlate the amount requested to a

7    reasonable forecast of costs or risk incurred. This invalidates the contract for the same reasons the

8    common law and state statutes disapprove of liquidated damages provisions that are not a reasonable

9    forecast of damages in the event of a breach - it undermines the purpose of allowing the clauses and the

10    policy against penalties. Liquidated damages provisions that are not a reasonable forecast of damages

11    in the event of breach of contract at the time the contract was made or, in some circumstances, not

12    reasonable in light of actual damages, are generally invalid. *See, e.g.,* Cal. Civ. Code § 1671 (2007)

13    (anticipated); Cal. Com. Code § 2718 (2007) (anticipated or actual).

14          Here, the Incentive Agreement was negotiated before this case was even filed. The contract

15    requires the Class Representatives to "cooperate fully in the investigation and pursuit of the matter"

16    and perform the other duties of a class representative before Class Counsel would seek any incentive

17    payment. However, if the Class Representatives did so, the sliding scale obligates Class Counsel to

18    make a greater incentive payment request for a greater monetary recovery, not for doing more work or

19    facing heightened risk. Indeed, had the case settled for more than $10 million dollars only a month

20    after it had been filed, before discovery had even commenced, Class Counsel would still have been

21    contractually obligated to seek an incentive payment of $75,000 per Class Representative. Thus, the

22    incentive award agreement provisions were never a reasonable forecast of costs or risks the Class

23    Representatives would incur. For the reasons discussed above, nor are they reasonable in light of the

24    actual costs incurred.

25

26            **(4)    The Incentive Agreement Runs Afoul of the California Rules of**

27                 **Professional Conduct**

28          Incentive award agreements such as the one at issue here are also inappropriate because they

violate the California Rule of Professional Conduct prohibiting fee-sharing with clients and fee-splitting among lawyers.[4] Cal. R. Prof. Conduct 2-200 (Financial Arrangements Among Lawyers);[5] Cal. R. Prof. Conduct 1-320 (Financial Arrangements with Non-Lawyers).[6]

The Incentive Agreement violates the ethics rule against fee-sharing with non-lawyers because it, in essence, promises the client a fee (over which the attorney has some control) for having brought the case. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 839 (noting that solicitation of clients using the promise of an incentive award to encourage plaintiffs to bring a lawsuit would violate professional disciplinary rules regarding solicitation and fee-splitting). The Incentive Agreement noted that the award was contingent on the approval of the Court. However, the contingency fee-like arrangement demonstrates that the Class Representatives believed they would be compensated for serving as named representatives and that Class Counsel had some control over the amount they would receive. Otherwise, they would not have contractually obligated Class Counsel to request a specific amount on their behalf. Class Counsel, for their part, agreed to seek the fee, regardless of whether or not it was actually warranted, to ensure they would be selected by Plaintiffs to bring the case. Furthermore, the plain language of the contract indicates that it was the parties' understanding that the incentive award request would be "rubberstamped" by the Court. The relevant

---

[4] "[T]he Central District of California has adopted the 'State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto' as the standard of professional conduct in the district. Local Rule Ch. VI., R. 1.2." *San Gabriel Basin Water v. Aerojet-General Corp.,* 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000).

[5] "(A) Neither a member nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer...." Cal. R. Prof. Conduct 1-320.

[6] "(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless: (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200; (B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future." Cal. R. Prof. Conduct 2-200.

section of the contract is titled "Incentive/Compensation to Clients" and repeatedly states that a certain amount "will be paid" depending on the amount of the recovery.[7]

Even though the fee is not paid directly by the lawyer, because both the attorneys fees and the incentive payments are deducted from the Settlement Fund and Class Counsel requests the incentive payment on the Class Representatives' behalf, this is indirect fee sharing. *See, e.g., In re Gould Secs. Litig.*, 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (refusing to grant an incentive award request that was not made pursuant to a contractual agreement because it "borders on permitting a lay plaintiff to share in the attorneys' fees."). Pursuant to the California Rules of Professional Conduct 1-320, attorneys are not permitted to pay incentive awards to class representatives out of the attorneys' fees award. *See Campbell v. Fireside Thrift Co.*, 2004 Cal. App. Unpub. LEXIS 216, at *36-38 ("Thus, when a class representative receives an incentive award as part of a settlement, it may either be paid from a common fund, if the settlement creates one, or directly by the defendant, as an addition to the other amounts to be under the settlement.") (citations omitted). Likewise, the Incentive Agreement is an attempt at improper fee sharing between an attorney and a client. To find otherwise would allow attorneys to skirt the ethics rule governing client solicitation. Cal. R. Prof. Conduct 1-400.

Furthermore, as Class Counsel and the Class Representatives in this case are all attorneys, the Incentive Agreement also violates the ethics rule prohibiting fee-splitting among lawyers. Cal. R. Prof. Conduct 2-200 ("[A] member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client."). Here, Class Counsel promised it would seek an incentive payment for the Class Representatives from the Court. This promise certainly has some value because it is the first step in getting the request granted. Also, the Class Representatives admittedly researched the claims they would bring against Defendants themselves prior to agreeing to serve as named

---

[7] Indeed, the promise of an incentive award undermines the purpose for which attorneys inform clients and prospective clients of the possibility of the court granting an incentive award request - to encourage the class representative's participation throughout the litigation. *See In re W. Union Money Transfer Litig.*, 2004 U.S. Dist. LEXIS 29377, at *53 (E.D.N.Y. Oct. 19, 2004).

1 plaintiffs in this class action. Surely they believed the case was worth a lot of money and wanted to

2 share in the ultimate recovery, even though they did not have the experience handling class actions and

3 complex litigation or knowledge of the applicable law to bring the case themselves. Fed. R. Civ. P.

4 23(g)(1). This is why they made the Incentive Agreement prior to agreeing to serve as a named

5 plaintiff. Thus, the Incentive Agreement is also an attempt at improper fee-splitting among lawyers.

6     (5)    **Incentive Agreements Such as This One Encourage Figurehead Cases and**

7         **Bounty Payments**

8

9         Incentive award agreements such as the one in this case are contrary to public policy because

10 they encourage figurehead cases and bounty payments by potential class counsel. Courts routinely

11 disapprove of figurehead lawsuits brought by plaintiffs too closely associated with the attorneys

12 bringing the lawsuit and anticipating large fee awards. *See, e.g., Susman v. Lincoln Am. Corp.*, 561

13 F.2d 86, 95 (7th Cir. 1977) (finding that an attorney's brother could not serve as a class representative);

14 *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984) (finding that a named

15 plaintiff who was class counsel's employee could not represent the class); *Turoff v. May Co.*, 531 F.2d

16 1357, 1360 (6th Cir. 1976) (finding that the attorneys who were part of the firm appointed as class

17 counsel (and their wives) were too closely associated with class counsel to represent the class). This is

18 due to the risk that the class representative would be more interested in maximizing the attorneys fees

19 award than in aggressively representing the class. *See, e.g., Susman*, 561 F.2d at 95; *Shroder*, 729 F.2d

20 at 1375; *Turoff*, 531 F.2d at 1360. When allowed to proceed, figurehead lawsuits often unnecessarily

21 encourage litigation, drive up attorneys fees awards, and give the proceedings the appearance of

22 impropriety. *See, e.g., Turoff*, 531 F.2d at 1360 (explaining that, when the class representatives are too

23 closely associated with class counsel it causes "manufactured litigation" and a "cloud" on the

24 proceedings).

25         Much like the figurehead lawsuits discussed above, the Class Representatives here are too

26 closely associated with Class Counsel. Because both the Incentive Agreement and the Retainer

27 Agreement between Class Counsel and the Class Representative are contingency fee arrangements,

28 their interests are aligned in obtaining the highest financial recovery possible. When the ultimate

amount of recovery determines both the attorneys fees and the incentive awards, there is a real fear that the class representatives are more interested in working with the class counsel only to maximize that award, rather than in aggressively representing the class. As evidenced by the oral arguments and briefing of some of the Objectors, the Incentive Agreement did in fact give the proceedings the appearance of impropriety. Thus, this relationship is contrary to public policy.

Likewise, courts and legislatures often disapprove of arrangements in which a bounty is paid to a plaintiff by an attorney to encourage the plaintiff to bring suit. *See, e.g., In re Gould Secs. Litig.,* 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (relating incentive awards to bounty payments). The payment of bounties to named plaintiffs violates public policy because it unnecessarily encourages litigation and creates class actions in which the lead plaintiff is unlikely to undertake a meaningful counsel selection process, engage in effective bargaining over lead counsel's fee, or adequately monitor lead counsel's performance. *See, e.g., In re Cendant Corp. Litig.,* 264 F.3d 201, 255 (3rd Cir. 2001) (noting also that lead counsel often select lead plaintiff rather than vice versa). Such arrangements can also lead to "bounty hunting" whereby prospective plaintiffs incite a bidding war between prospective class counsel. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 839-40 (noting that an undesirable consequence of promising incentive awards is that it will lead to bidding wars to attract plaintiffs, prompting plaintiffs to sign up with those who promise the highest amount); *In re Gould Secs. Litig.,* 727 F. Supp. at 1209 ("The real danger [of incentive awards] is a potentially undesireable precedent where every named plaintiff would expect a 'fee' or 'bounty' for the use of his or her name to create a class action. It is not difficult to envision a scenario ... of prospective named plaintiffs becoming involved in a bidding war ... with prospective class counsel.").

The usual grant of an incentive award request is not considered a bounty payment by most courts. *See, e.g., Deloach v. Philip Morris Cos., Inc.,* 2005 WL 1528783, at *3, 2005 U.S. Dist. LEXIS 13032, at *11-12 (M.D.N.C. June 29, 2005) (citing a number of cases in which courts have awarded incentive payments to named plaintiffs or class representatives and rejecting the argument that payment of incentive awards in class action litigation constitutes a bounty payment). However, the Incentive Agreement makes the present case very different. Because the contract was negotiated in advance, with

33

the understanding that the class representatives "will be paid" a specified amount correlated to a specified settlement or litigated victory amount and not to the amount or value of the work to be done by the class representative, the agreement represents a bounty payment. Indeed, if these arrangements were permitted, a rational plaintiff seeking counsel would be financially motivated to select his or her counsel based on which agreed to seek the largest incentive payment on his or her behalf. Also, counsel competing for named plaintiffs would be encouraged to contract to seek bigger and bigger awards on the plaintiff's behalf. In fact, because three of the Class Representatives did not join the lawsuit until after the initial complaint was filed, it appears as if Plaintiffs Brazeal, Nesci, and Gintz were recruited into the lawsuit by Class Counsel with the promise of incentive awards. Thus, in this case, granting the incentive award request would violate the public policy against bounty payments.

### C.    The Incentive Agreement Creates a Conflict of Interest Between the Contracting Class Representatives and the Unnamed Class Members

Most problematic, however, is the conflict of interest between the Class Representatives and the unnamed Class Members created by the Incentive Agreement. By entering into a contingency fee-type agreement with Class Counsel that correlated the incentive request solely to the settlement or litigated victory amount, the Class Representatives disaligned their interests with the interests of the Class. They no longer had the same interests as the Class in seeking injunctive relief or adequate compensation for alleged wrongs, or their continuing effects, for all Class Members. *See* Jerold S. Solovy et al., *The Head of the Class*, NAT'L LAW JOURNAL, Aug. 27, 1990, at 13 ("The primary difficulty with incentive awards is that they raise the specter that named plaintiffs may 'sell out' the interest of the class they purport to represent."). Worse, once a settlement offer of greater than $10 million was made, the Class Representatives had no financial incentive whatsoever in seeking injunctive relief or a larger settlement amount, as a settlement in that amount ensured a request for the contractually-capped incentive payment. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 840 (noting that "incentive awards could encourage collusion and 'suboptimal' class settlements, because plaintiffs with something extra to gain are not motivated to hold out for higher awards for the rest of the class."). Indeed, at the Final Approval Hearings, the Objecting Plaintiffs did

1   not argue that the lawsuit should not be settled or that it provided insufficient injunctive relief, but only

2   that Defendants should pay more.

3       Furthermore, once the threshold cash settlement amount was met, the Class Representatives had

4   no incentive to go to trial. In fact, it created a strong *disincentive* to proceed to trial, as it put the Class

5   Representatives in the position of risking $75,000 if they rejected any settlement amount over $10

6   million, for little potential return to themselves. A trial might return a much larger aggregate sum to the

7   class, but would increase individual returns, including those of the Class Representatives, only

8   marginally, if at all. A loss at trial would eliminate the incentive award, but a win would not increase it.

9   Thus, there was a disconnect between the interests of the Class Representatives and the unnamed Class

10  Members, and a consequent conflict of interests.

11      Although the notice and judicial approval requirements provide safeguards against conflicts of

12  interest and unreasonable settlements, here the parties did not disclose their agreement to the Court

13  from the outset and the agreement was never disclosed to the Class. *See Financial Arrangements in*

14  *Class Actions*, 20 FORDHAM URB. L.J. at 840. In fact, although apparently the Incentive Agreement was

15  provided to Defendants in April of 2006, no one informed the Court of the Incentive Agreement until

16  well after the Preliminary Approval Hearing, when the incentive award requests were made. The

17  failure to disclose this agreement to the Court violates the class representatives' fiduciary duties to the

18  class and duty of candor to the Court. *See Sipper v. Capital One Bank*, 2002 WL 398768, at *4 & n.8,

19  2002 U.S. Dist. LEXIS 3881, at *13 & n.8 (C.D. Cal. 2002) (citing other relevant cases and finding

20  that the failure to disclose the existence of a business relationship between class counsel and the named

21  plaintiff constituted a conflict of interest that destroyed the adequacy of the plaintiff's representation).

22  Class Members could not have consented to the conflict because they were never told about the

23  Incentive Agreement, as it was not included in the Notice sent to the Class Members which described

24  the incentive award requests.[8] Thus, the safeguards of notice and judicial approval could not operate to

25

26  ───────────────────

27  [8] The relevant section of the Notice reads: "All costs, fees, and expenses related to this lawsuit are to be paid out of the proceeds of the Settlement Fund. From the inception of the lawsuit, Class Counsel have not received any payment for their services in prosecuting the case, nor have they been reimbursed for

28  any out-of-pocket expenses. Class Counsel will apply to the Court for an award of *attorneys' fees* of 25% of the Settlement Fund and reimbursement of expenses advanced in the litigation ("Fee Petition").

1    prevent the conflict of interests here. The Court must now act to remedy the conflict by declining to

2    award incentive payments.

3         The conflict of interests here was not simply potential. Indeed, in this case there was an actual

4    manifestation of conflicting interest. The Objecting Plaintiffs claim that Class Counsel threatened to

5    not request incentive payments on their behalf pursuant to the Incentive Agreement if they did not

6    agree to the Settlement. This demonstrates that the Objecting Plaintiffs recognized that their own

7    interests diverged from those of the Class. Although the Objecting Plaintiffs argue that there is no

8    actual conflict of interests because they continue to object to the Settlement, the Objecting Plaintiffs

9    have never taken a position that jeopardizes their $75,000 incentive award request because they do not

10   object to the settlement with Kaplan. The $13 million settlement with Kaplan alone exceeds the $10

11   million provision in the Incentive Agreement which contractually requires Class Counsel to request a

12   $75,000 incentive payment on their behalf.

13        Thus, for the reasons discussed above, the Court declines to award any incentive awards to any

14   of the Class Representatives. Giving awards in this situation would be a violation of the Court's duty in

15   overseeing class actions and against the public interest.

16

17   **VI.    Attorneys Fees**

18        The Court finds that Class Counsel's Motion for Attorneys' Fees and Reimbursement of

19   Expenses is proper and grants the Motion.

20

21

22

23

___

24   Moreover, an application will be made to the Court for an incentive award of $25,000 for Plaintiffs
     Frailich, Brazeal, Brewer and Rimson, and $75,000 for Plaintiffs Rodriguez, Nesci and Gintz to

25   compensate them for their participation in, and prosecution of, this case on behalf of the Class, which
     included, among other things, producing documents, providing written discovery, consulting with Class

26   Counsel and members of the Class, and appearing for depositions ("Incentive Award Petition"). Class
     Counsel will file the Fee Petition and the Incentive Award Petition with the Clerk fo the Central District

27   of California, at the United States District Courthouse, 312 N. Spring Street, Los Angeles, California,
     90012 on or before May 7, 2007. The petitions will be available for inspection during normal business

28   hours at the office of the Clerk." Notice of Proposed Settlement of Class Action and Hearing Regarding
     Settlement at 3.

**VI.    Conclusion**

For the reasons set forth above,

(1)    The Court grants Plaintiffs' Motion for an Order Granting Approval of Class Action Settlement;

(2)    The Court denies Plaintiffs' Motion for Incentive Awards to Class Plaintiffs;

(3)    The Court grants Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses.

IT IS SO ORDERED.

DATED: September __10__, 2007.


MANUEL L. REAL

UNITED STATES DISTRICT JUDGE

37

## PROOF OF SERVICE

I am a citizen of the United States and employed in the County of San Mateo; I am over the age of eighteen years and not a party to the within entitled action, my business address is Law Office of Robert C. Chojnacki, 525 Laurel Avenue, Menlo Park, CA 94025.

On October 9, 2007, I served the within:

1.  **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT; and**

2.  **CIVIL APPEALS DOCKETING STATEMENT.**

on the parties in this action, by placing a true copy thereof in a sealed envelope(s), each envelope addressed as follows.

SEE SERVICE LIST ATTACHED

(x)     (By First Class Mail) I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail to be mailed by First Class mail at Menlo Park, California.

( )     (By Facsimile) I caused each such document(s) to be sent via facsimile to the addressee(s) below.

( )     (By California Overnight or Federal Express) I caused each such envelope to be sent by California Overnight or Federal Express to the offices of each addressee below.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct  Executed October 9, 2007 at Menlo Park, California.

Alison Harapat

1

2   Lead Class Counsel
    Sidney K. Kanazawa
3   McGUIRE WOOD, LLP
4   1800 Century Park East
    8th Floor
5   Los Angeles, CA 90067

6

7   Attorneys for Defendant West Publishing Corp. dba BAR/BRI.
8   Steven F. Molo
    James P. Tallon
9   SHEARMAN & STERLING, LLP
10  599 Lexington Avenue
11  New York, New York 10022-6069

12

13  Attorneys for Defendant Kaplan, Inc.
    Bradley S. Phillips
14  Stuart N. Senator
15  MUNGER, TOLLES & OLSON, LLP
16  355 South Grand Avenue
17  Los Angeles, CA 90071

18

19

20

21

22

23

24

25

26

27

28

SCANNED