

CUS-3222-R

PRIORITY MAIL
UNITED STATES POSTAL SERVICE®
WWW.USPS.COM

ES DISTRICT COURT
DISTRICT OF CALIFORNIA
CE OF THE CLERK
COURTHOUSE
GELES, CALIFORNIA 90012
OFFICIAL BUSINESS

RTS

A

NOV 21 2007
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY

Andrew H. Gilman
Dudley Avenue, 3rd Floor
Narberth, PA 19072

GILM116*_19072304416 1607 11 11/09/07
NOTIFY SENDER OF NEW ADDRESS
GILMAN
402 DEER LEDGE TRL
CEDAR PARK TX 78613-CRL

Not at this address

Dockets.Justia.com



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
WESTERN DIVISION
312 North Spring Street, Room G-8
Los Angeles, CA 90012
Tel: (213) 894-3535

October 23, 2007

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**SHERRI R. CARTER**
District Court Executive and
Clerk of Court

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(909) 328-4450

Robert Gaudet, Jr.
214 21st Avenue
Seattle, WA 98122
Tel: 206 332-1745 Fax: 401 232-6319
Email: robert_gaudet@yahoo.com

Re:  CV05-3222-R(MC) Notice of Appeal 10/10/07  Ryan Rodriguez et al v. West Publishing Co

Dear  Robert Gaudet, Jr.

Pursuant to Rule 3(e) of the Federal Rules of the Appellate Procedures, as amended November 1, 2003, a $5.00 filing fee and a $450.00 docket fee are required to be paid to the Clerk, U.S. District Court.

Please remit a cashier's check, certified bank check, business or corporate check, or money order drawn on a major America bank or the United States Postal Service payable to *Clerk, U.S. District Court* in the amount of $455.00. The Clerk's Office will also accept credit cards (Mastercard/Visa, Discover, American Express) for filing fees and miscellaneous fees. Credit card payments may be made at all payment windows where receipts are issued.

If payment is not received forthwith, the record on appeal in this case will not be processed. If you are attempting to proceed in forma pauperis, you will need to address this issue directly with the United States Court of Appeals.

Sincerely,

Clerk, U. S. District Court

By _____    L. Rendon
                                Deputy Clerk

*cc: Court of Appeals*

Robert Gaudet, Jr. (*pro se*)
robert.gaudet@yahoo.com
c/o Swedish Fulbright Comm'n
Vasagatan 15-17, Fourth Floor
SE-111 20 Stockholm
SWEDEN
Tel. +46 761355955
Fax: (401) 232-6319

Andrea Boggio (*pro se*)
boggio@stanfordalumni.org
1150 Douglas Pike
Smithfield, RI 02917
Telephone: (401) 232-6455
Fax: (401) 232-6319

Sandeep Gopalan (*pro se*)
sandeepgopalan@hotmail.com
P.O. Box 877906
Tempe, AZ 85287-7906
Tel. (480) 636-0710
Fax: (401) 232-6319

Elizabeth De Long (*pro se*)
Edelong06@gmail.com
9705 Fremont Ave. N.
Seattle, WA 98103
Tel. (206) 922-3044
Fax: (401) 232-6319

Representing Themselves *Pro Se*

FILED
CLERK, U.S DISTRICT COURT

OCT 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

DOCKETED ON CM

23 2007

BY _____ 184

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY FIRST CLASS MAIL, POSTAGE PREPAID, TO ALL COUNSEL (OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF RECORD IN THIS ACTION ON THIS DATE.
DATED: 10-23-07
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RODRIGUEZ, REENA B. FRAILICH, LOREDANA NESCI, JENNIFER BRAZEAL, and LISA GINTZ, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WEST PUBLISHING CORP., a Minnesota corp. d/b/a BAR/BRI, and KAPLAN, INC., a Delaware corp., <br><br> Defendants. <br><br> AND CONSOLIDATED CASE | Case No.: CV 05-3222 R(Mcx) <br><br> **NOTICE OF APPEAL OF OBJECTING CLASS MEMBERS ROBERT GAUDET, JR.; ANDREA BOGGIO; SANDEEP GOPALAN; ELIZABETH DE LONG** |

(486)

Notice is hereby given that objecting class members Robert Gaudet, Jr., Andrea Boggio, Sandeep Gopalan, and Elizabeth De Long hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Final Order and Judgment Approving Settlement (Doc. 429) entered on September 10, 2007, and all orders that merge in that final judgment, including without limitation the Opinion and Order (Doc. 432) entered September 11, 2007, and the Findings of Fact and Conclusions of Law (Doc. 433) entered September 12, 2007, and the Order Granting Class Counsel Attorneys Fees and Reimbursement of Expenses entered September 11, 2007.

Dated: October 9, 2007                 By:

_Robert Gaudet AB_

Robert Gaudet, Jr. (pro se)
c/o Swedish Fulbright Comm'n
Vasagatan 15-17, Fourth Floor
SE-111 20 Stockholm
SWEDEN
Tel: +46 76 1355955
Fax: (401) 232-6319
robert_gaudet@yahoo.com

Andrea Boggio (pro se)

1150 Douglas Pike

Smithfield, RI 02917

Tel: (401) 232-6455

Fax: (401) 232-6319

boggio@stanfordalumni.org


Sandeep Gopalan (pro se)

P.O. Box 877906

Tempe, AZ 85287-7906

Tel: (480) 636-0710

Fax: (401) 232-6319

Sandeepgopalan@hotmail.com

*Elizabeth De Long* AB

Elizabeth De Long (pro se)

9705 Fremont Ave. N.

Seattle, WA 98103

Tel: (206) 922-3044

Fax: (401) 232-6319

Edelong06@gmail.com

Objecting Class Members



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RODRIGUEZ, REENA B. FRAILICH, LOREDANA NESCI, JENNFIER BRAZIL, and LISA GINTZ, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>WEST PUBLISHING CORPORATION, a Minnesota Corporation d/b/a BAR/BRI, and KAPLAN, Inc., a Delaware Corporation,<br><br>    Defendants.<br><br>AND CONSOLIDATED ACTION | CASE NO. CV-05-3222 R(MCx)<br><br>[PROPOSED] FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT |

This matter came before the Court for hearing on June 18, 2007 and July 9, 2007, pursuant to the Order Granting Preliminary Approval of Class Action Settlement and Directing Dissemination of Notice to Class dated March 26, 2007 (the "Preliminary Approval Order"), on application for approval of the proposed

4670962 1

1

1   Settlement[1] set forth in the Stipulation and Settlement Agreement dated February

2   2, 2007, ("Settlement Agreement").

3       Pursuant to the Preliminary Approval Order, Notice was given to the Class.

4   The Notice advised Class Members of the opportunity to *inter alia*: object to the:

5   (1) Settlement Agreement and the Settlement; and/or (2) the Plan of Allocation.

6       On May 7, 2007 Class Counsel filed:  (1) Notice of Motion and Motion For

7   Final Approval of Class Action Settlement; (2) Declaration of Sidney K.

8   Kanazawa; and (3) Memorandum of Points and Authorities in Support of Final

9   Approval.

10      On May 17, 2007, plaintiffs/objectors Ryan Rodriguez, Lisa Gintz and

11  Loredana Nesci (the "Objecting Plaintiffs") filed an objection, *inter alia*, objecting

12  to entry of the Preliminary Approval Order (the "May 17 Objections").

13      On May 18, 2007, Class Counsel filed a response to the May 17 Objections.

14      On May 31, 2007, the Objecting Plaintiffs filed an *ex parte* application,

15  memorandum and declaration for an order to:  (1) allow Eliot Disner, Esq.

16  ("Disner") to "speak freely" on their behalf; (2) allow access to certain files: and

17  (3) clarify the status of Disner as a "co-lead counsel" (the "*Ex Parte* Application").

18      On June 1, 2007, Class Counsel filed an Opposition to the *Ex parte*

19  Application and defendants West Publishing Corporation ("West") and Kaplan,

20  Inc. ("Kaplan") filed objections to the *Ex Parte* Application (the "*Ex Parte*

21  Oppositions").

22      On June 7, 2007, the Objecting Plaintiffs filed a reply to the *Ex Parte*

23  Application.

24

25

---

26  [1]    Unless otherwise stated herein, all capitalized terms shall have the same
meanings as set forth in the Stipulation and Settlement Agreement dated February

27  2, 2007.

4670962 1

[PROPOSED] FINAL ORDER AND JUDGMENT - CV 05-3222 R(MCx)

| | DATE FILED | CLASS MEMBER |
|---|---|---|
| 13. | May 21, 2007 | Aaron Lukoff<br>John Prendergast<br>David Orange |
| 14. | May 22, 2007 | Daryl Chilimidos |
| 15. | May 22, 2007 | Nikki Love<br>John Bernitz |
| 16. | May 22, 2007 | Daniel M. Schafer |
| 17. | May 22, 2007 | Evans & Mullinix, P.A. |
| 18. | May 22, 2007 | Sarah Siegel |
| 19. | May 22, 2007 | Jennifer Brown McElroy |
| 20. | May 22, 2007 | Andrew Gilman<br>Stephen M. Vasil |
| 21. | May 23, 2007 | David Harris<br>Kareem Kamal<br>Matthew Kavanaugh<br>Simon Newfield<br>Jonathan Ricasa<br>Abigail Treanor<br>David Zelenski |
| 22. | May 23, 2007 | Pamela Collins |
| 23. | April 10, 2007 | Walenta Craig |
| 24. | May 28, 2007 | Richard A. Bodmer |
| 25. | June 12, 2007 | Stephen Lindholm |

On June 11, 2007, Class Counsel filed: (1) a reply memorandum in support of the Settlement which addressed the May 17 Objections and the objections set forth in the preceding paragraph (hereafter, the "Objections to the Settlement"); and (2) the declarations of: (a) Sidney K. Kanazawa, (b) Christine Bartholomew, (c) Richard Sartory, and (d) Hon. Daniel Weinstein.

4

On June 11, 2007, Defendants filed "Defendants' Combined Response To Various Class Members' Objections To Stipulation And Settlement Agreement." Also on June 11, 2007, West filed a reply memorandum to the May 17 Objections.

On June 15, 2007, Kaplan filed (1) "Notice of Filing of Declaration of Lee S. Taylor in Support of Motion for Final Approval of Settlement, Regarding Kaplan's Compliance with the Requirements of the Class Action Fairness Act;" and (2) Declaration of Lee S. Taylor, and subsequently filed (1) "Notice of Filing of Revised Declaration of Lee S. Taylor in Support of Motion for Final Approval of Settlement, Regarding Kaplan's Compliance with the Requirements of the Class Action Fairness Act;" (2) "Revised Declaration of Lee S. Taylor; Notice of Filing Under Seal;" and (3) "Declaration of Lee S. Taylor Authenticating and Attaching Documents."

On June 18, 2007, West filed the "Declaration of James P. Tallon Regarding the Class Action Fairness Act."

Pursuant to this Court's Order, on June 26, 2007, Class Counsel filed: (1) "Settling Plaintiffs' Supplemental Briefing In Support of Motion for Final Approval Re: 30% Distribution Limit to Authorized Claimants and *Cy Pres* Fund for Remainder;" and (2) "Declaration of Sidney K. Kanazawa." Also, on that date, Defendants filed: (1) "Defendants' Supplemental Brief Regarding Approval of Proposed Settlement, Addressing *Cy Pres* Provision of Proposed Settlement;" and (2) the Declaration of Stuart N. Senator.

In addition, on June 26, 2007, several objectors, including James Juranek, Audrey Juranek, Richard P. LeBlanc, III, David Harris, Kareem Kamal, Matthew Kavanaugh, Simon Newfield, Jonathan Ricasa, Abigail Treanor and David Zelinski, submitted additional briefing in further opposition to final approval of the Settlement.

1    On July 5, 2007, Eliot G. Disner filed a "Summary of Evidence Regarding

2  Defendant West Publishing Co.'s Violation of Section 2 of the Sherman Act (15

3  U.S.C. § 2)" and a "Re-Notice of Appearance of Counsel."

4    At the Final Settlement Hearing Objectors were given an opportunity to state

5  their objections to the Settlement Agreement, the Settlement and the Plan of

6  Allocation.

7    Having read and fully considered the terms of the Settlement Agreement, the

8  Plan of Allocation, and all submissions (which may include submissions not

9  specifically described above), written and oral, the Court finds the Settlement is

10 fair, reasonable and adequate:

11    **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED**

12 **THAT:**

13    1.    **Objections to the Settlement** – The Objections to the Settlement are

14 overruled.

15    2.    **Incorporation of Definitions** – This Final Order and Judgment

16 Approving Settlement (the "Judgment") incorporates by reference the definitions

17 in the Settlement Agreement, and all defined terms used herein shall have the same

18 meanings as set forth in the Settlement Agreement.

19    3.    **Jurisdiction** – The Court has personal jurisdiction over all Class

20 Members (as defined below) and has subject matter jurisdiction over this Action,

21 including, without limitation, jurisdiction to (1) approve the Settlement Agreement

22 and the Plan of Allocation, (2) grant final certification of the Class, and (3) dismiss

23 the Action with prejudice.

24    4.    **Final Class Certification** – The Class this Court certified in the

25 Preliminary Approval Order under Fed. R. Civ. P. 23(b)(3) is hereby finally

26 certified and consists of all persons who purchased a bar review course from

27 BAR/BRI in the Untied States from August 1, 1997 through July 31, 2006,

4670962 1

6

1    exclusive of those individuals set forth in Exhibit A hereto who timely requested

2    exclusion pursuant to the Court's Order of August 14, 2006.

3        **5.**    **Adequacy of Representation** – Plaintiffs and Class Counsel –

4    McGuireWoods LLP, Zwerling, Schachter & Zwerling, LLP and Finkelstein

5    Thompson LLP – have fully and adequately represented the Class and have

6    satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

7        **6.**    **Notice** – The Court finds that the distribution of the Notice, the

8    publication of the Summary Notice, the distribution of the Claim Form, and the

9    notice methodology were materially implemented in accordance with the terms of

10    the Settlement Agreement and the Preliminary Approval Order.  The Court further

11    finds that the Notice, Summary Notice and Claim Form were simply written and

12    readily understandable, and that the Notice, Summary Notice, Claim Form and

13    notice methodology: (i) constituted the best practicable notice, (ii) constituted

14    notice that was reasonably calculated, under the circumstances, to apprise Class

15    Members of the Settlement, their rights to object to the Settlement and to appear at

16    the Final Settlement Hearing, (iii) were reasonable and constituted due, adequate

17    and sufficient notice to all persons entitled to notice, and (v) met all applicable

18    requirements of the Federal Rules of Civil Procedure, the United States

19    Constitution (including the Due Process Clause), the Rules of the Court and any

20    other applicable law.

21        **7.**    **Final Settlement Approval** – The terms and provisions of the

22    Settlement Agreement have been entered into in good faith and are hereby fully

23    and finally approved as fair, reasonable and adequate as to, and in the best interest

24    of, each of the Settling Parties and the Class Members, and in full compliance with

25    all applicable requirements of the Federal Rules of Civil Procedure, the United

26    States Constitution (including the Due Process Clause), the Rules of the Court and

27    any other applicable law.  With respect to the determination that the Settlement

1  Agreement is fair reasonable and adequate, the Court specifically notes that the

2  outcome of a trial on the merits was by no means certain, this Action involved

3  highly complex factual and legal issues, the Settlement Agreement was reached

4  with the participation of a highly-respected mediator and retired judge, and the

5  monetary and non-monetary terms of the Settlement reflect substantial benefits.

6      8.    **Plan of Allocation** – The Court also hereby approves the Plan of

7  Allocation as a fair and reasonable method to allocate the Net Settlement Fund

8  among Class Members, and directs consummation of all its terms and provisions.

9      9.    **Dismissal of Action** – The Court dismisses on the merits and with

10  prejudice the First Amended Complaint and the Released Claims as defined in the

11  Settlement Agreement as to all Class Members.  Only the Persons identified in

12  Exhibit A hereto requested exclusion from the Class as of the deadline for opting

13  out.  These Persons so identified shall not share in the benefits of the Settlement.

14  The Court dismisses without prejudice the claims of such Persons who have

15  properly and timely excluded themselves in full accordance with the procedures set

16  forth in the Settlement Agreement.

17      10.    **Releases** – Upon the Effective Date of the Settlement, the

18  Representative Plaintiffs and each Class Member shall be deemed to have, and by

19  operation of this Final Order and Judgment shall, except as provided in paragraph

20  58 of the Agreement, (a) have released and forever discharged the released parties

21  from all manner of claims, demands, actions, suits, causes of action, whether class,

22  individual, or otherwise in nature, damages whenever incurred, liabilities of any

23  nature whatsoever, including costs, expenses, penalties and attorneys' fees, known

24  or unknown, suspected or unsuspected, in law or equity, that any member of the

25  Class (including any of their past, present or future officers, directors, agents,

26  employees, legal representatives, trustees, parents, associates, affiliates, licensees,

27  subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors,

4670962.1

[PROPOSED] FINAL ORDER AND JUDGMENT - CV 05-3222 R(MCx)

1  successors and assigns), whether or not he, she or it objects to the settlement and

2  whether or not he, she or it makes a claim upon or participates in the Settlement

3  Fund, whether directly, representatively, derivatively or in any other capacity, ever

4  had, now has or hereafter can, shall or may have concerning or relating to any

5  conduct alleged in the Complaint in this Action, and including without limitation

6  all claims that have been asserted or could have been asserted in any litigation

7  against the Released Parties or any of them for any conduct alleged in the

8  Complaint and Amended Complaint in this Action; and (b) in addition, upon the

9  Effective Date of the Settlement, the Representative Plaintiffs and each Class

10  Member shall be deemed to have, and by operation of this Final Order and

11  Judgment shall have waived and released any and all provisions, rights and

12  benefits conferred by § 1542 of the California Civil Code, which states:

13    **Section 1542. Certain Claims not Affected by General Release. A**

14    **general release does not extend to claims which the creditor does**

15    **not know or suspect to exist in his favor at the time of executing**

16    **the release, which if known by him must have materially affected**

17    **his settlement with the debtor;**

18  or by any law of any state or territory of the United States, or principle of common

19  law, which is similar, comparable or equivalent to § 1542 of the California Civil

20  Code. The Court has considered that each member of the Class may hereafter

21  discover facts other than or different from those which he, she or it knows or

22  believes to be true with respect to the claims which are the subject matter of

23  Paragraph 56 of the Agreement, but each member of the Class by operation of this

24  Final Order and Judgment has waived and fully, finally and forever settled and

25  released any known or unknown, suspected or unsuspected, contingent or non-

26  contingent claim with respect to the subject matter of Paragraph 56 of the

27

13. **Dismissal of Action** – This Action, including all individual claims and Class claims resolved by it, are hereby dismissed with prejudice against Defendants and all Class Members, without fees or cost except as otherwise provided by this Court.

14. **Non-Effect on Judgment** – Neither any modification or appellate reversal of the Plan of Allocation, the Fee Award or Incentive Awards, nor any orders entered by this Court thereon, shall in any way disturb nor affect the finality of the Settlement, and all such matters shall be considered separate from this Judgment.

15. **Effective Date** – If: (i) the Effective Date does not occur for any reason whatsoever; or (ii) the Settlement Agreement becomes null and void pursuant to the terms of the Settlement Agreement, this Judgment shall be deemed vacated and shall have no force or effect whatsoever.

16. **No Admissions** – Nothing in this Judgment, the Settlement Agreement or any aspect of the Settlement is or shall be deemed or construed to be an admission, concession or evidence of any violation of any statute or law or any liability or wrongdoing by any Defendant or Released Party or of the truth of any of the factual or legal claims or allegations relating to the subject matter of the Released Claims.

///
///
///
///
///
///
///
///

## OPT OUT MEMBER LIST

Adams, Christi R.
Orlando, FL

Adams, Kara Kinson
West Boxford, MA

Ahmad, Fatima
Montreal, Quebec, Canada

Albano, Molly E.
Southington, CT

Alexakis, Georgia
San Francisco, CA

Anderson, Dominic J.
Richland Center, WI

Andrews, Scott R.
Dublin, OH

Armesto, Castor
St Louis, MO

Ashe, Reagan
North Myrtle Beach, SC

Ast, Robyn
Chicago, IL

Avery, Robert Dean
Chicago, IL

Babbitt, Lindsay
Minneapolis, MN

Bacci, Bella Ee Ling
Napa, CA

Back, Ji-Yun
Arlington, VA

Barrila, Gaetano
Maple, Ontario, Canada

Batsedis, Olga
Dix Hills, NY

Bauer, Kristen A.
Mtn view, CA

Beck, Kimberly
Loveland, OH

Beretta, Jonathan, JD
Avondale, AZ

Bertin, Allen P.
Houston, TX

Birchfield, Jennifer
Rockford, IL

Blanchette, Jean-Pierre
New York, NY

Boesch, Victoria
Pasadena, CA

Bowen, Jeff J.
Los Angeles, CA

Boykin, Namosha
Washington, D.C.

Bracewell, Joseph S.
Washington, DC



Brady, Rebecca A
Cheektowaga, NY

Bragassam, Jossy
Singapore

Branton, Vincent A.
West Richland, WA

Brown, Necole M.
Lake Charles, LA

Brownstone, Rebecca B.
Calabasas, CA 91303

Buckner, Lauren
St. Louis, MO

Burgasser, Jessica J
Buffalo, NY

Burgos, Diana
Tampa, FL

Caldwell, Dan
Ormond Beach, FL

Caldwell, Peter
Lake City, FL

Caluori, Colleen A.
Johnston, RI

Campbell, David L.
Troy, MI

Capuzzi, Cristiano
Old Bridge, NJ

Carter, Daragh JM
Houston, TX

Carville, Todd C.
Utica, NY

Causland, Tara
Kirkland, WA

Chan, Flora L.
Winston-Salem, NC

Chareas, Stephen
Arl. Heights, IL

Chelico, Nabil Elias
Los Angeles, CA

Chen, Yi-Wen
Philadelphia, PA

Cherry, Daphne M.
Houston, TX

Cho, Hay-Mie
Tucson, AZ

Cho, Jayne P.
New York, NY

Choong, Pek Yoke
Singapore

Choudhry, Erum A.
San Jose, CA

Chung Jenny
Oakland, CA

Clarkson, Brooke
Kensington, MD

Clements, Adrienne M.
Fort Worth, TX

Chett, Gabe T.
Metter, GA

Collazos, Adriana
New York, NY

4433793 1

Collins, Charece
Carlisle, PA

Conahan, Sean M.
Tampa, FL

Cook, Dean
Plano, TX

Cook, Jessica
San Clemente, CA

Coppola, Maddalena
West Hempstead, NY

Cox, Genevieve A.
San Francisco, CA

Cristaudo, Alexander L.
Monroeville, NJ

Culmer, Gabrielle
New York, NY

Daley, Paul F.
Melbourne, FL

Daniels, Yvette
St. Petersburg, FL

Danquah, Angela
Greenford, Middlesex,
London

Darnell, Leslie S.
Jacksonville, FL

Dayton, Richard C.
San Jose, CA

deRoss, Carolyn
Friday Harbor, WA

Deshotel, Ashley Arinder
Baton Rouge, LA

Dhillon, Amar
Modesto, CA

Dickson, Amy L.
Castleton, NY

Dieteman, David F.
Erie, PA

Douglas R. Hoffman
Mt. Vernon, IL

Dreher, Salaam G.
Apopka, FL

Duffee, Eric D.
Columbus, OH

Dumas, Laura F.
Danville, CA

Duvall, Kathryn L.
Charlottesville, VA

Eck, Gretchen A.M.
Springfield, IL

Eck, Jonathan
Lebanon, NH

Eckart, Elyse
El Segundo, CA

Embry, Ronald G., Jr.
Houston, TX

Eskovitz, Sean
Los Angeles, CA

Estrada, E. Martin
Santa Monica, CA

Fairweather, John Zachary
Birmingham, AL

4433793 1

Goddard, Jane M
Orlando, FL

Goes, Ian
Toronto, Ontario

Gordon, Sarah L.
Pittsburgh, PA 15206

Grossman, Matthew A
Knoxville, Tennessee

Gunn, Kristy
Memphis, TN

Gutierrez, Joshua
Newton, MA

Hagen, Joyce
Oakland Park, FL

Hammond, Erin H.
Tacoma, WA

Hammond, Zachary
Spring, TX

Haytas, Joseph R.
Upland, CA

Hebert, Leon F., Jr.
Springfield, MA

Heine, Dorsey E
Los Angeles, CA

Hercules, Jesse
Oxford, MS

Hill, Mark
Tallahassee, FL

Hilleren, Christine C.
Mandeville, Louisiana

Hopkins, Crystal
Ypsilanti, MI

Howell, Byron Boylin
Tampa, FL

Hunt, Melissa A.
Chicago, IL

Hurta, Shelly Z.
Naperville, IL

Inagawa, Kenichi
Yokohama Kanagawa, Japan

Innet, Leanne M.
Ocean Ridge, FL

Jamsa, Siobhan
Minneapolis, MN

Jenkins, Lyn
Orlando, FL

Jervis, Amy Tufts
Melvin, KY

Jones, Allison Medlock
Birmingham, AL

Jordan, Patrick T.
Seattle, WA

Joshi, Neeraj
Montville, NJ

Jumper, Johanna L.
Nashville, TN

Kapeller-Wismiewski, Heather S.
Lansing, MI

Karstaedt, Louise
New York, NY

4433793 1

Katsivela, Maria E
Nassau, Bahamas

Katze, Samantha
New York, NY

Kazakova, Joanna
E. Rutherford, NJ

Kelly, Matthew
Walnut Creek, CA

Kelly, Meghan
St. Louis, MO

Kessler, Daniel
Munich, Germany

Kidron, Leeora
New York, NY

Kim, Hyung Sup
Lincoln, NE

King, Bernard F., III
San Diego, CA

King, Robert
Gainesville, FL

Konoor, Sapna
Millville, NJ

Ku, Katherine
Los Angeles, CA

Kuhl, Brooke Castle
no address available

La Muro, Anthony M. Jr.
Hempstead, NY

Lageson, Anne E.
St. Louis, MO

Laginess, Courtney A.
Cincinnati, OH

LaGrandeur, Thomas
Palo Alto, CA

Lamanna, Kelly R.
Pittsburgh, PA

Lammers, Steven
Valparaiso, IN

Lang Susman, Alexandra
Los Angeles, CA

Lategano, Rosemary
Albany, NY

Latkina, Dinara
Chicago, IL

Lauro, Daniel R.
Grottoes, VA

Lawrence, J. Raza
Los Angeles, CA

Leach, Brooke
Philadelphia, PA

Leight, Adrienne S.
San Francisco, CA

Levin, Daniel B.
Los Angeles, CA

Liederman, Peter H
Berkeley, CA

Litke, Carol
Oceanside, NY

Lobb, George C
Fairfield, CA

4433793 1

Longo, Anthony
Chicago, IL

Looby, David J.
Oklahoma City, OK

Lopez, Alejandra L.
Miami, FL

Lynch, Rebecca Gose
Oakland, CA

Macksood, Jennifer Ann
Carlsbad, CA

Magee, Michael
Athens, GA

Manfredo, Robert F.
Albany, NY

Mann, James
New York, NY

Marciniak, Erin
Springfield, VA

Markwood, Sarah
University City, MO

Marsch, Tiffany L.
Chicago, IL

Marzock, Kirk R
Lancaster, PA

Matarazzo, Leopoldo
Fair Lawn, NJ

Mattson, Clay
Buffalo, NY

Mazzotta, Francesco G.
Bethel Park, PA

McCord, Nicole
Cleveland, TN

McEwen, Warran
Orlando, FL

Medina, Erika
Philadelphia, PA

Melzer, Margaret A.
Palatka, FL

Menachemi, Efrat
New York, NY

Menahem, Caren Jennifer
Great Neck, NY

Mennillo, Seth Daniel
Brookline, MA

Merken, Stacie
Los Angeles, CA

Messinger, Jonathan D
Danversport, MA

Mezoff, Sheri
Brookline, MA

Miller, Shont E.
Pasadena, CA

Mills, Gregory A.
Bloomington, IN

Minnix, A. L.
Columbus, OH

Montgomery, Jennifer
Baton Rouge, WA

Moore, Michelle
Arlington, MA

Morelli, Gaia
Rome, Italy

Morgan, Cynthia
San Diego, CA

Morra, Robert A.
Forest Hills, NY

Morrissey, John R.
Toronto, Ontario, Canada

Mosby, Brian L
Indianapolis, IN

Moulton, Jason R
Crestview, FL

Mourad, Adriana
Washington, DC

Mueller, Andra
Saint Paul MN

Murphy, Ryan P.
Hollister, CA

Neal, Zachary L.
Washington, D.C.

Newby, John L., II
Washington, D.C.

Newell, Ryan Patrick
Wilmington, DE

Ng, Stephanie
Walnut Creek, CA

Nguyen, Vinh
Findlay, OH

Oberholzer, Lori
Columbus, OH

O'Dowd, Sean
New Paltz, NY

Oliveira, Leonor
Burbank, CA

Oxford, James R. Jr.
Cedartown, Georgia

Pages Stone, Natalie
Los Angeles, CA

Palmer, Blake
Wall, NJ

Palmer, Margaret Anne
Rector, PA

Patel, Ulka
Baltimore, MD

Paul, Michael
San Antonio, TX

Penn-Loya, Alexis
Santa Ana, CA

Pham, Pearl
Malvern, PA

Ploetz, Nicola
Mobile, AL

Pogoriler, Leah
Washington, DC

Polansky, Seth C.
Silver Spring, MD

Powell, Daniel J.
San Francisco, CA

Prado, Gabriela
Miami, FL

4433793 1

Proxmire, Mick L.
Columbus, OH

Raetz, James T.
Los Angeles, CA

Reboucas, Rui Tabakov
Sao Paulo, SP Brazil

Reddivari, Krishna
Dallas, TX

Regina, Richard
Baldwin, NY

Reisman, Sean Peter
New York, NY

Rengito, Stephanie
Bethpage, NY

Rhee, Patricia
Castle Rock, CO

Richter, Zachary C
Arlington, VA

Roach, Matthew T.
Jacksonville, FL

Robinson, James J.
Los Angeles, CA

Rogers, James
Sag Harbor, NY

Romaszewski, Sandra A.
Lansing, MI

Rusconi, Mikaela
Miami, FL

Russell, Freya, K.
Los Angeles, CA

Rutten, James C.
San Bernardino, CA

Sacrison, Katherine
Port Orchard, WA 98366

Sagi, Chava Eve
Woodland Hills, CA

Sagnard, Candice
Minneapolis, MN

Samuelson, Marc B.
Somers Point, NJ

Sanchez, Gabriel
Los Angeles, CA

Sanfilippo, Robert
Wayne, NJ

Sawyer, Joel W.
Mount Airy, NC

Scattergood, Carrie L.
Burlington, NJ

Schacherer, P.M., J D.
Forest, Virginia

Schaeffer, Stephen
Washington, DC

Schuknecht, Amber
Pittsburgh, PA

Schwartz, Jason Brett
Cherry Hill, NJ

Scott, Ann Marie
Los Angeles, CA

Sealy, Karen A.
Ellicott City, MD

4433793 1

Seward, Michael
Benton, Pennsylvania

Spigarelli, Rowena C
Whitehouse Station, NJ

Shapiro, David M.
Honolulu, HI

Spyridakis, Vasilios S.
Sacramento, CA

Shekhtman, Lyudmila
S  San Francisco, CA

St. John, Richard
Los Angeles, CA

Sheridan, Patrice
Boston, MA

Standish, Craig A.
Dover, NH

Shore, Blake
Jacksonville, FL

Stefek, Alicia
Owego, IL

Silverman, Charles
Chicago, IL

Stout, Katherine E.
New Martinsville, WV

Simmonds, Karen H.
Seattle, WA

Stump, Monica A.
Alexandria, VA

Simmons, Leslie Vaughan
Cartersville, Georgia

Stump, Nathan D.
Alexandria, VA

Simpson, Alistair G.
Toronto, Ontario Canada

Subasic, Alma
Brooklyn NY

Skeens, A. Skeens
Fort Wayne, IN

Sukkar, Suzanne K.
Ypsilanti, MI

Sloan, Charissa
Waco, TX

Sullivan, James
Fargo, ND

Smith, Penelope
New York, NY

Sullivan, Marbree D.
Somerville, MA

Smith, Travis M.
Houston, TX

Szudajski, Matthew T.
Carson City, NV

Spaide, Heather
New Canaan, CT

Taira, Wakana
Chofu-shi Tokyo, Japan

Sperath, Jessica T.
Indianapolis, IN

Takah, Jarrod T.
Burgettstown, PA

4433793.1

Tapia, Antonio G.
Orlando, FL

Tarasco, Monica D.
Pepper Pike, OH

Taylor, Lee S.
Los Angeles, CA

Tellalian, Bryan
Clovis, CA

Thabet, Mark
Chester, NY

Thompson, Scott A.
New York, NY

Thomson, Marchelle
Drexel Hill, PA

Torres, Stephanie W.
Buffalo, NY

Trunkey, Alan
Bainbridge Island, WA

Tsurui, Toshitaka
Edogawa-ku, Tokyo, Japan

Uchihara, Kiyoshi
Chiyoda-ku, Tokyo, Japan

Unno, Mitsuo
Brea, CA

Vaccaro, Michael
Avon Lake, OH

Van Deven, Nicholas P.
St. Louis, Missouri

Vanderhoofven, Nathan D.
Jacksonville, FL

Varner, Christina A.
San Francisco, CA

Venero, Jose Antonio
San Antonio, TX

Vogel, John-Paul
San Antonio, TX

Wada, Megan
San Francisco, CA

Wang, Annie
Glendale, CA

Wang, Shanyah Albert
Troy, MI

Warmuth, Glenn P.
Farmingville, NY

Warren, Tracy A
San Diego, CA

Watkins, Anthony L , Jr.
Birmingham, AL

Weg, Nadav
New York, NY

Weinstein, Reid M.
Baltimore, MD

Weiss, Sharon
Woodmere, NY

Weltin, Florence K.
St. Louis, MO

White, Catherine
London

Whitehead, Kristen
Forth Worth, TX

4433793 1

Whiting, Joseph M.
Larchmont, NY

Whitley, Joel
Los Angeles, CA

Wilkovich, Andrea
Fort Lee, NJ

Williams, Beth L.
Portola Valley, CA

Wilner, Jared
New York, NY

Winters, Gary M.
Houston, TX

Wiseberg, Nicol
Port St. Lucie, FL

Wiseberg, Phil
Palm Beach Garden, FL

Woodard, Bethany
Los Angeles, CA

Yoshida, Kaori
Rego Park, NY

Young, Blanca
Berkeley, CA

Young, Melodie
Forest Hills, NY

Yurtkuran, Shaun E.
Jackson, MS

Zayas, Idalisse
Kissimmee, FL

Zigman, Abigail
Staten island, NY

Zorn, Heather M.
Atlanta, GA

Rauls, Claire Serrano
Saint Paul, MN

Hwang, Irene
Fort Lee, NJ

Tavassoli, Alan
Phoenix, AZ

Band, Marissa L.
Cherry Hill, NJ

Landis, Jennifer M.
Fort Lauderdale, FL

Woo, In-Yu
New York, NY

Williams, Erika N.
Baton Rouge, LA

Parker, Warren B
Birmingham, AL

Rachko, Larissa
Woodbury, NJ

Stramiello, Linda Stephens
Madison, CT

Noushkam, Donna B.
Cerritos, CA

Graham, Emily
Miami, FL

Kim, James W.
Chicago, IL

Sarna, Alejandro L.
Washington DC

4433793 1

ORIGINAL

Sent EMTER "O"

JS6



ENTERED
CLERK, U.S. DISTRICT COURT

SEP 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED
CLERK, U.S DISTRICT COURT

SEP 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RYAN RODRIGUEZ, REENA B.
FRAILICH, LOREDANA NESCI,
JENNIFER BRAZEAL, and LISA
GINTZ, on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

      vs.

WEST PUBLISHING CORPORATION,
a Minnesota Corporation d/b/a BAR/BRI,
and KAPLAN, Inc., a Delaware
Corporation,

                    Defendants.

AND CONSOLIDATED ACTION

CASE NO. CV05-3222 R (MCx)

OPINION AND ORDER

I.    **Introduction**

    This is a federal antitrust class action brought by Plaintiffs Ryan Rodriguez ("Rodriguez"),

Reena B. Frailich ("Frailich"), Jennifer Brazeal ("Brazeal"), Loredana Nesci ("Nesci"), and Lisa Gintz

("Gintz") (represented by Class Counsel McGuireWoods LLP) and Plaintiffs Kari Brewer ("Brewer")

and Lorraine Rimson ("Rimson") (represented by Class Counsel Finkelstein Thompson LLP and

Zwerling, Schachter & Zwerling, LLP, respectively) against Defendants West Publishing Corporation

(doing business as BAR/BRI) ("West") (represented by Liner Yankelevitz Sunshine & Regenstreif, LLP

and Shearman & Sterling, LLP) and Kaplan, Inc. ("Kaplan") (represented by Jones Day and Munger,

432

1  Tolles & Olsen, LLP). Plaintiffs sue on behalf of themselves and more than 300,000 class members

2  nationwide who took a full-service bar review course from BAR/BRI between August 1, 1997 and July

3  31, 2006 ("the Class" or "Class Members"). The operative complaint alleges that: (1) BAR/BRI (now

4  owned by Defendant West) illegally acquired the assets of its direct competitor West Bar in violation of

5  Section 7 of the Clayton Act; (2) Defendant West unlawfully conspired with Defendant Kaplan to

6  restrain trade in the full-service bar review course market in violation of Section 1 of the Sherman Act;

7  and (3) Defendant West wrongfully monopolized the full-service bar review course market in violation

8  of Section 2 of the Sherman Act.

9  **II.    Procedural History**

10        After an extensive pre-filing factual investigation, Plaintiffs Rodriguez and Frailich ("Initial

11  Plaintiffs") filed the first complaint against Defendants in this Action in April 2005 alleging claims for

12  violation of federal antitrust laws ("Initial Complaint"). The Initial Plaintiffs later filed a First Amended

13  Complaint ("FAC"), in which Plaintiffs Brazeal, Nesci, and Gintz joined. Plaintiffs Brewer and Rimson

14  filed a related action against Defendants in this Court entitled, *Brewer v West Publishing Corp*, Case

15  No. CV-05-06211. The Court consolidated the two actions after motion practice on October 17, 2005.

16        The FAC, the operative complaint in this action, alleges claims for violation of Sections 1 and 2

17  of the Sherman Act, and Section 7 of the Clayton Act. The FAC seeks monetary damages and

18  injunctive relief. Defendants answered the FAC in July 2006, raising numerous defenses, including

19  statute of limitations, laches, proximate cause, standing, and *bona fide* business competition.

20        The action entered the discovery phase in August 2005. Plaintiffs took substantial factual and

21  expert discovery relating to liability, damages, and class certification issues. Plaintiffs reviewed and

22  analyzed over 400,000 pages of documents produced by Defendants and third parties, conducted one

23  deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), and deposed fourteen fact witnesses.

24  Defendants deposed the seven Plaintiffs, as well as three non-party witnesses. The parties also

25  conducted extensive expert discovery, including eight depositions of five different expert witnesses.

26  Plaintiffs and Defendants had a series of discovery disputes. These discovery disputes resulted in a

27  number of motions to compel before this Court and Special Discovery Master John Francis Carroll.

28        On March 13, 2006, Plaintiffs filed their Motion for Class Certification. Defendants raised many

2

1   challenges, including the relevant market definition, antitrust impact, and the existence of a formulaic

2   approach to damages. On May 15, 2006, after comprehensive briefing, including the submission of

3   detailed expert declarations and exhibits as well as extended oral argument, the Court certified a

4   national class defined as: "All persons who purchased a bar review course from BAR/BRI in the United

5   States from 1997 to the present." The Court appointed the seven named plaintiffs as class

6   representatives ("Class Representatives").

7       On June 29, 2006, after reviewing submissions from Plaintiffs and Defendants concerning the

8   proposed plan of notice to the Class, the Court issued an Order Re: Class Notice ("Class Notice Order")

9   which approved the proposed form of notice, and provided for dissemination by: (a) first-class mail; (b)

10  in national publications; and (c) over the internet. In accordance with the Class Notice Order, the Class

11  Action Notice ("Notice") was disseminated in July 2006. The Notice provided Class Members the

12  opportunity to request exclusion from the Class.

13      Defendants filed a petition with the Court of Appeals for the Ninth Circuit for leave to file an

14  appeal regarding the Class Certification Order. Plaintiffs filed an extensive opposition. The Ninth

15  Circuit denied Defendants' petition on August 11, 2006.

16      On July 17, 2006, Kaplan filed a motion for summary judgment seeking to dismiss Count II of

17  the FAC (the only count against Kaplan). Plaintiffs opposed the Motion and subsequently sought leave

18  to file two supplemental opposition briefs to the Motion, which the Court granted. The Court denied

19  Kaplan's Motion for Summary Judgment on September 18, 2006. Trial was set for February 13, 2007.

20      After completion of discovery, and with the February trial date approaching, the counsel for

21  Plaintiffs and Defendants, together with Rodriguez, Nesci, and Gintz, engaged in a formal mediation in

22  New York City on November 29, 2006. The Honorable Daniel Weinstein (Ret.) of JAMS, who has

23  substantial experience in resolving antitrust and class action cases, served as mediator. Plaintiffs were

24  represented by Class Counsel and Defendants were represented by their litigation counsel and their in-

25  house counsel. The record reflects that at all times the negotiations were at arm's-length and hard

26  fought. The parties were unable to reach a resolution on November 29, 2006.

27      Negotiations continued for the next several weeks with the assistance of the mediator. During

28  this time, the parties continued to prosecute discovery disputes and prepare for trial. After several

3

1   weeks of negotiations, an agreement was reached on all settlement terms. The Settlement Agreement

2   was executed on February 2, 2007. Plaintiffs Rodriguez, Nesci, and Gintz ("the Objecting Plaintiffs")

3   refused to authorize the execution of the Settlement Agreement on their behalf.

4         On March 19, 2007, over the objections of the Objecting Plaintiffs, the Court entered an Order

5   Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Directing

6   Dissemination of Notice to Class ("Preliminary Approval Order") that, among other things: (a) found

7   that the Settlement Agreement was negotiated in good faith, under the supervision of a well-respected

8   mediator, was the result of extensive arm's length negotiations, was concluded after Class Counsel

9   conducted broad discovery, and was sufficiently fair, reasonable, and adequate to warrant sending

10  notice of the Settlement to Class Members and holding a full hearing on the Settlement; (b) modified

11  the definition of the previously certified class to: "All Persons who purchased a bar review course from

12  BAR/BRI in the United States from August 1, 1997 through and including July 31, 2006"; (c) found

13  that the proposed forms and methods of notice met the requirements of the Federal Rules of Civil

14  Procedure, the United States Constitution, the Rules of the Court and all other applicable law; (d)

15  appointed a claims administrator; (e) established procedures for Class Members to object to the

16  Settlement; and (f) established the date for the Final Approval Hearing.

17        On June 18, 2007 and July 9, 2007, the Court conducted hearings on the fairness,

18  reasonableness, and adequacy of the Settlement. Twelve groups of Objectors were represented at the

19  first Final Approval Hearing (through counsel). Two of the three Objecting Plaintiffs - Nesci and

20  Rodriguez - were also present. At the Final Approval Hearing on July 9, 2007, after hearing argument

21  from the parties, Objectors and/or their counsel, and Objecting Plaintiffs Nesci and Rodriguez, the

22  Court: (1) granted Plaintiffs' Motion for an Order Granting Approval of the Class Action Settlement;

23  (2) denied Plaintiffs' Motion for Incentive Awards to Class Representatives; and (3) granted Class

24  Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses. This Opinion and Order

25  follows.

26  **III.   The Incentive Agreement and the Requests for Incentive Awards**

27       As part of their Retainer Agreement, the five Class Representatives represented by Class

28  Counsel Van Etten Suzumoto & Becket LLP (the predecessor to Class Counsel McGuireWoods LLP)

1  entered into an "Incentive Agreement" with their counsel.[1] Each of the five Class Representatives

2  represented by McGuireWoods signed the Incentive Agreement prior to entering the lawsuit. Under the

3  section entitled "Incentive/Compensation to Clients" the contingency fee-type contract obligates Class

4  Counsel to seek payment for each of the Class Representatives in an amount that adjusts based on the

5  end settlement or litigated victory amount. If the settlement or litigated victory was greater than or equal

6  to $500,000, Class Counsel would seek a $10,000 award per Class Representative. For $1.5 million or

7  more, Class Counsel would seek a $25,000 award. For $5 million or more, Class Counsel would seek

8  $50,000 and for $10 million or more, Class Counsel would seek $75,000. The five Class

9  Representatives who signed the Incentive Agreement all aver that they were never promised that they

10  would receive an incentive award and that any award was contingent on court approval. Such a promise

11  is not necessary to securing an award that is quickly becoming the grist of the class action money mill.

12        The Class was never advised of the Incentive Agreement. The Court was made aware of the

13  Incentive Agreement only after the Preliminary Approval Hearing, when the incentive payment requests

14  were made. Apparently, however, Defendants obtained a copy of the Incentive Agreement in April

15  2006.

16        The case settled for $49,000,000. Thus, per the Incentive Agreement, McGuireWoods is

17  contractually obligated to seek $75,000 for each Class Representative as an incentive payment.

18

19  [1] The section entitled "Incentive/Compensation to Clients" states in full: "In consideration for the
    services Clients will be providing, and as an incentive to Clients for their participation as Class
20  representatives here and to compensate them for all the burdens accruing therefrom, VSB agrees to seek
    payment for each Client in the following amounts: 1. The sum of $10,000 if the West case ends by
21  settlement or litigated victory with the payment to the Class a sum greater than or equal to five hundred
    thousand dollars ($500,000) in cash or anything of comparable value; 2. In supplement to the sum
22  identified in paragraph 1 directly above, an additional $15,000 (for a sum total of $25,000) will be paid
    to each client if the West case ends by settlement or litigated victory with the payment to the Class a sum
23  greater than or equal to one million five hundred thousand dollars ($1,500,000) in cash or anything of
    comparable value; 3. In supplement to the sum identified in paragraph 2 directly above, an additional
24  $25,000 (for a sum total of $50,000) will be paid to each client if the West case ends by settlement or
    litigated victory with the payment to the Class a sum greater than or equal to five million dollars
25  ($5,000,000) in cash or anything of comparable value; and 4. In supplement to the sum identified in
    paragraph 3 directly above, an additional $25,000 (for a sum total of $75,000) will be paid to each client
26  if the West case ends by settlement or litigated victory with the payment to the Class a sum greater than
    or equal to ten million ($10,000,000) in cash or anything of comparable value. 5. Such payments listed
27  above shall be subject to the following conditions: a. Clients have reasonably provided the assistance
    sought in paragraphs 1-3 under section "Services to be Rendered by Clients;" and b. any required Court
28  approval is first obtained, which VSB agrees to seek, as need be, at the pertinent time." (June 11, 2007
    Kanazawa Decl. Ex. 1 at 2-3.)

1   However, in the Settlement Agreement entered into on February 2, 2007, Defendants would only agree

2   not to oppose requests for incentive awards less than or equal to $25,000 for each Class Representative.

3   After the Settlement was reached, McGuireWoods communicated with the five Class Representatives it

4   represents about the incentive awards. Two of the five (Plaintiffs Brazeal and Frailich) agreed that

5   McGuireWoods would seek only $25,000 on their behalf. The three Objecting Plaintiffs refused to

6   agree to the lower amount and, as a result, McGuireWoods seeks $75,000 each for Plaintiffs Rodriguez,

7   Nesci, and Gintz pursuant to the terms of the Incentive Agreement. Class Counsel seeks these awards

8   on behalf of the Class Representatives despite the minimal assistance the Class Representatives

9   contributed to the prosecution of the litigation and the conflict of interests the contingency fee-type

10  agreement created between the Class Representatives and the Class Members.

11          The two other named plaintiffs, Plaintiffs Brewer and Rimson, who were represented by Class

12  Counsel Finkelstein Thompson LLP and Zwerling, Schachter & Zwerling, LLP, respectively, made no

13  ex-ante incentive award agreement with their clients. Plaintiffs Brewer and Rimson had no agreement

14  regarding any amount that would be requested as an incentive award on their behalf. Their counsel

15  maintain that they independently determined that $25,000 was an appropriate incentive award amount

16  for each of their Class Representatives.

17  **IV.    Jurisdiction**

18          This Court has jurisdiction over Class Members' claims because Plaintiffs have alleged

19  violations of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 18. 28 U.S.C. 1331.

20          This Court can also exercise personal jurisdiction over all absentee Class Members because

21  Class Members received proper notice of the action. The Notice informed potential Class Members of

22  the pendency of this Action and provided them with the opportunity to exclude themselves from the

23  Class. The Notice also informed Class Members of their opportunity to object to the Settlement and to

24  be heard at the Final Approval Hearing. As discussed further below, such notice satisfies the due

25  process requirements of the Fifth Amendment. *Brown v. Ticor Title Inc.*, 982 F2d 386, 392 (9th Cir.

26  1992).

27

28

1  **V.     Settlement Terms**

2      **A.     The Settlement Fund**

3         Consistent with the terms of the Settlement Agreement, Defendants paid forty-nine million

4  dollars ($49,000,000) into an interest-bearing account for the benefit of the Class, which amount, plus

5  interest ("Gross Settlement Fund"), has or will be used to pay for the costs of notice, settlement

6  administration, taxes and attorneys' fees and expenses pursuant to the orders of this Court. After such

7  payments from the Gross Settlement Fund, the balance will be distributed to the Class ("Net Settlement

8  Fund") pursuant to the Plan of Allocation.

9      **B.     Plan of Allocation**

10         Under the terms of the Plan of Allocation, the Net Settlement Fund will be distributed *pro rata*

11  based on the amount each Class Member who submits a timely and valid Claim Form ("Authorized

12  Claimant") paid BAR/BRI for the bar review course in relation to the amounts paid by all other

13  Authorized Claimants. For example, if the amount paid for a bar review course by an Authorized

14  Claimant equals 1/100,000 of the aggregate of such amounts paid by all other Authorized Claimants,

15  then the Authorized Claimant will receive 1/100,000 of the Net Settlement Fund. The maximum

16  amount of payment that any Authorized Claimant shall be entitled to receive from the Net Settlement

17  Fund, however, shall not exceed thirty-percent (30%) of the amount the Authorized Claimant paid for

18  the bar review course ("Maximum Payment").

19         Class Members also have the option of donating their portion of the Net Settlement Fund to the

20  National Legal Aid and Defender Association ("NLADA"), for the purpose of providing training

21  opportunities for young lawyers nationwide. NLADA, founded in 1911, is the oldest and largest

22  national, nonprofit membership organization devoted to advocating equal access to justice for all.

23         Defendants are not entitled to a reversion of any money remaining in the Net Settlement Fund

24  after distribution of the Maximum Payments to all Authorized Claimants. If any funds remain in the Net

25  Settlement Fund after distributing the Maximum Payments to all Authorized Claimants, Class Counsel

26  will make an application to the Court for a *cy pres* distribution of the residual amount of the Net

27  Settlement Fund.

28

**C.    Provisions to Promote Competition in the Bar Review Market**

For purposes of Settlement, BAR/BRI and Kaplan agreed to terminate the marketing agreement that Plaintiffs allege is unlawful and has allowed BAR/BRI to maintain a monopoly and Defendants to divide the market. Further, for a period of five years following the Effective Date, BAR/BRI will include the following statement on the forms it uses to enroll law students into its review courses:

> NOTE: By signing this Enrollment Form and making an initial payment to BAR/BRI, you are not committing yourself to taking the BAR/BRI Bar Review course or making full payment to BAR/BRI for such course.

Finally, in the Settlement Agreement, BAR/BRI expressly states "that it is committed to accurate advertising as required by the Lanham Act, the Federal Trade Commission Act and similar laws, regulations and rules."

**D.    Release**

The Settlement Order provides that all Class Members (including any of their past, present or future officers, directors, agents, employees, legal representatives, trustees, parents, associates, affiliates, licensees, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors, and assigns), with the exception of those who exercised their right to opt out (identified in Exhibit A to the Settlement Order), whether or not he, she, or it objects to the Settlement and whether or not he, she, or it makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity, ever had, now has or hereafter can, shall or may have concerning or relating to any conduct alleged in the FAC in this Action, and including without limitation all claims that have been asserted or could have been asserted in any litigation against the Released Parties or any of them for any conduct alleged in the FAC in this Action (collectively with all claims referenced in the next paragraph, the "Released Claims"), are permanently enjoined from filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or other proceeding against any or all Released Parties, or order in any jurisdiction entered against any or all Released Parties that is based upon, arises out of, or relates to any Released Claims.

Notwithstanding the foregoing, the Released Claims shall not include claims asserted against the

8

1   named defendants as of February 2, 2007, in the putative class actions, entitled *Park v. Thomson Corp.,*

2   *et al.,* Case No. 05 Civ. 2931 (WHP) and *Arendas v. Thomson Corp., et al.,* Case

3   6:06-cv-1113-Orl-28JGG, currently pending in the United States District Court, Southern District of

4   New York ("New York Actions").

5   **VI.    Notice and Dissemination Was Adequate**

6           Notice to the Class of the Settlement satisfied all applicable requirements, including due

7   process. Proper notice should provide: (a) the material terms of the proposed settlement; (b) disclosure

8   of any special benefit to the class representatives; (c) disclosure of the attorneys' fees provisions; (d) the

9   time and place of the final approval hearing and the method for objecting to the settlement; (e) an

10  explanation regarding the procedures for allocating and distributing the settlement funds; and (f) the

11  address and phone number of class counsel and the procedures for making inquiries. *See, e.g., Marshall*

12  *v. Holiday Magic,* 550 F.2d 1173, 1177-78 (9th Cir.1977); *In re Aetna Inc. Secs. Litig.,* MDL No. 1219,

13  2001 WL 20928 at * 5, 2001 U.S. Dist. LEXIS 68, at *16 (E.D. Pa. Jan. 4, 2001) (holding that the

14  notice must be "reasonably calculated under all the circumstances, to apprise interested parties of the

15  pendency of the action and afford them an opportunity to present their objections." (quoting *Mullane v*

16  *Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950) (citation omitted)). The Notice here met

17  all of these requirements and, thus, was adequate.

18          The Notice dissemination also satisfied all applicable requirements, including due process. The

19  Notice was mailed by first class mail to each Class Member identified from Defendants' records. The

20  Notice was also made available on a variety of internet sites – including that of the Claims

21  Administrator and Class Counsel. In addition, the Summary Notice describing the principal terms of the

22  Settlement Agreement and providing information on how a more detailed description of the Settlement

23  Agreement could be obtained was published in *The National Law Journal* (twice), *Lawyers Weekly*

24  *USA* (three times) and *USA Today* (once). The Summary Notice was sent by first-class mail to the

25  largest 200 law firms in the United States, as listed in *American Lawyer.* These publications and the

26  mailing to the 200 largest law firms specifically targeted the Class. Thus, the Notice dissemination was

27  adequate. *See, e.g., Silber v Mobon,* 18 F. 33 1449, 1452-54 (9th Cir. 1994) (approving notice sent by

28  first class mail as the "best notice practicable"); *Zimmer Paper Prods., Inc. v. Berger & Montague,*

1  *P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and

2  publication in the press fully satisfy the Notice requirement of both Fed. R. Civ. 23 and the due process

3  clause.") (citations omitted); *Montgomery v. Beneficial Consumer Disc. Co.*, No. 04- 2114, 2005 WL

4  497776, at *6, 2005 U.S. Dist. LEXIS 3249, at *19 (E.D. Pa. Mar. 2, 2005) (individual mailing

5  accompanied by publication in *USA Today* was best practicable notice under the circumstances; "[d]ue

6  process does not require actual notice, but rather a good faith effort to provide actual notice") (quoting

7  Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:53 (4th ed. 2002) ("*Newberg*").

8  **VII.    The Settlement Is Fair**

9       **A.    The Settlement Agreement Enjoys a Presumption of Fairness**

10          In the Ninth Circuit, a court affords a presumption of fairness to a settlement, if: (1) the

11  negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the

12  settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.

13  *Newberg* at § 11.41; *Young v. Polo Retail*, 2006 WL 3 050861, at *5, 2006 U.S. Dist. LEXIS 81077, at

14  *12-13 (N.D. Cal. Oct. 25, 2006). As described above, the Settlement was reached only after extensive

15  discovery had been conducted. Settlement negotiations occurred at arm's length for three months with

16  the assistance of a mediator and the Settlement Agreement was not reached until the eve of trial. Both

17  Class Counsel and Defendants' counsel are experienced in class actions, including antitrust class

18  actions. Moreover, only a small fraction of the Class objected to the Settlement. Thus, the Settlement

19  Agreement enjoys a presumption of fairness.

20       **B.    The Settlement Agreement is Fair, Adequate, and Reasonable**

21          "It is the settlement taken as a whole, rather than the individual component parts, that must be

22  examined for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). A court

23  may not delete, modify, or rewrite particular provisions of the settlement; rather, "[t]he settlement must

24  stand or fall in its entirety." *Id.* The Ninth Circuit has articulated eight factors to evaluate a settlement's

25  fairness, adequacy, and reasonableness:

26          (1)  The strength of plaintiffs' case;

27          (2)  The risk, expense, complexity, and likely duration of further litigation;

28          (3)  The risk of maintaining class action status throughout the trial;

1    (4)    The amount offered in settlement;

2    (5)    The extent of discovery completed, and the stage of the proceedings;

3    (6)    The experience and views of counsel;

4    (7)    The presence of a governmental participant;[2] and

5    (8)    The reaction of the class members to the proposed settlement.

6    *Molska v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *Hanlon*, 150 F.3d at 1026. All the applicable

7    factors favor a finding of fairness, adequacy, and reasonableness in this case. The Court also finds that

8    the conflict of interest between the Class Representatives and the Class Members does not disturb the

9    Court's finding that the Settlement is fair, adequate, and reasonable.

10    **(1)    The Strength of Plaintiffs' Case**

11    Although Plaintiffs prevailed on Kaplan's Motion for Summary Judgment and believe they

12    would prevail on any motion for summary judgment filed by BAR/BRI, defeating these motions does

13    not mean that Plaintiffs established Defendants' *prima facie* liability; whether they would obtain a

14    favorable, unanimous jury verdict as required by Federal Rule of Civil Procedure 48 is far from

15    guaranteed. *See, e.g., In re Airline Ticket Com'n Antitrust Litig.*, 953 F.Supp. 280, 283 (D. Minn. 1997)

16    (approving a settlement although it did not provide a full recovery of the potential losses and noting that

17    objectors failed to appreciate that on summary judgment, the court only decided that defendants did not

18    prevail as a matter of law, not that plaintiffs had a winning case). Claims for violation of federal

19    antitrust laws are notoriously difficult to prove. *See Palmer v. BRG*, 498 U.S. 46, 48 (1990). The

20    Court's ruling on Kaplan's Motion for Summary Judgment was simply a recognition that there were

21    material facts still in dispute. Accordingly, this factor weighs in favor of approving the Settlement.

22    **(2)    The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

23    The risk, expense, complexity and duration of continued litigation also favored settlement.

24    These factors consider "the probable costs, in both time and money, of continued litigation." *In re*

25    *Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002). In most cases, "unless the

26    settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive

27

28
_____
[2] There was no governmental presence with respect to the claims set forth in the action.

11

1   litigation with uncertain results." *Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*, 221 F.R.D. 523,

2   526 (C.D. Cal. 2004) (quoting *Newberg* at § 11:50 at 155). Indeed, settlement is encouraged in class

3   actions where possible. *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) ("It hardly

4   seems necessary to point out that there is an overriding public interest in settling and quieting litigation.

5   This is particularly true in class action suits which are now an ever increasing burden to so many federal

6   courts and which frequently present serious problems of management and expense."). Further, this

7   action is complex and, if not settled, is likely be enormously expensive and very lengthy. Antitrust class

8   actions "are notoriously complex, protracted, and bitterly fought" and "arguably the most complex

9   actions to prosecute." *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510

10  (E.D.N.Y. 2003) (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).

11  Additionally, the litigation would most likely take several years to finally resolve, considering the

12  length of trial and appeals. Accordingly, avoiding a trial and inevitable appeals in this complex,

13  antitrust suit strongly weigh in support of approval of the Settlement, rather than prolonged and

14  uncertain litigation. *See DIRECTV*, 221 F.R.D. at 527 ("Avoiding such a trial and the subsequent

15  appeals in this complex case strongly militates in favor of settlement rather than further protracted and

16  uncertain litigation"). Accordingly, this factor weighs in favor of approving the Settlement.

17          (3)     **The Risk of Maintaining Class Action Status Throughout the Trial**

18          As for the risk of maintaining class action status throughout the trial, this Court certified a

19  nationwide Class. Although Plaintiffs believe it is unlikely, there is no guarantee that Defendants would

20  not move for and obtain decertification of the Class before or during trial. *See In re Nasdaq Market-*

21  *Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). As noted by one court, if

22  "insurmountable management problems were to develop at any point, class certification can be revisited

23  at any time under Fed. R. Civ. P. 23(c)(1)." *Id.* Further, even if the Class remained certified throughout

24  the trial and Plaintiffs prevailed, Defendants would surely challenge class certification on appeal. If at

25  any point the Class were decertified or certification were reversed on appeal, the Class would recover

26  nothing. Thus, this factor also weighs in favor of approving the Settlement.

27          (4)     **The Amount Offered in the Settlement**

28          The relief offered in the Settlement also supports a finding that the Settlement is fair, adequate,

12

1  and reasonable. The Settlement includes a Settlement Fund of $49 million, as well as valuable non-

2  monetary relief. The $49 million represents approximately thirty-percent (30%) of Plaintiffs' damages,

3  estimated by their expert to be in the range of $158 million to $168 million, and seven times

4  Defendants' expert's estimate of damages. "[S]ettlement is about compromise, a yielding of the highest

5  hopes in exchange for certainty and resolution." *In re Warfarin*, 212 F.R.D. at 257-58 (finding

6  settlement amount representing 33% of maximum possible recovery was well within a reasonable range

7  when compared with recovery percentages in other class action settlements). Accordingly, this factor

8  weighs in favor of approving the Settlement.

9       (5)    **The Extent of Discovery Completed and the Stage of the Proceedings**

10      The extent of protracted and contentious discovery supervised by Special Master John Francis

11  Carroll completed and the stage of the proceedings when the parties reached the Settlement also

12  supports final approval of the Settlement. *See DIRECTV*, 221 F.R.D. at 528 ("A settlement following

13  sufficient discovery and genuine arms-length negotiation is presumed fair"). What is required is that

14  "sufficient discovery has been taken or investigation completed to enable counsel and the court to act

15  intelligently." *Newberg* at § 11:41. Here, Class Counsel conducted extensive discovery regarding each

16  of the relevant issues in the case, deposing more than a dozen witnesses and reviewing more than

17  400,000 pages of produced documents. When the parties reached the Settlement Agreement, they had

18  already engaged in numerous discovery disputes and Kaplan's Motion for Summary Judgment had

19  already been decided by the Court. Thus, this factor weighs in favor of approving the Settlement.

20       (6)    **The Experience and Views of Counsel**

21      In assessing the adequacy of the terms of a settlement, the trial court is entitled to, and should,

22  rely upon the judgment of experienced counsel for the parties. *See DIRECTV*, 221 F.R.D. at 528

23  ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with

24  the facts of the underlying litigation") (internal quotations and citations omitted); *see also Cotton v.*

25  *Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). The basis for such reliance is that "[p]arties represented

26  by competent counsel are better positioned than courts to produce a settlement that fairly reflects each

27  party's expected outcome in the litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.

28  1995). Indeed, when evaluating a proposed settlement, the trial judge, absent fraud, collusion, or the

1  like, should be hesitant to substitute its own judgment for that of counsel. *See Flinn v. FMC Corp.*, 528

2  F.2d 1169, 1173 (4th Cir. 1975); *Hanrahan v. Britt*, 174 F.R.D. 356, 366-368 (E.D. Pa. 1997) (finding

3  that a presumption of correctness applies to a class action settlement reached in arm's length

4  negotiations between experienced, capable counsel after meaningful discovery, citing the *Manual for*

5  *Complex Litigation* § 30.41 (2nd ed. 1985)). Here, Class Counsel have considerable experience in

6  litigating antitrust matters, class actions, and other complex litigation. Class Counsel concluded that

7  the Settlement terms are fair, adequate, and reasonable and in the best interests of the Class as a whole,

8  and recommended that it be granted final approval. This factor weighs in favor of approving the

9  Settlement.

10            **(8)    The Reaction of the Class Members to the Proposed Settlement**

11            Finally, the fact that the Settlement Agreement enjoys overwhelming support from the Class

12  supports a finding that the Settlement Agreement is fair, adequate, and reasonable. *DIRECTV*, 221

13  F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class

14  action settlement raises a strong presumption that the terms of a proposed class settlement action are

15  favorable to the class members."). The Notice was delivered by first class U.S. mail to approximately

16  376,000 Class Members. As of August 2007, more than 52,000 claims were filed. In contrast, only 54

17  Class Members submitted Objections; less than a thousandth of a percent of the Class. The relatively

18  low number of objectors supports a finding that the Settlement is adequate. *See, e.g., Boyd v. Cechtle*

19  *Corp*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the

20  class was persuasive that the settlement was adequate). Regardless, in any class action of significant

21  size, the absence of any objections would be "extremely unusual." *See In re Anthracite Coal Antitrust*

22  *Litig.*, 79 F.R.D. 707, 712-13 (M.D. Pa. 1978). Accordingly, this factor weighs in favor of approving

23  the Settlement.

24  **C.      Objections to the Settlement Agreement Are Overruled**

25            **(1)    The Adequacy of the Settlement Does Not Depend on the Individual Desires**

26                    **of the Objecting Plaintiffs**

27            The Court rejects the arguments by four Objectors or groups of Objectors that the Settlement

28  should not be approved because the Objecting Plaintiffs object to the terms of the Settlement. To the

1  contrary, "agreement of the named plaintiffs is not essential to approval of a settlement which the trial

2  court finds to be fair and reasonable." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982); *see*

3  *also Lazy Oil Co. v. Witco Co.*, 95 F. Supp. 2d 290, 333-34 (W.D. Pa. 1997) (approving a settlement

4  and noting same). Multiple courts have approved class action settlements notwithstanding the

5  objections of the class representatives. *See, e.g., Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615,

6  631 (9th Cir. 1982); *Parker,* 667 F.2d at 1204 (affirming the approval of a settlement of an

7  employment discrimination class action over the objections of 10 of the 11 named plaintiffs); *Maywalt*

8  *v. Parker & Parsley Petroleum*, 864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd* 67 F.3d 1072 (2d. Cir. 1995)

9  (granting final approval of a securities fraud class action over some 2,700 objections, including certain

10 of the class representatives); *Boyd,* 485 F. Supp. at 624 (approving a consent decree in an employment

11 discrimination class action despite the fact that "[a]pproximately sixteen percent of the class, including

12 three of the four named plaintiffs, have filed some opposition to the settlement"); *Olden v. LaFarge*

13 *Corp.*, 2007 U.S. Dist. LEXIS 5954, at *40-41 (E.D. Mich. Jan. 29, 2007) (approving settlement

14 without the support of any of the class representatives). Plainly, "[t]o empower the Class

15 Representatives with what would amount to an automatic veto over the Proposed Settlement does not

16 appear to serve the best interests of Rule 23 and would merely encourage strategic behavior 'designed

17 to maximize the value of the veto rather than the settlement value of the claims.'" *Maywalt,* 864 F.

18 Supp. at 1430, quoting *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991).

   (2)    **The Bifurcation Motion Is Improper, Lacks Merit and Is Denied**

20    Bifurcating the Section 7 claim from the Sherman Act claims, as requested by the Objecting

21 Plaintiffs, would create further obstacles and be a waste of time and resources. The moving party has

22 the "burden of proving that the bifurcation will promote judicial economy and avoid inconvenience or

23 prejudice to the parties." *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D.

24 Cal. 1992); *see also Ebay, Inc. v. Bidder's Edge, Inc.*, 2000-2 Trade Cases P 73,039, 56 U.S.P.Q.2d

25 1856, at *4 (C.D. Cal. July 25, 2000); *Burton v. Mountain W. Farm Bureau Mut. Ins. Co.*, 214 F.R.D.

26 598 (D. Mont. 2003). That burden cannot be met, as bifurcation belies judicial economy here. The only

27 difference between the Section 7 and Sherman Act claims is the damages. Bifurcation would result in a

28 duplication of time and effort that squanders judicial resources determining unimportant differences.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3)    **Courts Do Not Evaluate Settlements in Light of the Treble Damages that Might Be Available After a Successful Trial**

The Court rejects the Objecting Plaintiffs' argument that the monetary portion of the Settlement is inadequate because the Section 7 claim is worth $360 million. Objecting Plaintiffs arrive at this figure by trebling Plaintiffs' expert's estimated damages of $146 million since 2001 and then multiplying that figure by their estimated chances of winning at trial. This analysis is flawed because it presupposes that Plaintiffs will succeed at trial. Evaluating the Settlement in light of the treble damages available at the end of a successful trial is purely speculative. Courts do not consider such damages when calculating a reasonable range of recovery. *See, e.g., Detroit v. Grinnel Corp.*, 495 F.2d 448, 458 (2d Cir. 1974) ("[T]he vast majority of courts which have approved settlements in this type of case . . . have given their approval to settlements which are traditionally based on an estimate of single damages only."); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24; 2005 U.S. Dist. LEXIS 27011, at *69-70 (D.N.J. Sept. 13, 2005) ("In order to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement to the estimated single damages."); *In re Warfarin*, 212 F.R.D. 231, 257 (D. Del. 2002) (citing *In re Lorazaepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002)).

(4)    **The Lack of Provisions Prohibiting Future Misconduct or Dissolution Do Not Render the Settlement Inadequate**

The Court rejects the argument by certain Objectors that the non-monetary relief is either illusory or insufficient because it does not prohibit Defendants from engaging in anticompetitive or unlawful conduct in the future. Courts are reluctant to sustain such objections, finding that the "best assurance against future antitrust violations by defendants is the persistent threat of litigation by any class member." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 337 (N.D. Ga. 1993) (approving a settlement as fair, reasonable, and adequate despite the absence of injunctive relief prohibiting the defendant from engaging in future misconduct). Furthermore, this objection was promoted by a competitor in one of Defendant West's operating areas.

1    The Settlement requires Defendants to terminate the agreement Plaintiffs allege is unlawful.

2   BAR/BRI is also required to provide a clear statement to initial enrollees that they are not contractually

3   obligated to pay the full amount for a BAR/BRI course should they choose not to take such a course

4   upon graduation from law school. Since many law students enter into a contract with BAR/BRI in their

5   first year of law school, Plaintiffs have argued that the obligation to pay the full amount for the course

6   serves as a powerful hold on these students, thereby locking-up a substantial portion of the market for a

7   three-year period. Thus, this provision removes a significant barrier to entry into the market by

8   competitors, who would otherwise face the potentially overwhelming obstacle of trying to compete in a

9   market with few available customers for several years after entry. Furthermore, BAR/BRI has stated

10   that it is committed to accurate advertising as required by the Lanham Act, the Federal Trade

11   Commission Act, and similar laws.

12

13    Other Objectors criticize the Settlement because it does not provide for the break-up of

14   BAR/BRI. According to the Objecting Plaintiffs, "a significant number of class members are directly

15   interested in the future" of the bar review industry and believe that BAR/BRI would be broken up if

16   Plaintiffs instead went to trial and prevailed on the Section 7 claim. First, the overwhelming majority

17   of Class Members are in favor of the Settlement and have not filed any objection arguing that the

18   Settlement should be rejected because there are no provisions for dissolution. Second, there is no

19   guarantee that Plaintiffs would prevail at trial and obtain an order breaking-up BAR/BRI. Even if

20   Plaintiffs did prevail at trial, any verdict in their favor, including divestiture, would be subject to

21   appeal, thereby delaying any recovery to the Class. Regardless, neither Class Counsel nor the Court can

22   force competitors to enter the market.

23        (5)    The Possibility of a Cap and a *Cy Pres* Award Are Proper

24

25    The Court rejects the argument of certain Objectors that the possibility of a cap on individual

26   recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not

27   render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the

28   Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members

1  who make a valid claim, the Maximum Payment prevents a small group from receiving a multi-million

2  dollar windfall. This 30% Maximum Payment coincides with Plaintiffs' expert's estimate that the

3  average overcharge resulting from Defendants' alleged conduct was approximately 30% nationwide.

4  The Maximum Payment does not create any benefit for Defendants, as they will not receive any money

5  back if the Maximum Payment and *cy pres* award are implicated. In that event, this Court will

6  determine the recipient of any *cy pres* award of the undistributed funds.

7

8  **(6)    The Sealed Record Does Not Impact Approval of the Settlement**

9          The Court rejects the argument by certain Objectors that final approval of the Settlement should

10  be delayed and/or denied on the ground that the Class was purportedly denied access to the pleadings

11  filed under seal pursuant to a protective order entered by the Court on January 13, 2006 ("Protective

12  Order"). These Objections are moot, untimely, and more importantly, ignore the crucial role served by

13  the Court in the class action settlement approval process. These Objections disregard the fact that, in its

14  role as guardian for the Class, this Court has had access to all of the pleadings filed by the parties,

15  including those under seal pursuant to the Protective Order. The Court's access to and review of these

16  documents throughout the pendency of this Action precludes any contention that this Court is

17  incapable of assessing the fairness, adequacy, and reasonableness of the Settlement. To the contrary,

18  this Court is intimately familiar with facts and legal theories in this matter. *See Newberg* at § 11.25,

19  quoting *Manual for Complex Litigation* (Third) § 30.41 (1995).

20

21          The Objections based upon the inaccessibility of documents are untimely. Class Members

22  received notice of the Settlement in early April 2007, and could have acted earlier to obtain access to

23  the materials. Instead, they waited five weeks, until the Objections were due, to request a continuance

24  of the Final Approval Hearing to permit a review the sealed documents, or in the alternative, a rejection

25  of the Settlement.

26  **(7)    Class Counsel Has Fulfilled Its Fiduciary Obligation to the Class as a**

27  **Whole and Is Adequate Under Fed. R. Civ. P. 23**

28          The Court rejects the argument by one Objector that Class Counsel are inadequate due to a

1  "rift" within McGuireWoods (one of three Class Counsel), allegedly because "one of the partners, Eliot

2  Disner, has filed a brief objecting to the proposed settlement...." This is inaccurate. The brief in

3  question, although apparently drafted by Disner or at his direction, was filed by the Objecting Plaintiffs

4  without the authorization of Class Counsel. Moreover, Disner initially agreed to the Settlement and

5  supported it at the Preliminary Approval Hearing on March 19, 2007. Class Counsel maintains that the

6  viability of the theories espoused in the unauthorized filing by the Objecting Plaintiffs were thoroughly

7  considered by Class Counsel prior to entering the Settlement, with the ultimate decision by Class

8  Counsel as a whole (including Disner) that the Settlement was fair, adequate, and reasonable.

9

10      Between the Preliminary Approval Hearing and the Final Approval Hearing, Disner left

11  McGuireWoods on May 22, 2007. Then, prior to the Final Approval Hearing, Disner filed an Ex Parte

12  Application to Permit Lead Counsel to Speak Freely and, later, an Objection to the Settlement

13  Agreement with the Court. The Court denied the Application and overruled the Objection because

14  Disner was never appointed Class Counsel; McGuireWoods was appointed Class Counsel. Disner was

15  not in a position to object to the Settlement Agreement, as he was only one of at least half a dozen

16  McGuireWoods attorneys who helped negotiate the Settlement Agreement and only one of hundreds of

17  McGuireWoods partners firm-wide. There is no compelling reason for the Court to grant Disner a

18  Settlement Agreement veto. Therefore, the Court finds that Disner's subsequent reversal of position

19  and departure from McGuireWoods is immaterial to the Court's consideration of the fairness,

20  reasonability, and adequacy of the Settlement.

21      Class Counsel has fulfilled its fiduciary duty to the Class as a whole. The primary responsibility

22  of class counsel is to represent the entire class as it believes appropriate. *See* Advisory Committee

23  Note, Fed. R. Civ. P. 23(g) ("Paragraph (1) . . . articulates the obligation of class counsel to represent

24  the interests of the class, as opposed to the potentially conflicting interests of individual class

25  members."); *see also Newberg* at § 11.65 ("The general rule is that the named plaintiff and counsel

26  bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class

27  complaint."); *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("[C]lass action

28  counsel possess, in a very real sense, fiduciary obligations to those not before the court."). Class

1  counsel must make their own determinations about the appropriate course of action, taking full account

2  of their fiduciary obligation to the class as a whole. *See Olden*, 472 F. Supp. 2d at 939; *In re "Agent*

3  *Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986); *Lazy Oil Co.*, 166 F.3d at 590. The

4  Court finds that Class Counsel fulfilled its fiduciary obligation to the Class as a whole and is adequate

5  under Rule 23.

6

7  All other objections are overruled on relevance and other grounds.

8  **VIII.  The Court, in Its Discretion, Declines To Award Incentive Payments to the Class**

9  **Representatives**

10  **A.    The Factors Courts Consider in Deciding Whether to Award an Incentive Payment**

11  **and the Purposes for Which Courts Award Incentive Payments**

12

13  The decision whether to award an incentive payment to a class representative, and the size of

14  that award, is entirely within the trial court's discretion. *See, e g , In re Mego Fin. Corp. Sec Litig.*,

15  213 F.3d 454, 458, 462 (9th Cir. 2000). "The criteria courts may consider in determining whether to

16  make an incentive award include: (1) the risk to the class representative in commencing suit, both

17  financial and otherwise; (2) the notoriety and personal difficulties encountered by the class

18  representative; (3) the amount of time and effort spent by the class representative; (4) the duration of

19  the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a

20  result of the litigation." *Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (S.D. Cal. 1995)

21  (approving an award of $50,000 (half of the amount requested) to a named plaintiff who actively

22  participated in a litigation that lasted many years, provided "key testimony" at trial, and did not receive

23  great personal benefit from the common fund). Case law from other circuits is in accord. *See, e.g.*,

24  *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991)

25  ("Courts in [the Sixth Circuit] review the following factors when considering a request for class

26  representative incentive awards: (1) the action taken by the Class Representatives to protect the

27  interests of Class Members and others and whether these actions resulted in a substantial benefit to

28  Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial

1  risk; and (3) the amount of time and effort spent by the Class Representatives in pursuing the

2  litigation."); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an

3  award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of

4  the class, the degree to which the class has benefitted from those actions, and the amount of time and

5  effort the plaintiff expended in pursuing the litigation."). Courts generally evaluate class representative

6  incentive awards individually. *See, e.g., Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185,

7  1220-22, 1234-38 (S.D. Fla. 2006) (granting a reduced incentive award to a named plaintiff who

8  entered into an improper fee sharing agreement with his attorney after finding that the conflict of

9  interest created by it warranted partial forfeiture of the otherwise warranted award); *In re Heritage*

10  *Bond Litig.*, 2005 WL 1594403, at *18, 2005 U.S. Dist. LEXIS 13555, at *57 (C.D. Cal. 2005)

11  (awarding different amounts to different named plaintiffs).

12

13      The purposes for which courts award incentive payments are threefold. First, incentive awards

14  compensate class representatives for work done by them on behalf of the class under a quantum meruit

15  theory. *See Enter. Energy Corp.*, 137 F.R.D. at 251; *see also, Financial Arrangements in Class Actions*

16  *and the Code of Professional Responsibility*, 20 FORDHAM URB. L.J. 831, 834-835 (1993) ("*Financial*

17  *Arrangements in Class Actions*"). This is the same reason attorneys' fees, expert fees, and other costs

18  of litigation are generally deducted from the common fund - to prevent a windfall to the class. Second,

19  incentive awards are used to compensate class representatives for risks undertaken by them in bringing

20  the class action. *See, e.g., In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992). These

21  risks include retaliation resulting in personal or financial harm, discrimination, trouble finding

22  employment, and significant financial risk. *See, e.g., Cook*, 142 F.3d at 1016 (workplace retaliation);

23  *Allapattah Servs.*, 454 F. Supp. 2d at 1220-21 (financial retaliation); *Women's Comm for Equal*

24  *Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977) (discrimination);

25  *Glass v. UBS Fin. Servs., Inc.*, Slip Copy, 2007 WL 221862, at *16, 2007 U.S. Dist. LEXIS 8476, at

26  *52 (N.D. Cal. Jan. 26, 2007) (trouble finding employment); *Enter. Energy Corp.*, 137 F.R.D. at 251

27  (significant financial risk). Third, some courts award incentive awards to class representatives in

28  recognition of their willingness to act as a private attorney general. *See, e.g., In re*

   *Continental/Midlantic S'holders Litig.*, 1987 WL 16678, at *7, 1987 U.S. Dist. LEXIS 8070, at *12-13

Case 2:05-cv-03222-R-Mc    Document 432    Filed 09/10/2007    Page 22 of 37

(E.D. Pa. Aug. 29, 1987).

**B.    The Court Considered the Relevant Factors and the Purposes for Which Courts Award Incentive Payments in Deciding Not to Award Incentive Payments**

**(1)    The Risk to the Class Representative in Commencing Suit**

None of the Class Representatives faced substantial risks in bringing this suit. All seven of their retainer agreements provided that Class Counsel would front all fees and costs in bringing the litigation, and seek reimbursement for those fees and costs as part of any settlement or judgment. *Cf. Enter. Energy Corp.*, 137 F.R.D. at 251 (finding there was a significant financial risk where class members were contractually obligated to pay all expenses incurred in the pursuit of the litigation if they were not otherwise paid, amounting to hundreds of thousands of dollars). There is no indication the Class Representatives were threatened with financial or personal harm in retaliation for their having brought this suit, and there was no risk of being discriminated against. Plaintiffs' argument that the Class Representatives here faced some risk to their careers, citing *Glass v. UBS Financial Services, Inc.*, is unavailing. 2007 WL 221862, at *16. In *Glass*, the class representatives were securities brokers still currently employed in the securities industry and had "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America." *Id.* at *16. There is no indication that Class Representatives face inordinate or significant risks to their professional reputations as lawyers as a result of suing a publishing company and test provider for whom they have never worked and for whom it is not likely that they would consider working. Furthermore, this Court finds it hard to believe that any potential legal employer would consider it a negative for an attorney to be litigious. Thus, this factor weighs against awarding incentive payments.

**(2)    The Notoriety and Personal Difficulties Encountered by the Class Representatives**

Although the Class Representatives likely received some notoriety in bringing this lawsuit, they received a significant amount of positive press also. This Court is aware of no personal difficulties of consequence encountered by the Class Representatives. Accordingly, this factor weighs against

1  awarding incentive payments.

2

3      **(3)    The Amount of Time and Effort Spent by the Class Representatives**

4      The incentive award amounts requested by Plaintiffs are unreasonable: (1) in light of the time

5  and effort spent by the Class Representatives in furtherance of this litigation; (2) after analyzing the

6  value of the work done; and (3) when compared to the recovery of the unnamed Class members

7  pursuant to the Settlement Agreement. In their Motion for Incentive Awards to Class Plaintiffs, the

8  three Objecting Plaintiffs requested $75,000 each; the four Settling Plaintiffs requested $25,000 each.

9  At the first Final Approval Hearing on June 18, 2007, the Court ordered Class Counsel to provide

10  documentation for each of the Class Representatives indicating his/her time spent working on the

11  litigation, and the value of such time, using a lodestar-type calculation. In response, each of the Class

12  Representatives filed declarations with the Court and Class Counsel filed briefs arguing in support of

13  the requested amounts. As part of the Settlement Agreement, Defendants agreed not to oppose the

14  Class Representatives incentive award requests up to $25,000 and, thus, filed nothing in response to

15  Plaintiffs' papers.

16

17      The time and effort spent by the Class Representatives does not justify the huge incentive

18  awards requested. The Class Representatives' declarations contain extensive entries for interpersonal

19  communications, including emails and telephone calls, meetings with reporters and photographers, and

20  several hours spent reviewing news articles about the case. Three of the Class Representatives "billed"

21  their time in .10 hour increments. A substantial portion of these billings were amassed between January

22  1, 2007 and June 23, 2007. Even assuming all of the hours claimed are justified, the amount of time

23  and effort spent by the Class Representatives does not justify an incentive award in the tens of

24  thousands of dollars. Just because the Class Representatives in this case happen to be attorneys does

25  not mean that the time they spent working as Class Representatives in furtherance of this litigation

26  should be charged to the rest of the Class at $250 an hour. *See Newberg* at § 15:22 (4th ed. 2002)

27  (collecting case law indicating that attorneys who wish to represent the class in a class action should

28  not also act or be paid as class counsel); *Gilbert v. Master Washer & Stamping Co.*, 87 Cal. App. 4th

212, 221 (2001); *Bruno v. Bell*, 91 Cal. App. 3d 776, 788 (1979).

1    Class Counsel cites *Glass, Bradburn, and In re Insurance Brokerage Antitrust Litigation* as
2    recent opinions that support the amounts requested here. In fact, these cases are easily distinguishable
3    and reveal just how unreasonable the amounts requested in this case really are. *Glass*, 2007 WL
4    221862, at *17; *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.)*, Slip Copy,
5    2007 WL 1468847, at *19, 2007 U.S. Dist. LEXIS 35899, at *57-58 (E.D. Pa. May 14, 2007); *In re
6    Ins. Brokerage Antitrust Litig.*, Slip Copy, 2007 WL 1652303, at *10-11, 2007 U.S. Dist. LEXIS
7    40729, at *68-69 (D.N.J. June 5, 2007). In *Bradburn*, the court approved a $75,000 award to a small
8    business that served as a named class representative from a total settlement of $39,750,000. The
9    *Bradburn* representatives worked closely with their class counsel for over four years, undergoing nine
10   depositions and providing testimony at the class certification hearing while preparing to attend and give
11   testimony at the trial. 2007 WL 1468847, at *17-19. Significantly, there were no objections to the
12   award. *Id.* at *19. In the instant matter, three of the Class representatives are requesting individual
13   awards of $75,000 – an amount that was awarded based on the collective efforts of several
14   representatives of a small business in *Bradburn*. *Id.* Further, the representatives in *Bradburn* were
15   involved in litigation spanning four years, more than double the time involved in this case. *Id.* Finally,
16   while there were no objections to the award requested by the class representative in *Bradburn*, the
17   Court has received several objections by Class Members to the amounts requested by the Class
18   Representatives in this matter. *Id.*

19

20       *Glass* is likewise distinguishable. 2007 WL 221862, at *16-17. In that case, the court approved
21   $25,000 from a settlement of $45 million to each of the four named plaintiffs out of a class of 13,000
22   members. *Id.* In approving the awards, the court relied on the class counsel's declaration that the
23   named plaintiffs provided a great deal of informal discovery and insight into the policies and practices
24   of the defendant, and took into account the risk they faced suing a major employer in their industry. *Id.*
25   at 16-17. Here, the Class Representatives provided no such insights and faced no such risk, yet three of
26   them seek three times the amount requested by the class representatives in *Glass*. While in *Glass* there
27   was only one objection to the incentive awards amounts requested, here, a number of Objectors
28   vehemently oppose the incentive award payments, some even filing briefs addressing the issue. *Id.*
     Finally, in *Glass*, the court noted that the settlement provided for a maximum of $100,000 in incentive

1    awards, subject to court approval. *Id.* at 16. Here, Defendants agreed only not to oppose incentive

2    award requests for $25,000 for each of the Class Representatives.

3       In *In re Insurance Brokerage Antitrust Litigation*, the court awarded an incentive payment of

4    only $10,000 to each of fifteen named plaintiffs in an antitrust class action that resulted in a $121

5    million settlement fund. Slip Copy, 2007 WL 1652303, at *1, 10-11. The duration of the litigation in

6    that case was approximately the same as in this case, just under two years. *Id.* at *1. Also, the court

7    noted that there was only one objection to the amount requested and that the objection "lacked any

8    supporting case law or a thorough explanation as to why [the amount requested] should be considered

9    excessive." *Id.* at *11. Here, the Class Representatives seek bigger awards for the same type of

10    litigation, lasting about the same amount of time, that resulted in a smaller settlement fund. Also, in

11    this case, there are a number of outspoken Objectors who make valid and well-reasoned arguments

12    regarding the value of the work done by the Class Representatives and the impropriety of the Incentive

13    Agreement which five of them signed.

14

15       Most problematic, however, is the value to the litigation of the time and effort spent by the

16    Class Representatives. Although they are all attorneys, the Class Representatives were not Class

17    Counsel and it was unnecessary for them to have done work duplicative of that of the attorneys

18    representing the Class. The Class Representatives' declarations reflect that they spent much of their

19    time on this case researching case law and extensively reviewing documents produced in discovery,

20    pleadings, and deposition transcripts. The Class is already paying for those services, and Class Counsel

21    is being compensated for those services, through the Court's grant of Class Counsel's Motion for

22    Attorneys' Fees and Reimbursement of Costs. Again, none of the Class Representatives are current or

23    former employees of any of the Defendants in this case, so they could not provide extensive "informal

24    discovery" or "insight" into the practices of Defendants, as did the class representatives in *Glass*. 2007

25    WL 221862, at *17. Indeed, the fact that most of the Class Representatives contracted in advance the

26    amount of the incentive award that Class Counsel would request on their behalf, based solely on the

27    amount of recovery, leads the Court to believe that there is no correlation whatsoever between the

28    amount of work done, or the value of the work done, and the amount requested.

1    Finally, it is estimated that each Class Member who files an appropriate claim against the
2    Settlement Fund will receive about $125. The Settling Plaintiffs are requesting an amount
3    approximately 200 times that amount; the amount the Objecting Plaintiffs seek is approximately 600
4    times the amount each Class Member is expected to receive. Such a large discrepancy is inherently
5    suspicious and weighs against a finding that incentive awards are warranted. *See Staton v. Boeing Co.*,
6    327 F.3d 938, 975 (9th Cir. 2003) (finding a "serious concern[]" as to fairness, adequacy and
7    reasonableness" that the named plaintiffs would receive, on average, sixteen times greater damages
8    than each of the unnamed class members). Therefore, this factor weighs against awarding incentive
9    payments.

10
11    **(4)    The Duration of the Litigation**

12    Fourth, the duration of this litigation was relatively quick, given that antitrust litigation often
13    spans many years, the Complaint in this case was filed only two years before the Settlement Agreement
14    was reached, and the Class Representatives were not actively involved in trial preparations. *See*
15    *Bradburn*, Slip Copy, 2007 WL 1468847, at *57-58 (awarding a $75,000 incentive payment to a small
16    business that served as a class representative in class action antitrust lawsuit and worked closely with
17    their class counsel for over four years, undergoing nine depositions and providing testimony at the
18    class certification hearing while preparing to attend and give testimony at the trial). Thus, this factor
19    weighs against awarding incentive payments.

20
21    **(5)    The Personal Benefit Enjoyed by the Class Representative**

22    This factor weighs neither for or against an award of incentive payments.
23
24    After carefully considering the factors courts consider in deciding whether to award incentive
25    payments, and the purposes for which courts award incentive payments, the Court declines to award
26    any of the Class Representatives incentive payments in this case.

27    **B.    The Incentive Agreement is Inappropriate and Contrary to Public Policy**

28    Additionally, the Court declines to award incentive payments to the five Class Representatives

1  who signed the Incentive Agreement[3] because that agreement is inappropriate and contrary to public

2  policy. This appears to be the first case in which a class representative entered into a contingency fee-

3  type contract with class counsel from the outset whereby class counsel agreed to request a particular

4  incentive award on behalf of the class representative based on the amount of the ultimate recovery.

5  However, some commentators have opined that such agreements might be acceptable. *See* Clinton A.

6  Krislov, *Scrutiny of the Bounty, Incentive Awards for Plaintiffs in Class Litigation*, 78 ILL. B.J. 286,

7  290 (1990). ("While the plaintiff's attorney cannot promise the plaintiff an award in advance, there

8  would seem to be no reason to question the attorney's commitment in the initial engagement agreement

9  to request an incentive award if the primary claim is successful."). The Court strongly disagrees. These

10  contracts: (1) lead to an improper request of the court; (2) create the appearance of impropriety; (3) fail

11  to correlate the amount requested to any reasonable forecast of costs or risk incurred; (4) run afoul of

12  the California Rules of Professional Conduct; and (5) encourage "figurehead" lawsuits or "bounty

13  hunting" by potential class action plaintiffs.

14

15  (1)    The Incentive Agreement Leads to an Improper Request of the Court

16       The Incentive Agreement leads to an improper request of the Court, as it completely ignores the

17  factors courts should (and do) take into account when deciding whether to award incentive payments.

18  *See, e.g.*, *Van Vraken*, 901 F. Supp. at 299-300. Under Federal Rule of Civil Procedure 11, claims,

19  defenses, and other legal conclusions presented to the court must be warranted by existing law or by a

20  nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment

21  of new law. Fed. R. Civ. P. 11. It is disingenuous, improper, and a violation of the Federal Rules, for

22  class counsel to request and argue for an arbitrary, contractually-obligated incentive award that is not

23  reflective of the factors courts consider in granting such requests.

24

25

26       [3] The Court recognizes that, of the five Class Representatives who signed the Incentive

27  Agreements, only the three Objecting Plaintiffs are requesting the $75,000 award pursuant to the terms
of the Incentive Agreement. The two Settling Plaintiffs who signed the Incentive Agreements, Plaintiffs

28  Frailich and Brazeal seek $25,000, the same amount as the other two Settling Plaintiffs and the amount
that Defendants agreed not to oppose in the Settlement Agreement.

(2)    The Incentive Agreement Creates the Appearance of Impropriety

The Incentive Agreement itself creates at least the appearance of impropriety and can cloud the proceedings. Under the terms of the agreement, Class Counsel will request an incentive award on behalf of the Class Representatives based on the amount ultimately recovered, not on the amount of work to be done, the amount of time spent, the value of work done, or the risks undertaken in bringing the lawsuit. The contract essentially aligns the financial interests of the Class Representatives and Class Counsel in seeking the highest amount of monetary recovery possible in the shortest amount of time or for the least amount of work. Such an agreement runs afoul of the rule forbidding class counsel and class representatives from being the same person or otherwise having identical interests. *See, e.g., In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257, 260 (N.D. Cal. 1996) ("[A]n attorney may not serve as both class representative and class counsel."); *Turoff v. May Co.*, 531 F.2d 1357, 1360 (6th Cir. 1976) ("[T]he roles of class representative and of class attorney cannot be played by the same person."); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90-92 (7th Cir. 1977) ("Courts have also expressed fear as to the danger of champerty because of the close relationship between the putative class representative and counsel.").

Contracts such as these act to undermine class action settlement agreements. Even if it is not actually the case, courts (the ones charged with the responsibility of determining fairness, adequacy and reasonableness under Federal Rule 23) "fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Susman*, 561 F.2d at 91. Likewise, class members, who are generally not involved in settlement negotiations, justifiably fear collusion, especially when other remedies, such as injunctive relief, are minimal or nonexistent. Although the Court finds there was no collusion in this case, many of the Objectors understandably expressed these concerns in briefs and at the Final Approval Hearings. Further, when the defense counsel agrees not to oppose incentive award requests in line with the terms of the contract between the class counsel and the class representatives, it appears as if the class representatives were "bought off" by defense counsel. This is especially true where, as here, defense counsel uncovered the terms of the Incentive Agreement through discovery before settlement

1    negotiations even began. In this case, at least five different groups of Objectors argued that the $75,000

2    award requests for the Objecting Plaintiffs represent an attempt to "buy them off."

3

4        **(3)    The Incentive Agreement Fails to Correlate the Amount Requested to a**

5                **Reasonable Forecast of Costs or Risk Incurred**

6        The Incentive Agreement is also improper because it fails to correlate the amount requested to a

7    reasonable forecast of costs or risk incurred. This invalidates the contract for the same reasons the

8    common law and state statutes disapprove of liquidated damages provisions that are not a reasonable

9    forecast of damages in the event of a breach - it undermines the purpose of allowing the clauses and the

10    policy against penalties. Liquidated damages provisions that are not a reasonable forecast of damages

11    in the event of breach of contract at the time the contract was made or, in some circumstances, not

12    reasonable in light of actual damages, are generally invalid. *See, e.g.*, Cal. Civ. Code § 1671 (2007)

13    (anticipated); Cal. Com. Code § 2718 (2007) (anticipated or actual).

14

15        Here, the Incentive Agreement was negotiated before this case was even filed. The contract

16    requires the Class Representatives to "cooperate fully in the investigation and pursuit of the matter"

17    and perform the other duties of a class representative before Class Counsel would seek any incentive

18    payment. However, if the Class Representatives did so, the sliding scale obligates Class Counsel to

19    make a greater incentive payment request for a greater monetary recovery, not for doing more work or

20    facing heightened risk. Indeed, had the case settled for more than $10 million dollars only a month

21    after it had been filed, before discovery had even commenced, Class Counsel would still have been

22    contractually obligated to seek an incentive payment of $75,000 per Class Representative. Thus, the

23    incentive award agreement provisions were never a reasonable forecast of costs or risks the Class

24    Representatives would incur. For the reasons discussed above, nor are they reasonable in light of the

25    actual costs incurred.

26        **(4)    The Incentive Agreement Runs Afoul of the California Rules of**

27                **Professional Conduct**

28    Incentive award agreements such as the one at issue here are also inappropriate because they

1    violate the California Rule of Professional Conduct prohibiting fee-sharing with clients and fee-

2    splitting among lawyers.[4] Cal. R. Prof. Conduct 2-200 (Financial Arrangements Among Lawyers);[5]

3    Cal. R. Prof. Conduct 1-320 (Financial Arrangements with Non-Lawyers).[6]

4        The Incentive Agreement violates the ethics rule against fee-sharing with non-lawyers because

5    it, in essence, promises the client a fee (over which the attorney has some control) for having brought

6    the case. *See Financial Arrangements in Class Actions*, 20 FORDHAM URB. L.J. at 839 (noting that

7    solicitation of clients using the promise of an incentive award to encourage plaintiffs to bring a lawsuit

8    would violate professional disciplinary rules regarding solicitation and fee-splitting). The Incentive

9    Agreement noted that the award was contingent on the approval of the Court. However, the

10   contingency fee-like arrangement demonstrates that the Class Representatives believed they would be

11   compensated for serving as named representatives and that Class Counsel had some control over the

12   amount they would receive. Otherwise, they would not have contractually obligated Class Counsel to

13   request a specific amount on their behalf. Class Counsel, for their part, agreed to seek the fee,

14   regardless of whether or not it was actually warranted, to ensure they would be selected by Plaintiffs to

15   bring the case. Furthermore, the plain language of the contract indicates that it was the parties'

16   understanding that the incentive award request would be "rubberstamped" by the Court. The relevant

17

---

18   [4] "[T]he Central District of California has adopted the 'State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto' as the standard of

19   professional conduct in the district. Local Rule Ch. VI., R. 1.2." *San Gabriel Basin Water v. Aerojet-General Corp.*, 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000).

20

     [5] "(A) Neither a member nor a law firm shall directly or indirectly share legal fees with a person who is

21   not a lawyer...." Cal. R. Prof. Conduct 1-320.

22   [6] "(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless: (1) The client has consented in writing thereto after a full

23   disclosure has been made in writing that a division of fees will be made and the terms of such division; and (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division

24   of fees and is not unconscionable as that term is defined in rule 4-200; (B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of

25   value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in the

26   employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the

27   member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity

28   would be forthcoming or that referrals would be made or encouraged in the future." Cal. R. Prof. Conduct 2-200.

1  section of the contract is titled "Incentive/Compensation to Clients" and repeatedly states that a certain

2  amount "will be paid" depending on the amount of the recovery.[7]

3      Even though the fee is not paid directly by the lawyer, because both the attorneys fees and the

4  incentive payments are deducted from the Settlement Fund and Class Counsel requests the incentive

5  payment on the Class Representatives' behalf, this is indirect fee sharing. *See, e.g., In re Gould Secs.*

6  *Litig.*, 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (refusing to grant an incentive award request that was

7  not made pursuant to a contractual agreement because it "borders on permitting a lay plaintiff to share

8  in the attorneys' fees."). Pursuant to the California Rules of Professional Conduct 1-320, attorneys are

9  not permitted to pay incentive awards to class representatives out of the attorneys' fees award. *See*

10 *Campbell v. Fireside Thrift Co.*, 2004 Cal. App. Unpub. LEXIS 216, at *36-38 ("Thus, when a class

11 representative receives an incentive award as part of a settlement, it may either be paid from a common

12 fund, if the settlement creates one, or directly by the defendant, as an addition to the other amounts to

13 be under the settlement.") (citations omitted). Likewise, the Incentive Agreement is an attempt at

14 improper fee sharing between an attorney and a client. To find otherwise would allow attorneys to skirt

15 the ethics rule governing client solicitation. Cal. R. Prof. Conduct 1-400.

16

17      Furthermore, as Class Counsel and the Class Representatives in this case are all attorneys, the

18 Incentive Agreement also violates the ethics rule prohibiting fee-splitting among lawyers. Cal. R. Prof.

19 Conduct 2-200 ("[A] member shall not compensate, give, or promise anything of value to any lawyer

20 for the purpose of recommending or securing employment of the member or the member's law firm by

21 a client, or as a reward for having made a recommendation resulting in employment of the member or

22 the member's law firm by a client."). Here, Class Counsel promised it would seek an incentive

23 payment for the Class Representatives from the Court. This promise certainly has some value because

24 it is the first step in getting the request granted. Also, the Class Representatives admittedly researched

25 the claims they would bring against Defendants themselves prior to agreeing to serve as named

26

---

27 [7] Indeed, the promise of an incentive award undermines the purpose for which attorneys inform clients
   and prospective clients of the possibility of the court granting an incentive award request - to encourage
28 the class representative's participation throughout the litigation. *See In re W. Union Money Transfer*
   *Litig.*, 2004 U.S. Dist. LEXIS 29377, at *53 (E.D.N.Y. Oct. 19, 2004).

1   plaintiffs in this class action. Surely they believed the case was worth a lot of money and wanted to

2   share in the ultimate recovery, even though they did not have the experience handling class actions and

3   complex litigation or knowledge of the applicable law to bring the case themselves. Fed. R. Civ. P.

4   23(g)(1). This is why they made the Incentive Agreement prior to agreeing to serve as a named

5   plaintiff. Thus, the Incentive Agreement is also an attempt at improper fee-splitting among lawyers.

6                    (5)    **Incentive Agreements Such as This One Encourage Figurehead Cases and**

7                           **Bounty Payments**

8

9       Incentive award agreements such as the one in this case are contrary to public policy because

10  they encourage figurehead cases and bounty payments by potential class counsel. Courts routinely

11  disapprove of figurehead lawsuits brought by plaintiffs too closely associated with the attorneys

12  bringing the lawsuit and anticipating large fee awards. *See, e.g., Susman v. Lincoln Am. Corp.*, 561

13  F.2d 86, 95 (7th Cir. 1977) (finding that an attorney's brother could not serve as a class representative);

14  *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984) (finding that a named

15  plaintiff who was class counsel's employee could not represent the class); *Turoff v. May Co.*, 531 F.2d

16  1357, 1360 (6th Cir. 1976) (finding that the attorneys who were part of the firm appointed as class

17  counsel (and their wives) were too closely associated with class counsel to represent the class). This is

18  due to the risk that the class representative would be more interested in maximizing the attorneys fees

19  award than in aggressively representing the class. *See, e.g., Susman*, 561 F.2d at 95; *Shroder*, 729 F.2d

20  at 1375; *Turoff*, 531 F.2d at 1360. When allowed to proceed, figurehead lawsuits often unnecessarily

21  encourage litigation, drive up attorneys fees awards, and give the proceedings the appearance of

22  impropriety. *See, e.g., Turoff*, 531 F.2d at 1360 (explaining that, when the class representatives are too

23  closely associated with class counsel it causes "manufactured litigation" and a "cloud" on the

24  proceedings).

25      Much like the figurehead lawsuits discussed above, the Class Representatives here are too

26  closely associated with Class Counsel. Because both the Incentive Agreement and the Retainer

27  Agreement between Class Counsel and the Class Representative are contingency fee arrangements,

28  their interests are aligned in obtaining the highest financial recovery possible. When the ultimate

amount of recovery determines both the attorneys fees and the incentive awards, there is a real fear that the class representatives are more interested in working with the class counsel only to maximize that award, rather than in aggressively representing the class. As evidenced by the oral arguments and briefing of some of the Objectors, the Incentive Agreement did in fact give the proceedings the appearance of impropriety. Thus, this relationship is contrary to public policy.

Likewise, courts and legislatures often disapprove of arrangements in which a bounty is paid to a plaintiff by an attorney to encourage the plaintiff to bring suit. *See, e.g., In re Gould Secs. Litig.*, 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (relating incentive awards to bounty payments). The payment of bounties to named plaintiffs violates public policy because it unnecessarily encourages litigation and creates class actions in which the lead plaintiff is unlikely to undertake a meaningful counsel selection process, engage in effective bargaining over lead counsel's fee, or adequately monitor lead counsel's performance. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 255 (3rd Cir. 2001) (noting also that lead counsel often select lead plaintiff rather than vice versa). Such arrangements can also lead to "bounty hunting" whereby prospective plaintiffs incite a bidding war between prospective class counsel. *See Financial Arrangements in Class Actions*, 20 FORDHAM URB. L.J. at 839-40 (noting that an undesirable consequence of promising incentive awards is that it will lead to bidding wars to attract plaintiffs, prompting plaintiffs to sign up with those who promise the highest amount); *In re Gould Secs. Litig.*, 727 F. Supp. at 1209 ("The real danger [of incentive awards] is a potentially undesireable precedent where every named plaintiff would expect a 'fee' or 'bounty' for the use of his or her name to create a class action. It is not difficult to envision a scenario ... of prospective named plaintiffs becoming involved in a bidding war ... with prospective class counsel.").

The usual grant of an incentive award request is not considered a bounty payment by most courts. *See, e.g., Deloach v. Philip Morris Cos., Inc.*, 2005 WL 1528783, at *3, 2005 U.S. Dist. LEXIS 13032, at *11-12 (M.D.N.C. June 29, 2005) (citing a number of cases in which courts have awarded incentive payments to named plaintiffs or class representatives and rejecting the argument that payment of incentive awards in class action litigation constitutes a bounty payment). However, the Incentive Agreement makes the present case very different. Because the contract was negotiated in advance, with

33

1   the understanding that the class representatives "will be paid" a specified amount correlated to a

2   specified settlement or litigated victory amount and not to the amount or value of the work to be done

3   by the class representative, the agreement represents a bounty payment. Indeed, if these arrangements

4   were permitted, a rational plaintiff seeking counsel would be financially motivated to select his or her

5   counsel based on which agreed to seek the largest incentive payment on his or her behalf. Also, counsel

6   competing for named plaintiffs would be encouraged to contract to seek bigger and bigger awards on

7   the plaintiff's behalf. In fact, because three of the Class Representatives did not join the lawsuit until

8   after the initial complaint was filed, it appears as if Plaintiffs Brazeal, Nesci, and Gintz were recruited

9   into the lawsuit by Class Counsel with the promise of incentive awards. Thus, in this case, granting the

10  incentive award request would violate the public policy against bounty payments.

11  **C.    The Incentive Agreement Creates a Conflict of Interest Between the Contracting**

12  **        Class Representatives and the Unnamed Class Members**

13

14          Most problematic, however, is the conflict of interest between the Class Representatives and

15  the unnamed Class Members created by the Incentive Agreement. By entering into a contingency fee-

16  type agreement with Class Counsel that correlated the incentive request solely to the settlement or

17  litigated victory amount, the Class Representatives disaligned their interests with the interests of the

18  Class. They no longer had the same interests as the Class in seeking injunctive relief or adequate

19  compensation for alleged wrongs, or their continuing effects, for all Class Members. *See* Jerold S.

20  Solovy et al., *The Head of the Class*, NAT'L LAW JOURNAL, Aug. 27, 1990, at 13 ("The primary

21  difficulty with incentive awards is that they raise the specter that named plaintiffs may 'sell out' the

22  interest of the class they purport to represent."). Worse, once a settlement offer of greater than $10

23  million was made, the Class Representatives had no financial incentive whatsoever in seeking

24  injunctive relief or a larger settlement amount, as a settlement in that amount ensured a request for the

25  contractually-capped incentive payment. *See Financial Arrangements in Class Actions*, 20 FORDHAM

26  URB. L.J. at 840 (noting that "incentive awards could encourage collusion and 'suboptimal' class

27  settlements, because plaintiffs with something extra to gain are not motivated to hold out for higher

28  awards for the rest of the class."). Indeed, at the Final Approval Hearings, the Objecting Plaintiffs did

1  not argue that the lawsuit should not be settled or that it provided insufficient injunctive relief, but only

2  that Defendants should pay more.

3  Furthermore, once the threshold cash settlement amount was met, the Class Representatives had

4  no incentive to go to trial. In fact, it created a strong *disincentive* to proceed to trial, as it put the Class

5  Representatives in the position of risking $75,000 if they rejected any settlement amount over $10

6  million, for little potential return to themselves. A trial might return a much larger aggregate sum to the

7  class, but would increase individual returns, including those of the Class Representatives, only

8  marginally, if at all. A loss at trial would eliminate the incentive award, but a win would not increase it.

9  Thus, there was a disconnect between the interests of the Class Representatives and the unnamed Class

10  Members, and a consequent conflict of interests.

11

12  Although the notice and judicial approval requirements provide safeguards against conflicts of

13  interest and unreasonable settlements, here the parties did not disclose their agreement to the Court

14  from the outset and the agreement was never disclosed to the Class. *See Financial Arrangements in*

15  *Class Actions,* 20 FORDHAM URB. L.J. at 840. In fact, although apparently the Incentive Agreement was

16  provided to Defendants in April of 2006, no one informed the Court of the Incentive Agreement until

17  well after the Preliminary Approval Hearing, when the incentive award requests were made. The

18  failure to disclose this agreement to the Court violates the class representatives' fiduciary duties to the

19  class and duty of candor to the Court. *See Sipper v. Capital One Bank,* 2002 WL 398768, at *4 & n.8,

20  2002 U.S. Dist. LEXIS 3881, at *13 & n.8 (C.D. Cal. 2002) (citing other relevant cases and finding

21  that the failure to disclose the existence of a business relationship between class counsel and the named

22  plaintiff constituted a conflict of interest that destroyed the adequacy of the plaintiff's representation).

23  Class Members could not have consented to the conflict because they were never told about the

24  Incentive Agreement, as it was not included in the Notice sent to the Class Members which described

25  the incentive award requests.[8] Thus, the safeguards of notice and judicial approval could not operate to

26

27  ────────────

[8] The relevant section of the Notice reads: "All costs, fees, and expenses related to this lawsuit are to be paid out of the proceeds of the Settlement Fund. From the inception of the lawsuit, Class Counsel have not received any payment for their services in prosecuting the case, nor have they been reimbursed for

28  any out-of-pocket expenses. Class Counsel will apply to the Court for an award of attorneys' fees of 25% of the Settlement Fund and reimbursement of expenses advanced in the litigation ("Fee Petition").

1    prevent the conflict of interests here. The Court must now act to remedy the conflict by declining to

2    award incentive payments.

3        The conflict of interests here was not simply potential. Indeed, in this case there was an actual

4    manifestation of conflicting interest. The Objecting Plaintiffs claim that Class Counsel threatened to

5    not request incentive payments on their behalf pursuant to the Incentive Agreement if they did not

6    agree to the Settlement. This demonstrates that the Objecting Plaintiffs recognized that their own

7    interests diverged from those of the Class. Although the Objecting Plaintiffs argue that there is no

8    actual conflict of interests because they continue to object to the Settlement, the Objecting Plaintiffs

9    have never taken a position that jeopardizes their $75,000 incentive award request because they do not

10   object to the settlement with Kaplan. The $13 million settlement with Kaplan alone exceeds the $10

11   million provision in the Incentive Agreement which contractually requires Class Counsel to request a

12   $75,000 incentive payment on their behalf.

13

14       Thus, for the reasons discussed above, the Court declines to award any incentive awards to any

15   of the Class Representatives. Giving awards in this situation would be a violation of the Court's duty in

16   overseeing class actions and against the public interest.

17   **VI.    Attorneys Fees**

18

19       The Court finds that Class Counsel's Motion for Attorneys' Fees and Reimbursement of

20   Expenses is proper and grants the Motion.

21

22

23

---

24   Moreover, an application will be made to the Court for an incentive award of $25,000 for Plaintiffs
     Frailich, Brazeal, Brewer and Rimson, and $75,000 for Plaintiffs Rodriguez, Nesci and Gintz to
25   compensate them for their participation in, and prosecution of, this case on behalf of the Class, which
     included, among other things, producing documents, providing written discovery, consulting with Class
26   Counsel and members of the Class, and appearing for depositions ("Incentive Award Petition"). Class
     Counsel will file the Fee Petition and the Incentive Award Petition with the Clerk fo the Central District
27   of California, at the United States District Courthouse, 312 N. Spring Street, Los Angeles, California,
     90012 on or before May 7, 2007. The petitions will be available for inspection during normal business
28   hours at the office of the Clerk." Notice of Proposed Settlement of Class Action and Hearing Regarding
     Settlement at 3.

**VI.    Conclusion**

For the reasons set forth above,

(1)    The Court grants Plaintiffs' Motion for an Order Granting Approval of Class Action Settlement;

(2)    The Court denies Plaintiffs' Motion for Incentive Awards to Class Plaintiffs;

(3)    The Court grants Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses.

IT IS SO ORDERED.

DATED: September _10_, 2007.



_____

MANUEL L. REAL

UNITED STATES DISTRICT JUDGE

ENTER
NOTED

LODGED
CLERK, U.S. DISTRICT COURT

AUG 20 2007
3:08

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

SEP 12 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED
CLERK, U S DISTRICT COURT

SEP 10 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN RODRIGUEZ, REENA B. FRAILICH, LOREDANA NESCI, JENNIFER BRAZEAL, and LISA GINTZ, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WEST PUBLISHING CORPORATION, a Minnesota Corporation d/b/a BAR/BRI, and KAPLAN, Inc., a Delaware Corporation,<br><br>                    Defendants.<br><br>AND CONSOLIDATED ACTION | Case No.: CV-05-3222 R(MCx)<br><br>[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW |

ORIGINAL

433

1    Representative Plaintiffs[1] and Defendants have submitted for approval a

2    Settlement of this Action that is memorialized in the Settlement Agreement. For the

3    reasons set forth below, the Court has determined that the Settlement is fair, reasonable

4    and adequate, and should therefore be approved.  As the Court is contemporaneously

5    issuing a Judgment and an Order Approving Settlement, the Court makes the following

6    findings of fact and conclusions of law:

7    **I.BACKGROUND**

8        **A.    Materials Considered by the Court**

9            1.    In coming to its decision, this Court has considered the written

10   memoranda and other material submitted by the Settling Parties, as well as those

11   submitted by objectors to the Settlement (the "Objectors").  In addition, this Court

12   has relied upon its familiarity with this case resulting from motion hearings and the

13   documents submitted in connection therewith, and its general case management

14   duties.  As discussed below, Class Counsel and counsel for Defendants have fully

15   briefed the request for approval, and they have supported the request with

16   declarations of fact.  Class Counsel and counsel for Defendants were present at the

17   June 18 and July 9, 2007 Final Settlement Hearing and addressed issues that were

18   raised at the time by the Court and the Objectors.

19       **B.    History of the Litigation**

20           2.    After an extensive pre-filing factual investigation, plaintiffs

21   Ryan Rodriguez ("Rodriguez") and Reena B. Frailich (the "Initial Plaintiffs") filed

22   the first complaint in this Action in April 2005 against Defendants alleging claims

23   for violation of the federal antitrust laws (the "Initial Complaint").

24           3.    The Initial Plaintiffs later filed a First Amended Complaint

25

26   [1] Unless otherwise specifically defined herein, the capitalized terms in the Findings

27   of Fact and Conclusions of Law have the same meaning as attributed to them in the

28   Stipulation and Settlement Agreement, dated February 2, 2007 (the "Settlement
Agreement").

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  ("FAC"), in which plaintiffs Jennifer Brazeal, Loredana Nesci ("Nesci") and Lisa

2  Gintz ("Gintz") joined.

3        4.     Plaintiffs Kari Brewer and Lorraine Rimson filed a related action

4  against Defendants in this Court entitled, *Brewer v. West Publishing Corp.*, Case

5  No. CV-05-06211. The Court consolidated the two actions after motion practice on

6  October 17, 2005.

7     **C.**    **Plaintiffs' Allegations**

8        5.     The FAC, the operative complaint which seeks monetary

9  damages and injunctive relief, alleges claims for violation of Sections 1 and 2 of the

10  Sherman Act, and violation of Section 7 of the Clayton Act.

11     **D.**    **Defendants' Response**

12        6.     Defendants answered the FAC in July 2006, raising numerous

13  defenses, including statute of limitations, laches, proximate cause, standing, and

14  *bona fide* business competition.

15     **E.**    **Discovery**

16        7.     The Action entered the discovery phase in August 2005.

17  Plaintiffs took substantial factual and expert discovery relating to liability, damages

18  and class certification issues.

19        8.     Plaintiffs reviewed and analyzed over 400,000 pages of

20  documents produced by Defendants and third parties, conducted one deposition

21  pursuant to Fed. R. Civ. Proc. Section 30(b)(6), and deposed fourteen fact witnesses

22  as follows:

23

| Date | Deponent | Description of Deponent |
|------|----------|-------------------------|
| 07/14/06 | Trent Anderson | Former employee of Kaplan |
| 02/22/06, | Richard Conviser | CEO of BAR/BRI |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

| 2/23/06 | ("Conviser") | |
| 07/11/06 | John Costonis | Chancellor of Louisiana State University |
| 01/06/06 | Robert Feinberg | President and CEO of PMBR |
| 06/20/06 | Jonathan Grayer | Chairman and CEO of Kaplan |
| 06/13/06 | Kandace Kukas | Marketing director for the North Atlantic region of Kaplan |
| 07/20/06 | Ian MacDiarmid | Former employee of Kaplan |
| 06/21/06 | David Oliveiri | Former employee of Thomson Corporation |
| 02/14/06 | John Perovich | Former employee of Thomson Corporation. |
| 7/14/06 | John Polstein | CEO of the Test Prep Division at Kaplan. |
| 07/07/06 | Andrew Rosen | COO at Kaplan. |
| 02/07/06 | Brian Sacks | Western regional director at BAR/BRI. |
| 06/14/06 | Donna Skibbe | Employee of Kaplan and a former employee of BAR/BRI and West Bar Review ("West Bar"). |
| 06/23/06 | Michael Suchsland | Executive at BAR/BRI |

9.    Defendants deposed the seven Plaintiffs as well as non-party

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   witnesses Jack Goetz, Hugh Reed and Stanley Chess.

2      10.   The Settling Parties also conducted extensive expert discovery,
3   including eight depositions of five different expert witnesses.

4      11.   Plaintiffs and Defendants had a series of discovery disputes.
5   These discovery disputes resulted in a number of motions to compel before this
6   Court and Special Discovery Master John Francis Carroll, whose appointment was
7   also the subject of motion practice.

8   **F.   Class Certification**

9      12.   On March 13, 2006, Plaintiffs filed their motion for class
10  certification. Defendants raised many challenges, including the relevant market
11  definition, antitrust impact and the existence of a formulaic approach to damages.

12     13.   On May 15, 2006, after comprehensive briefing, including the
13  submission of detailed expert declarations and exhibits as well as extended oral
14  argument, the Court certified a national class defined as: "All persons who
15  purchased a bar review course from BAR/BRI in the United States from 1997 to the
16  present." *See* Order filed May 15, 2006 (the "Class Certification Order").

17     14.   The Court appointed Plaintiffs as the Class Representatives.

18     15.   On June 29, 2006, after reviewing submissions from Plaintiffs
19  and Defendants concerning the proposed plan of notice to the Class, the Court
20  issued an Order Re Class Notice (the "Class Notice Order") which approved the
21  proposed form of notice, and provided for dissemination by: (a) first-class mail; (b)
22  in national publications; and (c) over the Internet. In accordance with the Class
23  Notice Order, the Class Action Notice was disseminated in July 2006. The Class
24  Action Notice provided Class Members the opportunity to request exclusion from
25  the Class.

26     16.   Defendants filed a petition with the Court of Appeals for the
27  Ninth Circuit for leave to file an appeal regarding the Class Certification Order.

Plaintiffs filed an extensive opposition. The Ninth Circuit denied Defendants' petition on August 11, 2006.

### G.    Trial

17.    The original trial date for this Action was set for June 20, 2006.

18.    At the request of the parties the trial date was continued to September 12, 2006. The Court later continued the trial date to February 13, 2007 *sua sponte* .

### H.    Summary Judgment

19.    On July 17, 2006, Kaplan filed a motion for summary judgment seeking to dismiss Count II of the FAC (the only count against Kaplan). Plaintiffs opposed the motion and subsequently sought leave to file two supplemental opposition briefs to the motion, which the Court granted. The Court denied Kaplan's motion for summary judgment. *See* Order filed September 18, 2006.

### I.    Negotiation of the Settlement Agreement

20.    After completion of discovery and with the February trial date approaching, the Settling Parties together with Rodriguez, Nesci, and Gintz (the "Objecting Plaintiffs") engaged in a formal mediation in New York City on November 29, 2006. The Honorable Daniel Weinstein (Ret.) of JAMS, who has substantial experience in resolving antitrust and class action cases, served as mediator. Plaintiffs were represented by Class Counsel; plaintiff Gintz was also present. BAR/BRI was represented by Shearman & Sterling, LLP and Kaplan was represented by Munger, Tolles & Olson LLP. Also present were in-house counsel for Defendants and Conviser.

21.    The record reflects that at all times, the negotiations were at arm's-length and hard fought. The Settling Parties were unable to reach a resolution on November 29, 2006.

22.    Negotiations continued for the next several weeks with the

FINDINGS OF FACT AND CONCLUSIONS OF LAW

assistance of the mediator. Throughout this time, Class Counsel continued to prosecute discovery disputes and prepare for trial. After several weeks of negotiations, an agreement was reached on all Settlement terms (which was supported by the mediator); the Settlement Agreement was executed on February 2, 2007.

23. The Objecting Plaintiffs refused to authorize the execution of the Settlement Agreement on their behalf.

## II. THE TERMS OF THE SETTLEMENT

### A. The Settlement Fund

24. Consistent with the terms of the Settlement Agreement, Defendants paid forty-nine million dollars into an interest-bearing account for the benefit of the Class, which amount, plus interest (hereinafter, "Gross Settlement Fund"), has or will be used to pay for the costs of notice, settlement administration, taxes and attorneys' fees and expenses pursuant to the orders of this Court. After such payments from the Gross Settlement Fund, the balance will be distributed to the Class ("Net Settlement Fund") pursuant to the Plan of Allocation.

### B. Plan of Allocation

25. Under the terms of the Plan of Allocation, the Net Settlement Fund will be distributed *pro rata* based on the amount each Class Member who submits a timely and valid Claim Form ("Authorized Claimant") paid BAR/BRI for the bar review course in relation to the amounts paid by all other Authorized Claimants. For example, if the amount paid for a bar review course by an Authorized Claimant equals 1/100,000 of the aggregate of such amounts paid by all other Authorized Claimants, then the Authorized Claimant will receive 1/100,000 of the Net Settlement Fund. The maximum amount of payment that any Authorized Claimant shall be entitled to receive from the Net Settlement Fund, however, shall not exceed thirty-percent (30%) of the amount the Authorized Claimant paid for the